**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JASON M. BREEZEE, *et al*., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No. 1:23-cv-03392 (BAH) |
| | * | |
| ISLAMIC REPUBLIC | * | |
| OF IRAN, | * | |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT
AND TO TAKE JUDICIAL NOTICE OF EVIDENCE IN PRIOR RELATED CASES**

Plaintiffs, fifty-one American service members and their families, by and through undersigned counsel, submit the following Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Default Judgment and to take Judicial Notice of Evidence in Prior Related Cases:

## I.      INTRODUCTION

This case arises out of the June 25, 1996 terrorist bombing of the United States Air Force housing complex at Khobar Towers in Dhahran, Saudi Arabia. A gasoline tanker, modified to serve as a bomb, exploded with the force of 20,000 pounds of TNT next to the Khobar Towers complex, housing coalition forces "charged with monitoring Iraq's compliance with United Nations Security Council Resolutions…" Pls.' Amended Compl ("Amended Compl.") ¶ 63, ECF No. 1. The bombing killed nineteen American service members and wounded hundreds of others, including twelve (12) of the service member plaintiffs in this case. The total plaintiffs in the instant case also include twenty (20) immediate family members of the twelve injured service members, eighteen (18) immediate family members of injured airmen who were plaintiffs in *Schooley v.*

*Islamic Republic of Iran*, 17-1376 (D.D.C. 2019), and one (1) immediate family member of an injured airmen who was a plaintiff in *Ackley v. Islamic Republic of Iran*, 20-621 (D.D.C. 2022), previous actions arising out of the Khobar Towers bombing, who were awarded compensatory damages. Plaintiffs allege that the Islamic Republic of Iran (hereinafter "Iran") orchestrated the attack and is liable for plaintiffs' claims under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A. The defendant has failed to enter an appearance, or defend against this action, despite being properly served, pursuant to 28 U.S.C. § 1608(a)(4). *See* Return of Service/Affidavit of Summons and Complaint Executed, ECF. No. 13; Clerk's Entry of Default, ECF No. 15. Plaintiffs request that this Court enter judgment in their favor against the defendant Iran and grant plaintiffs compensatory damages including pain and suffering, solatium, and punitive damages.

## II.    BACKGROUND

### A.  Procedural History

Plaintiffs commenced this action on November 11, 2023. ECF No. 1. Consistent with 28 U.S.C. § 1608(a)(3), necessary papers were sent via FedEx to defendant on January 3, 2024. ECF Nos. 8 & 9. When service under 28 U.S.C. § 1608(a)(3) could not be completed, plaintiffs requested service under 28 U.S.C. § 1608(a)(4). ECF No. 11. The necessary papers were then issued via diplomatic channels consistent with 28 U.S.C. § 1608(a)(4) on January 18, 2024. ECF No. 12. Subsequently, the defendant was properly served via diplomatic channels by the United States State Department pursuant to 28 U.S.C. §1608(a)(4). ECF No. 13. Defendant failed to respond or file an answer to the complaint filed against them within the 60 days allowed for foreign defendants under 28 U.S.C. §1608(d).

Plaintiffs filed an Affidavit in Support of Default against the defendant on July 8, 2024. ECF No. 14. The Court issued an Entry of Default on July 9, 2024. ECF No. 15. On September

27, 2024, Plaintiffs filed an amended complaint adding additional plaintiffs to this case. ECF No. 16.

### B. The Court May Take Judicial Notice of Evidence Establishing the Same Defendant's Liability for the June 25, 1996 Terrorist Attack on Khobar Towers

Rule 201 of the Federal Rules of Evidence authorizes a court to take judicial notice, on its own or at the request of a party, of adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(a)–(c). The United States Court of Appeals for the District of Columbia recognizes that "[i]t is settled law that the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties." *Veg-Mix Inc. v. USDA*, 832 F.2d 601, 607 (D.C. Cir. 1987). And, "a court may take judicial notice of related proceedings and records in cases before the same court." *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 263 (D.D.C. 2006) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp.2d 105, 109 n.6 (D.D.C. 2005)).

This Court should take judicial notice of the related records and proceedings from other cases before the District Court for the District of Columbia, where Iran has already been found liable for this same attack, including *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) (*Heiser I*); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (2006); *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010); and *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181 (D.C. 2008). All of these cases arose out of the bombing of Khobar Towers and address identical issues regarding the liability of Iran for the attack on Khobar Towers.

In *Blais* and *Heiser I*, the Court heard extensive evidence, including expert testimony, and held that Iran was liable for the same June 25, 1996, terrorist attack on the Khobar Towers at issue

in this case. *Heiser I*, 466 F. Supp. 2d at 265; *Blais*, 459 F. Supp. 2d at 48.  In the *Rimkus* case, the court took judicial notice of the findings in *Blais* and *Heiser I* to impose liability for the same attack on Iran as well. *Rimkus,* 575 F. Supp. 2d at 195. This has been the overwhelming trend in all subsequent cases arising out of the Khobar Towers attack. *See, e.g., Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) (Howell, C.J.);  *Schooley v. Islamic Republic of Iran*, No. CV 17-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, No. CV 19-CV-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 25, 2019) (Howell, C.J.); *Christie v. Islamic Republic of Iran*, No. CV 19-CV-1289 (BAH), 2020 WL 3606273 (D.D.C. Jul.. 2, 2020) (Howell, C.J.); *Blank v. Islamic Republic of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) (Howell, C.J.); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL 3354720 (D.D.C. August 12, 2022) (Howell, C.J.); *Mustard v. Islamic Republic of Iran*, No. 21-cv-163 (BAH), 2023 WL 1778193 (D.D.C. February 6, 2023) (Howell, C.J.); *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (August 15, 2023); *Thole v. Islamic Republic of Iran*, 23-cv-793 (BAH), 2024 WL 2208208 (May 16, 2024); *Estate of Johnson v. Islamic Republic of Iran*, 23-cv-1689 (BAH), 2024 WL 3225954 (D.D.C. June 28, 2024).

Defendant defaulted and did not appear in the *Blais*, *Heiser I, Rimkus, Valencia, Akins, Aceto, Christie*, *Schooley*, *Ackley*, *Mustard*, *Gration*, *Thole*, and *Estate of Johnson* cases, just as it has defaulted and refused to appear in this case. Plaintiffs here are similarly situated in all respects to plaintiffs in those cases. Indeed, eighteen of these plaintiffs are family members of service members who were plaintiffs in *Schooley*, and one plaintiff is a family member of a service member plaintiff in *Ackley*.

The District Court in *Harrison*, in a discussion of the issue of whether to take judicial notice of *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D.Va 2007), a related proceeding arising out of the bombing of the U.S.S. Cole case, concluded:

> **"The statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack,"** *Rimkus v. Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010). Thus, when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may "rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced." *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011).

*Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 30-31 (emphasis added).

In similarly taking judicial notice of the proceedings set forth in prior Khobar Towers FSIA litigation in *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010), the Court concluded that judicial notice of a prior case is permissible "because the validity of judicial records is generally 'not subject to reasonable dispute,' and such records are capable of establishing the type and substance of evidence that was presented to earlier courts. The objective issue of what that evidence was — rather than the subjective determination of what that evidence means — is thus a proper exercise of judicial notice." *Id*.

The taking of judicial notice of the prior Khobar cases does not conclusively establish the facts found in those cases, or the liability of the defendant in the instant case. Iran did not appear in those cases and was not represented by counsel, and the plaintiffs here were not plaintiffs in those case. However, "'[T]he FSIA does not require this Court to re-litigate issues that have already been settled' in previous decisions." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010).  Instead, this Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence. *Heiser I*, 466 F.

Supp. 2d at 264 (reconsidering evidence presented in *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (2006)). In rendering default judgment against the defendant, this Court is therefore required to find facts and make legal conclusions anew.

In *Heiser I*, evidentiary hearings were held on December 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 16, 18 and 19, 2003 and on February 5, 6, 9 and 10, 2004, *Heiser I,* 466 F. Supp. 2d at 250; in *Blais* on May 26, 2006, *Blais,* 459 F. Supp. 2d at 46 n.4.; and in *Rimkus* on January 4, 2008, *Rimkus,* 575 F. Supp. 2d at 185.

The plaintiffs in *Blais* presented the investigations and opinions of Louis Freeh, the FBI Director at the time of the Khobar bombing, and Dale Watson, the Deputy Counterterrorism Chief of the FBI, who after the bombing became Section Chief for all international terrorism. Dr. Bruce Tefft, one of the founding members of the CIA's counterterrorism bureau in 1985, was qualified as an expert and testified about Defendants' involvement in sponsoring terrorism. *Blais* Tr. 6, 8.[1]

The *Heiser I* plaintiffs, in addition to the evidence presented in *Blais*, presented live testimony from Mr. Freeh, additional statements from Mr. Watson and Dr. Tefft, and the testimony of Middle East expert Dr. Patrick Clawson who studies Iranian sponsorship of terrorism. Dr. Clawson's expert opinion regarding the perpetrators of the Khobar Towers bombing was based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject. *Heiser I* Ex. 9 at 62–63. As detailed in the paragraphs below, the evidence in those cases established the defendant's liability for the plaintiffs' injuries as a result of the terrorist bombing of Khobar Towers.

---

[1] References to the transcripts of the hearings held in *Blais* and *Heiser I* will be abbreviated throughout as "Tr." References to exhibits admitted into evidence in those hearings will be abbreviated "Ex."

The United States military presence in Saudi Arabia was with the consent of that host country. *Blais* Ex. 14 at 3. It was part of a coalition of forces, primarily from the United States, Great Britain, and France that was charged with monitoring Iraq's compliance with United Nations Security Council resolutions enforcing the cease-fire that had brought an end to the 1991 Gulf War "Operation Desert Storm" ejection of Iraqi occupying forces from Kuwait. *Id.* at 3-4; *Blais* Tr. at 40-41.

The deployment of U.S. troops to the region was considered a peacetime deployment within a friendly host country. *Blais* Tr. at 42-43. Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces assigned to Operation Southern Watch, charged with monitoring compliance with U.N. Security Council resolutions after the end of the Gulf War. *Blais*, Tr. 41.

At approximately ten minutes before 10 p.m. on June 25, 1996, a large gasoline tanker truck pulled up alongside the perimeter wall of the Khobar Towers complex. The driver jumped out, ran into a waiting car that had pulled up near the truck, and sped off. *Blais*, Tr. 9-10.

Although security guards on top of Building 131 started to give warnings about the unusual vehicle location, the truck exploded with great force within about 15 minutes. The investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT. The Defense Department said that it was the largest non-nuclear explosion ever up to that time. *Blais*, Tr. 10.

The explosion sheared off the face of Building 131, which housed members of the U.S Air Force 4404th Wing (Provisional) and damaged every other building in the complex. Nineteen United States Air Force personnel were killed in the explosion, and hundreds of others were injured. *Blais*, Tr. 11; Ex. 2. The bomb left a crater 55 feet across and 16 feet deep (Perry D.

Jamieson, *Khobar Towers Tragedy and Response*, 55, 2008. https://media.defense.gov/2010/Oct/29/2001330162/-1/-1/0/AFD-101029-033.pdf (last visited November 17, 2024).

The Khobar Towers suites were built with sliding glass doors on the day room balconies and large windows in the stairwells. *Id.* at 13-14. The bomb "blasted window panes into dangerous spears of glass." *Id*. at 56. The glass shards in most cases were blown into the rooms, not out, causing most of the injuries. *Id.* Many airmen were getting ready for bed or relaxing in slippers, socks or barefoot in their living areas and were forced to escape the buildings in bare feet over strewn glass fragments. *Id*. at 47. A few minutes after the bomb exploded, well-meaning local Saudis tried to enter the compound to offer help, leading to a false alarm of a follow-on attack and creating additional panic. *Id*. at 57. The Khobar Towers dining facility, the Desert Rose "chow hall", was soon turned into a make-shift triage area and injured airmen were also treated at the nearby medical clinic in Building 111. *Id.* at 57.

The attack was carried out by individuals recruited principally by a senior official of Iran's Islamic Revolutionary Guard Corp (IRGC)[2] Brigadier General Ahmed Sharifi. Sharifi, who was the operational commander, planned the operation and recruited individuals for the operation at the Iranian embassy in Damascus, Syria. He provided the passports, the paperwork, and the funds for the individuals who carried out the attack. *Blais*, Tr. 12-13; Ex. 13.

The truck bomb was assembled at a terrorist base in the Bekaa Valley in Lebanon which was jointly operated by the IRGC and by the terrorist organization known as Hezbollah. *Blais*, Tr.

---

[2] The IRGC "acts as a military arm of the government, has been recognized as an "integral part of Iran's political structure" and part of the state. *See, e.g.*, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 180 (D.D.C. 2010) (holding under FSIA, the IRGC "acts as a military arm of the government [ ] and . . . "constitute[ ] integral parts of Iran's political structure, and thus constitute[s] a foreign state").

13. The individuals recruited to carry out the bombing referred to themselves as "Saudi Hezbollah," and they drove the truck bomb from its assembly point in the Bekaa Valley to Dhahran, Saudi Arabia. *Id.*

The terrorist attack on the Khobar Towers was approved by Ayatollah Khamenei, the Supreme leader of Iran at the time. *Blais*, Tr. 13-14. It was also approved and supported by the Iranian Minister of Intelligence and Security ("MOIS")[3] at the time, Ali Fallahian, who was involved in providing intelligence security support for the operation. *Blais*, Tr. 14. Fallahian's representative in Damascus, a man named Nurani, also provided support for the operation. *Id.*

Under Director Louis Freeh, the FBI conducted a massive and thorough investigation of the attack, using over 250 agents. *Blais*, Ex. 4 at 37. Based on that investigation, an Alexandria, Virginia, grand jury returned an indictment on June 21, 2001, against 13 identified members of the pro-Iran Saudi arm of the Hezbollah organization. The indictment's description of the plot to bomb the Khobar Towers complex frequently refers to direction and assistance from Iranian government officials. *Blais*, Tr. 25-26; Exs. 7, 7A.

In addition, as a result of this investigation, the FBI also obtained a great deal of information linking the defendants to the bombing from interviews with six admitted members of the Saudi Hezbollah organization, who were arrested by the Saudis shortly after the bombing. *Heiser I*, Dec. 18, 2003 Tr. at 11-30.

---

[3] Like the IRGC, MOIS is a political organ of the state of Iran that has been recognized by several courts in this district as a "division of the state of Iran". *See, e.g.*, *Valore*, 700 F. Supp. 2d at 65 (holding MOIS is subject to suit under 1605A as part of the state of Iran); *see also*, *Rimkus*, 750 F. Supp. 2d 163, 180 (D.D.C. 2010) (holding under FSIA, "MOIS is a division of the state of Iran" and an " integral part[ ] of Iran's political structure, and thus constitute a foreign state"); *Blais v. Islamic Rep. of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006) (Lamberth, J.) (concluding that both MOIS and IRGC are liable under terrorism exception to jurisdiction of the FSIA as part of the state).

These six individuals admitted to the FBI their complicity in the attack on the Khobar Towers and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers. *Heiser I*, Ex. 7 at 11, 13–14, 27; *see also Heiser I*, Dec. 18, 2003 Tr. at 24–30. The six individuals also indicated that the selection of the target and the authorization to proceed was done collectively by Iran, MOIS, and IRGC, though the actual preparation and carrying out of the attack was done by the IRGC. *Heiser I*, Dec. 18, 2003 Tr. at 25.

According to Director Freeh, the FBI obtained specific information from the six about how each was recruited and trained by the Iranian government in Iran and Lebanon, and how weapons were smuggled into Saudi Arabia from Iran through Syria and Jordan. One individual described in detail a meeting about the attack at which senior Iranian officials, including members of the MOIS and IRGC, were present. (*Heiser I*, Dec. 18, 2003 Tr. at 23.) Several stated that IRGC directed, assisted, and oversaw the surveillance of the Khobar Towers site, and that these surveillance reports were sent to IRGC officials for their review. Another told the FBI that IRGC gave the six individuals a large amount of money for the specific purpose of planning and executing the Khobar Towers bombing.

Director Freeh has publicly and unequivocally stated his firm conclusion, based on evidence gathered by the FBI during their five-year investigation, that Iran was responsible for planning and supporting the Khobar Towers attack. *Blais*, Ex. 3 at 16; Exs. 5, 3; Tr. at 19-20, 23.

Dr. Clawson testified that the government of Iran formed the Saudi Hezbollah organization. *Id*. at 56. He testified as to the defendants' state-sponsorship of terrorism, noting that at the time of the Khobar Towers bombing, Iran spent an estimated amount of between $50 million and $150 million on terrorist activities. *Heiser I*, Ex. 10 at 46.

10

In light of all these facts, Dr. Clawson stated conclusively his opinion that the government of Iran, MOIS, and IRGC[4] were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction. *Heiser I*, Ex. 9 at 67–68.

Dr. Bruce Tefft, who testified as an expert in *Blais*, was one of the founding members of the CIA's counterterrorism bureau in 1985. *Blais*, Tr. 6, 8. He served in the CIA until 1995, and continued to work as a consultant on terrorism, including work as an unofficial adviser to the New York Police Department's counterterrorism and intelligence divisions. *Blais*, Tr. 6. He retained a top-secret security clearance in connection with his work. *Id.* He had been qualified as an expert witness in numerous other cases involving Iranian sponsorship of terrorism. *Blais*, Ex. 1 at 3.

Dr. Tefft expressed the opinion that defendants Iran and the IRGC were responsible for planning and supporting the attack on the Khobar Towers, including providing operational and financial support. He stated that there was "no question about it. It wouldn't have happened without Iranian support." *Blais*, Tr. 43. Dr. Tefft based his conclusion on publicly available sources that were not inconsistent with classified information known to him from his time at the CIA and from his security clearances since that time. He relied on the public sources described above, as well as several others, which he described as authoritative and reliable, including congressional testimony by Matthew Levitt, senior fellow and director of the Washington Institute's Terrorism Studies Program, and articles published by the Federation of American Scientists as well as the Free Muslims Coalition. *Blais*, Exs. 8, 11, 12; Tr. 28-29, 31-33.

Accordingly, Plaintiffs' motion asking the Court to take judicial notice of prior findings of fact and supporting evidence imposing liability under Section 1605A (and its predecessor, Section

---

[4] The IRGC and MOIS are not defendants in this case; the disclosure of facts herein is for informational purposes only, notwithstanding that they were defendants in *Heiser I* and *Heiser II* and other terrorism cases.

1605(a)(7)) on Iran for providing material support and resources to the terrorists who attacked the Khobar Towers complex on June 25, 1996, is well-supported and is well grounded in the cases of this Court. There is no reason deviate from precedent here.

### C. The Instant Plaintiffs

The plaintiffs in this action include twelve (12) service members who "suffered physical and/or emotional injuries as a result of the terrorist attack" on Khobar Towers, Amended Compl. ¶ 1, twenty (20) of their immediate family members; eighteen (18) immediate family members of injured airmen who were plaintiffs in *Schooley*, and one (1) immediate family member of an injured airman who was a plaintiff in *Ackley*. The service member plaintiffs, and where applicable, the family member plaintiffs, are described below.

#### 1. *Jason M. Breezee*

On June 25, 1996, Senior Airman Jason M. Breezee was deployed to Khobar Towers in Dhahran, Saudi Arabia, with the 4404th Maintenance Squadron as an aerospace ground equipment mechanic. Decl. of Jason M. Breezee ("Jason Breezee Decl.") (October 14, 2024) ¶ 3. That evening, as he used the restroom in his dorm in Building 110, a massive explosion erupted, shaking the building "like an earthquake" and causing the bathroom windows to implode. Jason Breezee Decl. ¶¶ 5-6. The force of the blast launched him into the bathtub, where he sustained a glass laceration to his finger. *Id.* ¶ 6. Jason crawled out of the bathroom to find his roommate bleeding and quickly evacuated. *Id.*

Outside, Jason encountered "utter chaos." *Id.* Driven by instinct despite his own injuries, he assisted others by making makeshift splints from belts and broken chair legs to stabilize the broken bones of fellow airmen and helped them down the stairs to get them to triage. *Id.* After the bombing, he returned to work, but the constant fear of another attack left him in a state of relentless

anxiety. *Id*. ¶ 7. He recalls with lingering horror the chilling sight of the 19 bodies of his fallen comrades being moved into the air-conditioned trailer that once served as a dining area, forever imprinting that scene in his memory. *Id*. ¶ 8.

The aftermath of the bombing left Jason struggling with profound psychological trauma. *Id*. ¶¶ 9-10. He suffers from PTSD, including survivor's guilt, insomnia, and intense discomfort in crowded spaces. *Id*. "I really don't like being around people," he explains, acknowledging the anger that arises easily and the difficulty he faces in trusting others. *Id*. ¶ 9. Loud noises trigger severe anxiety, often sending him "crawling out from under the kitchen table," actions that leave him feeling isolated and misunderstood even within his own family. *Id*. ¶ 10. Jason continues to grapple with the haunting memories and trauma of that tragic night, questioning why he survived when so many of his friends did not. *Id*.

The U.S. Department of Veterans Affairs has recognized the extent of Jason's injuries and awarded him a 100% disability rating, including 50% for PTSD, 50% for sleep apnea, and 10% for tinnitus—all directly related to the Khobar Towers bombing. *Id*. ¶ 11; Exhibit 7 (VA ebenefits website disability ratings page).

### 2. *One Family Member of Airman Shannon K. Bump*

Shannon K. Bump, a Master Sergeant in the United States Air Force, stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *6. He was injured in the bombing and was awarded $3 million for his pain and suffering. *Id*. at *6 & *75. His son, Kyle M. Bump, is a plaintiff in this lawsuit.

### a. Kyle M. Bump-Son

Kyle M. Bump, the son of *Schooley* plaintiff Shannon K. Bump, was only a year old at the time of the Khobar Towers bombing ("Kyle Bump Decl.") (October 14, 2024) ¶ 2 & 6. His father

sustained glass shrapnel wounds and developed PTSD following the attack. *Id*. ¶ 5. Kyle grew up hearing stories about how his father was once an easygoing and carefree individual but became short-tempered and emotionally distant after the bombing. *Id*. ¶ 6.

Kyle grew up in fear of his father's temper, noting that it took very little to anger him. "I was scared to go to him about anything…" he says, out of fear that his father might lose his temper. *Id*. ¶ 6. This strained relationship led Kyle to rely more heavily on his mother and created a lasting emotional distance between him and his father. *Id*. ¶ 8. The attack robbed him of the opportunity to have the strong, supportive relationship with his father that he desired, and "led to a painful transition into [his] teenage and adult years, living in a household where the fear of triggering or upsetting [his] father led [him] to hide away and shut [himself] in [his] room." *Id*.

### 3.  *Two Family Members of Airman Dwayne A. Burnham*

Dwayne A. Burnham, a Senior Airman in the U.S. Air Force, stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *42. He was injured in the bombing and was awarded $6 million for his pain and suffering. *Id*. at *75. Two of his family members are plaintiffs in this lawsuit: his brother, Christopher L. Burnham, and his sister, Sandra B. Madden.

#### a. Christopher L. Burnham-Brother

Christopher Burnham is the brother of *Schooley* plaintiff Dwayne Burnham. Decl. of Christopher L. Burnham ("Christopher Burnham Decl.") (October 14, 2024) ¶ 2. Christopher's parents called him to tell him about the attack. Christopher Burnham Decl. *Id*. ¶ 6. They didn't know until a day later that Dwayne had survived. *Id*. Christopher says, "It was the longest day of my life, waiting for that news." *Id*. Christopher describes how the Khobar Towers bombing changed his relationship with his brother, Dwayne. ¶¶ 6-7. Dwayne sustained glass shrapnel

injuries and developed PTSD. *Id*. ¶ 5. Upon returning home, Dwayne became withdrawn and on edge, a stark contrast to the close relationship they once shared. *Id*. ¶ 7. Christopher feels that he lost his brother that day, and their sibling bond deteriorated. *Id*.

**b. Sandra B. Madden-Sister**

Sandra B. Madden is the sister of *Schooley* plaintiff Dwayne Burnham. Decl. of Sandra B. Madden ("Sandra Madden Decl.") (October 14, 2024) ¶ 2. She heard about the Khobar Towers attack from her sister. Sandra Madden Decl. ¶ 6. Her immediate thoughts were of her brother Dwayne and his safety. *Id*. She felt immense anxiety and panic, not knowing if her brother had survived or was injured. *Id*. It wasn't until the next day that the family was informed that Dwayne had survived, although he had suffered multiple lacerations from glass shrapnel and developed PTSD as a result of the attack. *Id*. ¶¶ 5-6. Sandra continued to worry about Dwayne's mental and emotional state, even after learning he was physically safe. *Id*. ¶ 6. Sandra states, "I was in fear of another attack. I couldn't wait for him to get home so that I could see for myself that he was okay." *Id*. ¶ 7.

**4. *Two Family Members of Airman Salvatore Capaccio***

Salvatore Capaccio, a Senior Airman in the U.S. Air Force, stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *50. He was injured in the bombing and was awarded $7 million for his pain and suffering. *Id*. at *75. Two of his family members are plaintiffs in this lawsuit: his half-sister, Alexandria L. Capaccio, and his brother, Vincent D. Capaccio.

**a. Alexandra L. Capaccio-Half-Sister**

Alexandria L. Capaccio is the half-sister of *Schooley* plaintiff Salvatore Capaccio. Decl. of Alexandria L. Capaccio ("Alexandria Capaccio Decl.") (October 28, 2024) ¶ 2. Alexandria recalls

her fear and trauma as a young child when she learned of the Khobar Towers bombing; she was seven years old at home with her parents when she heard her mother screaming and crying. Alexandria Capaccio Decl. ¶ 6. It was at least into the following day before she found out her brother survived *Id*. Alexandria suffered extreme emotional distress following the events of the Khobar Towers; she started sleeping with her mother out of fear, and experienced recurring nightmares of her brother being blown up. *Id*. ¶ 6. Every time Salvatore was deployed afterward, she was gripped with fear and anxiety, leading to a long-lasting emotional impact. *Id*. ¶ 7.

### b. Vincent D. Capaccio-Brother

Vincent D. Capaccio is the brother of *Schooley* plaintiff Salvatore Capaccio. Decl. of Vincent D. Capaccio ("Vincent Capaccio Decl.") (October 14, 2024) ¶ 2. Vincent was 14 years old when Salvatore was injured in the Khobar Towers bombing. Vincent Capaccio Decl. ¶ 6. His mother told him that his brother was involved in a terrorist attack, which caused Vincent extreme worry about his big brother. *Id*. Vincent and Salvatore's once close relationship became distant after the attack. *Id*. ¶ 7. The emotional and physical trauma Salvatore endured strained their family dynamic, and Vincent's own life took a downward spiral, leading to issues with substance abuse and emotional challenges. *Id*. ¶¶ 7-9.

### 5. *Four Family Members of Airman Artis R. Coleman*

Artis R. Coleman, a Staff Sergeant in the U.S. Air Force stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *19. He was injured in the bombing and was awarded $7 million for his pain and suffering. *Id*. at *75. Four of his family members are plaintiffs in this lawsuit: his brothers Anthony J. Coleman, Jason L. Coleman, Phillip Coleman, Jr. and Temeke Coleman.

### a. Anthony J. Coleman-Brother

Anthony J. Coleman is the brother of *Schooley* plaintiff Artis R. Coleman. Decl. of Anthony J. Coleman ("Anthony Coleman Decl.") (October 30, 2024) ¶ 2. Anthony learned of the Khobar Towers bombing from his brother Artis' wife. Anthony Coleman Decl. ¶ 6. He suffered unbearable days of waiting for more information about Artis' condition after the attack. *Id*. Artis was severely injured, suffering brain damage and an aneurysm in 1997, which forced him to give up his military career. *Id*. ¶¶ 5-7. Anthony assisted in Artis' recovery, helping him walk and care for himself. *Id*. ¶¶ 7-8. The emotional toll of the bombing left Anthony in a state of depression, always worried about his brother's condition, and knowing that his brother would never be the same again. *Id*. ¶ 9.

### b. Jason L. Coleman-Brother

Jason L. Coleman is the brother of *Schooley* plaintiff Artis R. Coleman. Decl. of Jason L. Coleman ("Jason Coleman Decl.") (November 1, 2024) ¶ 2. After learning about the bombing from Artis' wife, Jason spent several days in disbelief and fear that there was a bombing and that his brother was hurt. Jason Coleman Decl. ¶ 7. When Artis returned, Jason was grateful to see him alive, but Artis was never the same. *Id*. ¶ 8-12. Jason helped care for Artis, assisting with his mobility and daily struggles. *Id*. ¶ 8. Jason says that he was "very sad, angry, and upset seeing [his] brother going through this." *Id*. The attack ended Artis' military career, but Jason remains thankful for his survival, despite the deep emotional scars. *Id*. ¶¶ 11-12.

### c. Phillip Coleman, Jr.-Brother

Phillip Coleman Jr., is the brother of *Schooley* plaintiff Artis R. Coleman. Decl. of Phillip Coleman, Jr. ("Phillip Coleman Decl.") (October 15, 2024) ¶ 2. Phillip learned of the attack when his sister called to tell him that Artis was in Khobar Towers. Phillip Coleman Decl. ¶ 6.

Immediately, Phillip felt confused, upset, and terrified for his brother's fate. *Id*. It took several days before the family learned that Artis had survived. *Id*. During this agonizing wait, Phillip couldn't sleep and cried constantly, fearing the worst. *Id*.

When Phillip was finally reunited with Artis, he was so happy to see him. *Id*. ¶ 7. However, it was immediately clear that Artis was no longer the same. *Id*. Artis had sustained severe injuries, including paralysis on one side of his body, and required round-the-clock care. *Id*. ¶¶ 6 & 7. Phillip took a leave of absence from his job to help care for his brother. *Id*. ¶ 7. He assisted with Artis' daily needs—bathing him, cooking for him, feeding him, and taking him to his doctor's appointments. *Id*.

Phillip experienced devastation over what happened to his brother. *Id*. ¶ 10. He says, "It hurts to see him struggle every day." *Id*. This emotional toll led Phillip to seek solace through prayer, often visiting his pastor for support. *Id*. ¶ 8. He remains thankful that Artis survived, but laments how much the attack has changed their lives. *Id*. ¶ 9.

### d. Temeke Coleman-Brother

Temeke Coleman is the brother of *Schooley* plaintiff Artis R. Coleman. Decl. of Temeke Coleman ("Temeke Coleman Decl.") (October 30, 2024) ¶ 2. Temeke and Artis were very close, growing up together and sharing family activities. Temeke Coleman Decl. ¶ 6. On June 25, 1996, while at his mother's house, Temeke received a call from Artis' wife about the bombing at Khobar Towers. *Id*. ¶ 7. He was immediately fearful and began searching for information, speaking with family and watching the news. *Id*. For several agonizing days, they did not know if Artis was alive, and Temeke was filled with fear and uncertainty. *Id*.

When they finally received word that Artis had survived, Temeke was overjoyed, describing it as "a God answered prayer." *Id*. ¶ 8. However, he struggled seeing his brother unable

to walk and suffering from seizures. *Id*. He supported him in any way he could, including helping him walk and manage daily tasks. *Id*. Temeke is grateful for Artis' survival and admires his resilience, despite having to give up his dream career. *Id*. ¶ 9.

### 6. *Bradley J. Donaghue*

On June 25, 1996, Bradley Donaghue was an Airman First Class stationed at Khobar Towers, Dhahran, Saudi Arabia, as part of the 4404th Maintenance Squadron. Decl. of Bradley J. Donaghue ("Bradley Donaghue Decl.") (October 15, 2024) ¶ 3. At the time of the bombing, he was working on an F-16 jet, performing an inspection on the flight line about a quarter of a mile from the blast site. Bradley Donaghue Decl. ¶ 5. When the bomb detonated, the force of the explosion blew him out of the jet's exhaust pipe, causing him to fall four to five feet onto the concrete. *Id*. Bradley was knocked unconscious, and upon regaining consciousness, he initially could not see and experienced severe ringing in his ears. *Id*. He describes the chaos after the explosion, "I was dizzy, nauseous, and left with a headache that lasted for days." *Id*. He later helped carry injured comrades down the stairs using a door that had blown off its hinges. *Id*. ¶ 6.

The bombing caused Bradley long-term physical and emotional trauma. *Id*. ¶ 10. His knees and back continue to give him trouble, limiting his ability to enjoy running. *Id*. ¶ 9. The haunting images of his dead comrades and devastation has left a permanent mark on him; he says, "The destruction and bloody images are engraved in my brain and haunt me daily." *Id*. ¶ 10. His emotional trauma led to PTSD, anxiety, and strained relationships at home and work. *Id*. These mental health challenges directly contributed to the end of his first marriage and estrangement from his two sons. *Id*.

Bradley has a combined 90% VA rating, with 40% for traumatic brain injury with benign paroxysmal position vertigo, and 50% for post-traumatic headaches as secondary to traumatic

brain injury with benign paroxysmal positional vertigo, both of which conditions resulted from the Khobar Towers bombing. *Id*. ¶ 13; Exhibit 3 (Letters from VA, dated August 12, 2024; August 8, 2024).

### 7. Two Family Members of Airman Thomas F. Edman

Thomas F. Edman, a Captain in the U.S. Air Force stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *8. He was injured in the bombing and was awarded $6 million for his pain and suffering. *Id*. at *75. Two of his children are plaintiffs in this lawsuit: his daughter, Emily R. Edman, and his son, Robert R. Edman.

#### a. Emily R. Edman-Daughter

Emily R. Edman, the daughter of *Schooley* plaintiff Thomas Edman, was eight years old at the time of the Khobar Towers bombing. Decl. of Emily R. Edman ("Emily Edman Decl.") (October 31, 2024) ¶¶ 2 & 6. On June 25, 1996, Emily was at home in Virginia with her mother and brother, watching the news when the attack was reported. Emily Edman Decl. ¶ 6. Although her mother reassured them that their father might have been flying, the family spent thirteen agonizing hours not knowing if he was safe. *Id*. Emily recalls this period as "the most terrifying experience of my life," filled with fear and sadness until they finally learned that her father had survived but was injured. *Id*.

When her father returned to the U.S. on June 29, 1996, Emily was overjoyed to see him but felt scared by his condition. *Id*. ¶ 7. She remembers her father on crutches, and despite her young age, she tried to help him as much as she could. *Id*. Over time, Emily noticed a change in her father—he became less social, claustrophobic, and quicker to anger. *Id*.

The trauma of the bombing has stayed with Emily into adulthood. She has sought counseling and was diagnosed with Borderline Personality Disorder, which she believes stems

from the fear and separation she experienced during the attack. *Id.* ¶ 8. The event profoundly affected her, leaving lasting emotional scars. *Id.*

### b. Robert M. Edman-Son

Robert M. Edman was nearly seven years old when his father, *Schooley* plaintiff Thomas Edman, was injured in the Khobar Towers bombing. Decl. of Robert M. Edman ("Robert Edman Decl.") (November 1, 2024) ¶¶ 2 & 6. On June 25, 1996, Robert vividly recalls walking into the living room to see his mother watching the news about the bombing in Saudi Arabia. Robert Edman Decl. ¶ 6. Knowing that his father was deployed there, Robert felt immediate fear and worry. *Id.* His mother shielded him from much of the bad news, but he remembers the relief of seeing his father interviewed on television from a stretcher, knowing that he had survived. *Id.*

As Robert has grown older, he has come to understand the full extent of the trauma his father has endured since the attack. *Id.* ¶ 7. His father continues to suffer from severe claustrophobia, refusing to ride in elevators and choosing to climb stairs regardless of the effort it takes. *Id.* This has worsened as his father has aged and has become a burden on him. *Id.* Robert also reflects on the deep survivor's guilt his father experiences, often waking up in the middle of the night in tears, grieving for the friends he lost in the bombing. "It makes me sad to think about the people who died that day, some of whom were my dad's close friends." *Id.* Robert feels immense sorrow over the lifelong pain his father has had to endure. *Id.*

### 8. *Kenneth P. Giddens and Three Family Members*

### a. Kenneth P. Giddens-Surviving Service Member

On June 25, 1996, Kenneth Giddens was an Airman First Class stationed at Khobar Towers in Dhahran, Saudi Arabia. Decl. of Kenneth P. Giddens ("Kenneth Giddens Decl.") (October 14, 2024) ¶ 3. At the time of the bombing, Kenneth was exercising in the fitness center when he heard

a loud boom and felt the building shake violently. Kenneth Giddens Decl. ¶¶ 5-6. The mirrors on the walls shattered, and he was struck by flying glass, which embedded in his forearms, hands, and legs. *Id*. ¶ 6. Despite his injuries, Kenneth fled the gym, running toward buildings 129 and 131 amidst chaos, dust, and smoke. *Id*. ¶ 7.

During his escape, Kenneth saw several friends injured, one with glass stuck in his head and another leaving bloody footprints behind him. *Id*. After reaching the triage area, he assisted in treating a friend who was covered in glass and bleeding profusely. *Id*. Although he received gauze and bandages for his own wounds, Kenneth insisted the medics prioritize those who were more seriously injured, including his friend with a leg wound. *Id*. ¶ 8.

Kenneth lost two close friends, Brent Marthaler and Earl Cartrette Jr., in the bombing. *Id*. ¶ 9. The horrific events of that night left him struggling with survivor's guilt and PTSD. *Id*. Before the attack, he had no issues with anxiety, depression, or insomnia, but now he suffers from all of them. *Id*. ¶ 10. Loud bangs and unknown noises trigger intense anxiety, and he takes medication to manage these symptoms. *Id*. The emotional toll of the bombing contributed to the end of two marriages, as he felt no one understood what he was going through. *Id*. Kenneth currently holds a 60% VA disability rating, with 50% attributed to PTSD and 10% to tinnitus. *Id*. ¶ 11; Exhibit 8 (VA ebenefits website disability ratings page). Kenneth was awarded the Purple Heart for the injuries he sustained. *Id*. ¶ 11; Exhibits 4 & 5 (Purple Heart Certificate and Special Order, dated August 26, 1996; photograph of Purple Heart ceremony).

Three of Kenneth Giddens' family members are plaintiffs in this lawsuit: his siblings Denise R. Rodriguez, David J. Giddens, and Timothy P. Giddens.

### b. Denise R. Rodriguez-Sister

Denise Rodriguez is the sister of Kenneth Giddens. Decl. of Denise R. Rodriguez ("Denise Rodriguez Decl.") (October 28, 2024) ¶¶ 2 & 4. Denise and Kenneth were very close growing up, doing many things together as children and remaining close into adulthood. Denise Rodriguez Decl. ¶ 5. The last time she saw him before the bombing, they spent time catching up as a family, and Kenneth was helping her prepare for her potential enlistment in the Air Force reserves. *Id*. ¶ 6.

On the morning of June 26, 1996, Denise received devastating news from a family member that there had been a bombing on her brother's Air Force base in Saudi Arabia. She immediately left work, overwhelmed with fear and anxiety. *Id*. ¶ 7. "My heart sank," she states, and she and her mother began contacting the Red Cross, praying for news of Kenneth's safety. *Id*. The waiting period before they learned that he had survived was agonizing, and Denise describes her emotional state during that time as "hysterical." *Id*. When they finally received confirmation that Kenneth was alive but injured, Denise felt immense relief and gratitude, although the pain and uncertainty remained. *Id*. ¶¶ 7-8.

When they were reunited, Denise was overjoyed but soon realized the extent of Kenneth's mental injuries. *Id*. ¶ 9. His physical wounds healed, but his emotional trauma surfaced over time. *Id*. Denise remained by his side, praying for him daily and supporting him through his struggles. *Id*. Her faith and church community helped her cope with the depression she experienced following the attack, and she found strength in knowing that her brother was not going through it alone. "I was always there," she says.  *Id*. ¶¶ 9-10.

Even though they no longer live near each other, Denise's bond with Kenneth remains strong. She continues to pray for him every day, recognizing the deep mental scars he carries, but knowing their relationship will never change. *Id*. ¶ 12.

### c. David J. Giddens-Brother

David J. Giddens, the younger brother of Kenneth Giddens, was stationed overseas with the U.S. Army in Darmstadt, Germany, when he first learned of the Khobar Towers bombing. Decl. of David J. Giddens ("David Giddens Decl.") (October 28, 2024) ¶¶ 4-6. He discovered the attack while watching the Armed Forces Network. David Giddens Decl.¶ 6. Immediately filled with disbelief and concern, David called his mother, who was in regular contact with Kenneth, hoping for updated information. "I was in a state of disbelief trying to comprehend what had happened," David recalls. *Id*. The initial hours were fraught with uncertainty, as no immediate information was available regarding the injured or deceased. *Id*.

After some time, David finally learned from his mother that Kenneth had survived the attack. *Id*. Over the following days, David was in a state of shock, constantly fearing for his own safety, as he was also serving overseas and felt vulnerable to a similar attack. *Id*. ¶ 7. He sought spiritual guidance from the Chaplain during this time to help him cope with his emotions. *Id*.

After the bombing, David became a source of emotional support for his brother, encouraging Kenneth to stay connected with friends and family to avoid feeling isolated. *Id*. ¶ 8. Their bond grew stronger, and communication between them increased significantly. *Id*. ¶ 10. "As we are both members of the armed forces, we had a deeper connection…" David explains, reflecting on how the attack affected their relationship. *Id*.

Even now, David is frequently reminded of the bombing, as Kenneth often brings it up in conversation. *Id*. ¶ 11. Currently stationed overseas, David remains near areas that have

experienced terrorist attacks, and this proximity has heightened his sense of vulnerability, anxiety, and sadness. *Id*. The Khobar Towers bombing continues to affect him deeply. *Id*.

### d. Timothy P. Giddens-Brother

Timothy Giddens is the younger brother of Kenneth Giddens. Decl. of Timothy P. Giddens ("Timothy Giddens Decl.") (October 20, 2024) ¶¶ 4 & 5. On the day of the attack, Timothy was working at Hurlburt Field Air Force Base when he heard about the bombing through the military news. Timothy Giddens Decl. ¶ 6. Initially, Timothy did not know if his brother's unit had been affected, and fear set in as he began asking around for any information about Kenneth. *Id*. "I was scared for my brother…" Timothy recalls, and his concern extended to other friends in his brother's unit. *Id*.

Relief finally came when he learned that Kenneth had survived, but Timothy's relief was clouded by anger at the lack of security provided to Kenneth's unit. *Id*. "I felt angry about the lack of security... and how an attack like this was even possible," he reflects. *Id*. ¶ 7.

When Kenneth returned home to Eglin Air Force Base, Timothy immediately went to see him, finding the dorms filled with injured airmen and their families. *Id*. ¶ 8. "It was a somber event," Timothy remembers, as many had stitches and visible injuries from broken glass. *Id*. Despite the relief of seeing his brother alive, the atmosphere was one of sadness. *Id*.

Over the years, Timothy and Kenneth did not speak much about the attack, but when the subject came up, it was clear that Kenneth still struggled to process the trauma. *Id*. ¶ 9. Timothy has taken on the role of emotional support, trying to be a good listener and offer positivity whenever the memories resurface. *Id*. "I believe the attack strengthened my relationship with my brother," he says, feeling a deeper appreciation for their bond and a need to rally around Kenneth in support. *Id*. ¶ 10.

Timothy regrets that neither he nor Kenneth sought professional help immediately after the attack, reflecting that at the time, they felt they just had to "deal with it" as part of their military duty. *Id*. ¶ 13. Now, Timothy recognizes how the trauma has affected his brother, particularly with PTSD and trouble sleeping. *Id*. ¶ 12. "The long-term impact of this attack has been trying to deal with the emotional and psychological issues…" he notes, acknowledging that the effects are still present. *Id*.

### 9. *One Family Member of Airman Shawn K. Hale*

Shawn K. Hale, an Airman First Class in the U.S. Air Force stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *10. He was injured in the bombing and was awarded $6 million for his pain and suffering. *Id*. at *75. His wife, Maria A. Hale, is a plaintiff in this lawsuit.

#### a. Maria A. Hale-Wife

Maria A. Hale is the wife of *Schooley* plaintiff Shawn Hale. Decl. of Maria A. Hale ("Maria Hale Decl.") (October 14, 2024) ¶ 2. At the time of the bombing, Maria was stationed at Eielson Air Force Base in Alaska. Maria Hale Decl. ¶ 6. She received a call from her sister-in-law, Tiffawnie Sierra Hale, who had heard a news report about the bombing. *Id*. Initially, they thought it might be a mistake or an old report, but Maria immediately tried to contact Shawn and his base in Saudi Arabia. *Id*. She was unable to reach him, and Maria had no idea whether her husband was alive or the extent of his injuries. *Id*. "It would be three anxiety-filled days before I would hear his voice and know the severity of his injuries," she recalls. *Id*.

When Shawn finally returned to the United States, Maria joined him at Walter Reed Medical Center, where he underwent several surgeries. *Id*. ¶ 8; *see* Exhibit 3 (newspaper article featuring photograph of Shawn Hale being transported by ambulance after the attack, dated July

8, 1996). She describes caring for him by administering eye drops and gels, helping him attend follow-up appointments, and supporting him through his nightmares and sleepless nights. *Id*. "During these episodes, I will care for him by talking to him or simply just holding him," she explains. *Id*.

The bombing left lasting emotional scars on their relationship. *Id*. ¶ 9. Shawn now suffers from PTSD and avoids large crowds and fireworks displays, especially on the 4th of July. *Id*. Maria vividly remembers the first 4th of July after the bombing, when a firework went off and Shawn instinctively tried to dive into a grassy patch. *Id*. "Awareness has become our normal," she reflects, noting that even their children know to make sure Shawn always has a seat in public with a clear view of entrances and exits. *Id*.

The incident has taken an emotional toll on Maria as well. *Id*. ¶ 10. Revisiting the events for her declaration brought back unresolved pain, and she reflected on a photo album she made for her husband just weeks after the bombing. *Id*.; Exhibit 4 (Letter from Maria Hale, dated August 3, 1996). "I realize I have not completely resolved the pain from this event in our lives," she admits, speaking to the long-term effects of the bombing on their family. *Id*.

### 10. *One Family Member of Airman Leighton J. Reid*

Leighton J. Reid, a member of the U.S. Air Force stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *18. He was injured in the bombing and was awarded $6 million for his pain and suffering. *Id*. at *75. His sister, Eunice B. Holman, is a plaintiff in this lawsuit.

#### a. **Eunice B. Holman–Sister**

Eunice B. Holman is the sister of *Schooley* plaintiff Leighton Reid. Decl. of Eunice B. Holman ("Eunice Holman Decl.") (October 17, 2024) ¶¶ 2-3; *see* Exhibit 4 (Photograph of Eunice Holman and Leighton Reid). Eunice's close relationship with Leighton dates back to their

childhood, when Eunice often acted as his primary caregiver due to their parents' long work hours. "I remember even running home from school to care for him every day," she recalls. *Id*. ¶ 6. After marrying her husband, a career military man, Eunice continued to provide for Leighton, welcoming him into her home every summer and during his military leaves. When Eunice's husband became Leighton's legal guardian in 1970, they took him to Germany, where they cared for him as he completed high school. *Id*. ¶¶ 6-7; Exhibit 3 (Appointment of Donald L. Holman as Guardian of Leighton Reid, Jr.).

Eunice remembers the shocking moment she first learned about the attack while on vacation in Michigan. Eunice Holman Decl. ¶ 8. She was watching the evening news when horrifying images of the bombing flashed on the screen. *Id*. "I was shocked, stunned, and crying," she recalls, immediately recognizing that her brother was stationed there. *Id*. Unable to reach her husband for support, Eunice turned to her sister-in-law for information, but they were left in limbo for over forty hours, fearing the worst. *Id*. ¶¶ 8-9.

Finally, Eunice's sister-in-law received confirmation from Leighton's unit commander that he had survived, though he had been injured. *Id*. ¶ 9. Eunice describes the toll this took on her, explaining, "this whole ordeal caused me to suffer great emotional distress." *Id*. ¶ 10. Although her brother survived, she has witnessed a steady decline in his health since the bombing, particularly with back, neck, and hearing injuries. *Id*. ¶ 11. As a nurse, Eunice feels a sense of helplessness in not being able to do more for her brother, constantly stressing over his worsening condition. *Id*.

The images from the bombing, and the pain and suffering so many endured, still haunt her today. *Id*. ¶ 12.

### 11. *One Family Member of Airman Richard R. Jiron*

Richard R. Jiron, a Staff Sergeant in the U.S. Air Force stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Ackley*. *Ackley*, 2022 WL 3354720, at *28. He was injured in the bombing and was awarded $6 million for his pain and suffering. *Id*. at *53. His brother, Jeffrey R. Jiron, is a plaintiff in this lawsuit.

### a.   Jeffrey J. Jiron-Brother

Jeffrey J. Jiron is the brother of *Ackley* plaintiff Richard R. Jiron, who was seriously injured in the Khobar Towers bombing on June 25, 1996. Decl. of Jeffrey J. Jiron ("Jeffrey Jiron Decl.") (October 30, 2024) ¶¶ 2 & 5. Jeffrey learned of the attack the morning after when his mother called, distraught after hearing the news from an uncle in the Navy. Jeffrey Jiron Decl. ¶ 6. Jeffrey remembers that day vividly, describing the hours waiting for news as "some of the worst hours of our families' lives." *Id*. Although they soon found out Richard had survived, he recalls the anxiety and fear of another potential attack, which haunted his family in the days that followed. *Id*.

When his brother returned, Jeffrey witnessed the impact of the attack on Richard's health and personality. *Id*. ¶ 9. Richard began smoking heavily, appearing nervous and "almost like he had Parkinson's," a constant reminder of the toll the bombing took on him. *Id*. As a former military medic, Jeffrey often reflects on the trauma of that day, explaining that "this specific day always comes to mind..." *Id*. ¶ 11. His own experiences in the Gulf War compounded the emotional toll of the attack, which has intensified his anxiety and depression. *Id*. ¶¶ 10-11. He relates his mental struggles to the trauma his family endured from this tragedy, feeling as though he, too, was a victim of the attack. *Id*. ¶¶ 11 & 13.

Jeffrey describes the attack's impact on their family's closeness, noting that they "suspended most of the recurring family events" and gatherings. *Id*. ¶ 13. More than 25 years later,

Jeffrey's anger and sadness persist, as he mourns the change in his once "fun-loving and outgoing" brother. *Id*. ¶ 14. Reflecting on the lasting pain the bombing caused, Jeffrey concludes, "Life is day-by-day," as PTSD continues to affect his family deeply. *Id*. ¶ 15.

### 12. *Steven Kerr and One Family Member*

#### a.  **Steven Kerr–Surviving Service Member**

On June 25, 1996, Senior Airman Steven Kerr was stationed at Dhahran, Saudi Arabia, as a firefighter and crew chief with the 4404th Civil Engineer Squadron. Decl. of Steven Kerr ("Steven Kerr Decl.") (October 14, 2024) ¶ 2. Steven and his crew were approximately 10 miles away from Khobar Towers when a massive explosion erupted, shaking their fire station. Steven Kerr Decl. ¶  6. At first, they thought an aircraft had crashed, but upon seeing a mushroom cloud in the distance, Steven shouted, "they hit Khobar; they bombed Khobar!" and rushed with his team toward the site, realizing they could also be in danger of a second attack en route. *Id*.

Upon arrival, Steven encountered an "apocalyptic" scene with shattered glass covering the streets, clouds of dirt in the air, and countless bloodied service members running in panic. *Id*. ¶ 7. For the next hour, Steven and his crew worked tirelessly in triage, treating injuries with makeshift bandages as supplies ran out. *Id*. Then, they entered Building 131, the most damaged building, to search for survivors. *Id*. Inside, Steven found pools of blood and saw the remains of service members, some having packed for their imminent return home. *Id*. ; *see* Exhibit 7 (photographs). Steven was awarded the Air Force Commendation Medal with Valor Device for his leadership in the evacuation, rescue and cleanup of Khobar Towers after the bombing. *Id*. ¶¶ 13-14; Exhibit 4 (Air Force Commendation Medal with Valor Device Certificate, dated October 18, 1996); *see also* Exhibit 6 (Letter of Evaluation, dated September 2, 1996). He was also awarded the Armed Forces Expeditionary Medal. *Id*.  ¶ 13; Exhibit 5.

Steven later learned that a friend, Senior Airman Jeremy Taylor, had died in the blast. *Id*. ¶ 8. He describes the heartache of knowing that, had he not been on duty, Jeremy would have been with him that evening playing cards in a different building. *Id*. In the following days, Steven was tasked with a standby watch over Building 131 as it was demolished, which he felt was rushed and inadequate for proper search and closure. *Id*. ¶ 10. One frightening incident came days later when Saudi officials, armed with machine guns, confronted Steven and his crew over a bonfire used to dispose of materials, nearly resulting in a shootout. *Id*. ¶ 12.

Years after the attack, Steven struggles with PTSD, anxiety, insomnia, and hypervigilance, explaining, "The long-lasting effects of this attack 28 years later still haunts me…I can't even enjoy going out to dinner with my wife and daughter without facing the main entrance to the restaurant and watching what people are doing around me. The attack on Khobar Towers has permanently altered my life." *Id*. ¶ 16. Steven holds a VA disability rating of 30% for the PTSD that was caused by the Khobar Towers bombing. *Id*. ¶ 17; Exhibit 8 (Letter from VA, dated June 11, 2024).

**b.  Karen Kerr-Wife**

Karen Kerr is the wife of Steven Kerr. Decl. of Karen Kerr ("Karen Kerr Decl.") (October 14, 2024) ¶ 2. Karen learned about the Khobar Towers bombing while she was at an airport restaurant with a friend, watching the news. Karen Kerr Decl. ¶ 5. She immediately contacted Ellsworth Air Force Base but received no information. *Id*. Hours later, the fire department confirmed Steven was safe, though Karen remained anxious until his return home three months later. *Id*. ¶¶ 5 & 6.

When Steven returned, Karen arranged a romantic getaway, only to realize he had changed. *Id*. ¶ 7. "He just wanted to be left alone in his own little world," she explains. *Id*. ¶ 7. Over the

years, Steven became more irritable, drank heavily, and often retreated from family life, traits that strained their once-loving relationship. *Id*. ¶ 8. Karen says, "I felt like I was no longer important to him, and I was very close to ending our marriage," as Steven's anger and detachment took a toll on their family. *Id*. ¶¶ 8-9.

Steven's trauma also manifests in his behavior today. Once comfortable in crowds, he now avoids large gatherings, even restaurants, where he insists on sitting facing the door. *Id*. ¶ 11. Karen notes his anger flares during minor frustrations, and his sleep has worsened, marked by loud snoring and episodes where he swings his arms. *Id*. ¶¶ 11-13. Despite years of urging him to seek help, Steven was only recently diagnosed with sleep apnea, a condition Karen understands may be connected to PTSD. *Id*. ¶ 14. She reflects on the life they shared before the bombing, marked by Steven's patience and love for children, which has since been overshadowed by the lasting effects of his trauma. *Id*. ¶¶ 8-13.

### 13. *Travis S. Leeper and Two Family Members*

#### a. Travis S. Leeper-Surviving Service Member

On June 25, 1996, Travis S. Leeper, an Airman First Class stationed with the 4404th Operations Group, was at Khobar Towers in Dhahran, Saudi Arabia, when a massive truck bomb detonated next to the complex. Decl. of Travis S. Leeper ("Travis Leeper Decl.") (October 15, 2024) ¶ 3. Travis was in his dormitory in Building 128, just beginning to fall asleep, when he heard an unusual noise. *Id*. ¶ 6. Suddenly, a blinding flash filled the room, and then "it sounded like air being sucked from the room for a brief second before the blast..." *Id*. The force of the explosion shattered the windows, and Travis was thrown from his bed onto the floor. *Id*.

In the chaos that followed, Travis scrambled to check on his fellow airmen, finding his bare feet bloodied from shattered glass. *Id*. He describes the scene as dark and frantic, with people

disoriented and someone yelling, "They're attacking the base!" *Id*. Looking outside, he saw local personnel along the perimeter fence and mistook them for insurgents. *Id*. "It was a nightmare!" he recalls. *Id*.

Despite his own injuries, Travis helped his fellow service members, guiding them through the building and down the stairs. *Id*. ¶ 7. He later assisted with first aid for the wounded, helped evacuate others to safety, and transported injured soldiers to emergency vehicles. *Id*. The next day, the full impact of the attack set in as he and his unit began the grim task of cleaning up shattered glass, doors, and furniture. *Id*. ¶¶ 7 & 11; *see* Exhibit 5 (photographs). For his actions that night, Travis was awarded the Air Force Achievement Medal. *Id*. ¶ 8; Exhibit 4 (Air Force Achievement Medal Certificate, dated November 25, 1996).

The bombing left Travis with lasting emotional scars. *Id*. ¶¶ 12 & 13. He now struggles with chronic insomnia and relies on sleep aids, waking easily to any sound. *Id*. ¶ 12. He also suffers from frequent anxiety and panic attacks, which have affected his personal relationships. *Id*. ¶ 13. He finds it difficult to express emotions or communicate openly with his wife, often feeling "bottled up." *Id*. The trauma has changed him, leaving a lasting impact on his daily life and ability to connect with others. *Id*.

**b.  Judith K. Kazmar-Mother**

Judith K. Kazmar is the mother of Travis Leeper. Decl. of Judith K. Kazmar ("Judith Kazmar Decl.") (October 14, 2024) ¶¶ 2 & 4. On the day of the attack, Judith had just returned home from work when her daughter called with shocking news: a bombing had taken place in Saudi Arabia. Judith Kazmar Decl. ¶ 5. Judith recalls turning on the television, overwhelmed with worry, and learning that Travis's base had been attacked. *Id*. "I became very worried," she explains, and that night she could barely sleep, fearing for her son's safety. *Id*.

The following day, Judith received a call from Travis, who explained that he had survived but suffered injuries to his feet. *Id*. Hearing his voice was a relief, but it pained her to know he had been hurt. *Id*. Travis's tour was extended several months, delaying his return from August to October, which only added to Judith's anxiety. *Id*. ¶ 6. "There were a lot of sleepless nights until we saw him again," she remembers, the worry persisting as she feared for his safety in a "dangerous place." *Id*.

Finally, upon seeing Travis in person in Utah, Judith felt immense relief that he was physically whole. *Id*. However, every time she hears news about Saudi Arabia or military conflicts, the painful memories of the bombing resurface. *Id*. ¶ 7. "I think about this awful incident and how I could have lost my son," she reflects, haunted by the possibility of what might have been. *Id*.

**c. John E. Kazmar-Father**

John E. Kazmar is the stepfather of Travis Leeper. Decl. of John E. Kazmar ("John Kazmar Decl.") (October 14, 2024) ¶¶ 2 & 4. John first met Travis when Travis was eight years old, and he married Travis' mother when Travis was nine years old. John Kazmar Decl. ¶ 5. John and Travis grew "very close, like father and son" over time. *Id*. John supported Travis and his siblings by providing financial support and being involved in his sports and school activities. *Id*.

On the day of the attack, John and his wife Judy had just returned from work when their daughter relayed that she had received a call from Saudi Arabia, informing her that Travis had survived a bombing. *Id*. ¶ 7. John remembers turning on the news in shock and supporting his wife, who immediately contacted her family for emotional support. *Id*. ¶¶ 7-8. That spent that night worried for Travis's well-being. *Id*. ¶ 8.

The following day, they received a call from Travis, who recounted the horror of the attack. Although they were relieved to hear his voice, the aftermath kept them on edge, with constant

worry about his safety. *Id*. Following the attack, Travis's tour was extended, and John and Judy waited six more months before they could see him in person at his base in Salt Lake City. *Id*. ¶ 9. Seeing Travis in person reassured them of his physical recovery, but John remained concerned about Travis's disturbed and intermittent sleep, which John believes is a result of the lasting impact of the traumatic events on Travis. *Id*.

### 14. *One Family Member of Airman George P. Nicholaou*

George P. Nicholaou, a Senior Master Sergeant in the U.S. Air Force stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *39. He was injured in the bombing and was awarded $7 million for his pain and suffering. *Id*. at *75. His daughter, Angelique U.M. Mercier, is a plaintiff in this lawsuit.

### a. **Angelique U.M. Mercier-Daughter**

Angelique U.M. Mercier is the daughter of *Schooley* plaintiff George P. Nicholaou. Decl. of Angelique U.M. Mercier ("Angelique Mercier Decl.") (October 15, 2024) ¶¶ 2 & 5. She recalls being home with her mother when they heard the devastating news of the bombing. Angelique Mercer Decl. ¶ 6. Her mother shared that George's building had been attacked, but they had no confirmation of whether he was alive or dead. *Id*. Angelique remembers going to work that evening in shock, feeling "like a zombie," unable to comprehend the situation. *Id*. "I didn't know whether my dad was alive, and my mom wasn't really talking" she explains, describing the hours of terror and uncertainty. *Id*. It was several hours later before they knew that he survived but was injured. *Id*.

When her father finally returned home, Angelique noticed he was no longer the same person. *Id*. ¶ 7. Before the attack, he had been "protective, playful, and sweet," always encouraging her dreams and making her feel included in his life. *Id*. After the bombing, however, he became

angry, judgmental, mean, and often yelled. *Id*. Angelique began to feel isolated and withdrew from

him, spending more time in her room to avoid confrontations. *Id*. She turned to drinking as a way

to cope with the feelings of abandonment, putting herself in risky situations. *Id*.

Reflecting on this painful time, Angelique shares, "It felt like I had a dad that never came

home." *Id*. ¶ 8. She has since taken steps toward healing, approaching ten months of sobriety, and

now sees her father's humanity, recognizing his trauma as well. *Id*.

**15.** *James A. Mings and Two Family Members*

**a.  James A. Mings-Surviving Service Member**

On June 25, 1996, Senior Airman James A. Mings was stationed at Khobar Towers in

Dhahran, Saudi Arabia, as part of the 4404th Security Police Squadron. Decl. of James A. Mings

("James Mings Decl.") (October 15, 2024) ¶ 4. James was on a mobile patrol on the aircraft

parking ramp when terrorists detonated a massive truck bomb outside the complex. James Mings

Decl. ¶ 6. Immediately upon hearing the blast, he went into "reaction mode," exclaiming, "They

got us!" *Id*. James recalls feeling scared but determined to fulfill his duty to protect lives and

resources. *Id*.

In the immediate aftermath, James helped secure restricted areas, establish evacuation

routes for medical personnel, and implemented an emergency traffic control plan to facilitate the

rapid transport of the wounded to a nearby hospital. *Id*. He continued to provide security by

expanding the perimeter around Khobar Towers and the Command-and-Control Center,

explaining that he "didn't trust anyone to make sure we weren't hit again." *Id*. ¶ 8. For his

leadership during this time, James was awarded the Air Force Commendation Medal. *Id*. ¶ 9;

Exhibit 3 (Air Force Commendation Medal Certificate).

The bombing left James with lasting trauma. *Id*. ¶ 10. Diagnosed with PTSD, he describes how it has changed him from an outgoing individual to someone who now avoids going out in public. *Id*. "This event completely screwed me up," he reflects, noting how he struggles with anxiety in large crowds, causing him to miss family events and become bitter toward his loved ones. *Id*. The attack also took away his ability to celebrate his parents' wedding anniversary with them, as it fell on the day of the bombing, and he hasn't been able to commemorate it with them for the past 27 years. *Id*.

James credits his wife and family as his "only reason" for persevering. *Id*. ¶ 11. He holds a 100% VA disability rating, with 50% attributed to PTSD and 50% to sleep apnea resulting from the attack. *Id*. ¶ 12; Exhibit 4 (Letter from VA, dated April 6, 2022 and VA ebenefits website disability ratings page).

### b.  Albert J. Mings-Father

Albert J. Mings is the father of James Mings. Decl. of Albert J. Mings ("Albert Mings Decl.") (October 14, 2024) ¶ 4. That evening, Albert was preparing to celebrate his wedding anniversary when his wife interrupted him with the devastating news of an explosion. Albert Mings Decl. ¶ 6. They spent hours in front of the television, crying and praying, desperately waiting for any updates on James's fate. *Id*. "We had no idea what was happening and if James was okay," Albert remembers, describing the fear and helplessness as they watched, uncertain if another attack might follow. *Id*.

After an agonizing wait, they finally received a brief call from James, confirming he was alive. *Id*. ¶ 7. When he reunited with James, Albert embraced him tightly, watching every move as his son greeted family. *Id*. ¶ 8. "All I could think was how blessed we were that he was alive," he says, though he felt heartbroken knowing he could not ease James's pain. *Id*. ¶¶ 8-9.

The bombing has deeply impacted Albert's life, as he remembers the attack every year on his wedding anniversary, mourning what could have been his son's last day. *Id.* ¶¶ 10-11. Reflecting on the fragility of life, he shares, "This incident made me realize how quickly everything could change at any time." *Id.* ¶ 10. Since the attack, Albert cherishes every moment with James, holding his family closer than ever. *Id.* ¶ 12.

### c. Deborah L. Mings-Mother

Deborah L. Mings, deceased, is the mother of James Mings. Decl. of Albert J. Mings, Proposed Personal Representative of the Estate of Deborah L. Mings ("Estate of Deborah Mings Decl.") (October 15, 2024) ¶ 3. Her husband, Albert J. Mings, is in the process of being appointed the personal representative of her estate. Estate of Deborah Mings Decl. ¶ 1.

On June 25, 1996, Deborah was at home preparing to celebrate her 30th wedding anniversary with Albert when she saw a breaking news report about the Khobar Towers bombing. *Id.* ¶ 6. Realizing her son's location in Saudi Arabia, she immediately began to cry and pray. *Id.* Deborah felt "her heart drop" when they finally heard James' voice. *Id.*

The days that followed were filled with anxiety and prayer, and Deborah found comfort through faith, trusting that God was watching over her son. *Id.* ¶ 8. When James returned, she cherished their reunion but felt helpless watching him struggle after the attack, "[second-guessing] herself as a mother" for not being able to protect him. *Id.* ¶¶ 9-10. Her relationship with James grew closer after the attack, and she leaned on her faith, family, and spiritual counselor to find peace. *Id.* ¶ 11.

Deborah's life was forever changed by the bombing, and her wedding anniversary became a constant reminder of the horrific attack that nearly took her son. *Id.* ¶ 13. Each time she saw an

American flag, she was reminded of the sacrifices made for freedom, knowing her son could have been among those lives that were taken. *Id*. ¶ 12.

**16.** ***James E. Porter***

On June 25, 1996, Senior Airman James E. Porter was deployed to Dhahran, Saudi Arabia, stationed at Khobar Towers as a munitions systems journeyman with the United States Air Force. Decl. of James E. Porter ("James Porter Decl.") (October 15, 2024) ¶ 3. He was in his room on the seventh floor of Building 110, about to put on his boots, when he felt the lights dim, and the entire building shook as if from an earthquake. James Porter Decl. ¶¶ 5-6. James recalls looking outside and seeing a plume of smoke rising nearby before being ordered to evacuate by a runner shouting that they were "under attack." *Id*. ¶ 6.

Outside, James describes "pure and utter chaos" with people running in all directions, some covered in blood. *Id*. ¶ 7. He recounts the terrifying scene of screaming, crying, and frantically trying to help the wounded. *Id*. The group was told to hide at the base of the building due to fears of snipers, where James felt exposed and vulnerable, fearing he could die at any moment. *Id*.

After the attack, James struggled with constant bomb threats, which heightened his stress and left him feeling "like I was going to die at any moment..." *Id*. ¶ 8. The experience changed him permanently, making him extremely jumpy and unable to sleep. *Id*. ¶ 9. Now diagnosed with PTSD, he experiences anxiety attacks, nightmares, and difficulty focusing. *Id*. ¶¶ 8-9. For years, he suppressed his emotions, fearing that seeking help would end his career, which led him to depression, divorce, and thoughts of self-harm. *Id*. ¶ 10. James has an 80% VA disability rating, with 70% attributed to PTSD that resulted from the Khobar Towers bombing. *Id*. ¶ 11; Exhibit 4 (Letters from VA dated June 25, 2021; June 23, 2021).

**17.** *Amy Rancier and Four Family Members*

**a.  Amy Rancier-Surviving Service Member**

On June 25, 1996, Staff Sergeant Amy Rancier was stationed at Khobar Towers in Dhahran, Saudi Arabia, as a Command Post Controller with the 4404th Wing Operations. Decl. of Amy Rancier ("Amy Rancier Decl.") (October 15, 2024) ¶ 3. She had only ten days left in her deployment when a massive truck bomb detonated outside her building. Amy Rancier Decl. ¶¶ 5 & 10. Amy was in her apartment, sitting on the sofa with her dinner, when she heard "the most deafening sound of a loud boom or explosion." *Id*. ¶ 10. She was thrown across the room, and glass from sliding doors shattered around her. *Id*. ¶¶ 10 & 11. Disoriented and unable to move, she recalls someone yelling, "Get out of this building now!" but her injuries left her unable to stand. *Id*. ¶ 11. She was eventually dragged out by strangers through debris and glass. *Id*.

In the aftermath, Amy found herself crouched under a bush, terrified and thinking she would die. *Id*. "I was praying, sobbing, shaking and terrified," she recalls, overwhelmed by thoughts of her young son and her parents. *Id*. ¶¶ 11-12. Two male strangers lifted her up and helped her to the medical triage building on the compound. *Id*. ¶ 12. At the triage area, she witnessed "bloodied, mangled" bodies brought in on stretchers, a sight she could barely process in her shock. *Id*. Amy was later taken to a Saudi hospital, where she endured painful stitches to her face without anesthesia, holding back screams as the doctor sutured her wounds. *Id*. ¶¶ 13-14.

Amy's life has been deeply scarred by the trauma of the bombing. She suffers from PTSD, nightmares, chronic pain, and has difficulty trusting others. *Id*. ¶ 17. "Somedays I can't even get out of bed," she explains, describing the toll on her mental health. *Id*. Awarded a Purple Heart for her injuries, she now holds a 100% VA disability rating, including 70% for posttraumatic stress disorder with traumatic brain injury, and 30 percent for tension headaches as secondary to post

traumatic stress disorder with traumatic brain injury, caused by the Khobar Towers bombing. *Id.*
¶¶ 15-18; Exhibit 6 (Purple Heart Certificate and Special Order, dated July 2, 1996); Exhibit 7
(Letters from VA, dated October 21, 2021; October 20, 2021).

### b. Courtney T.E. Johnson-Son

Courtney T. E. Johnson is the son of Amy Rancier. Decl. of Courtney T.E. Johnson
("Courtney Johnson Decl.") (October 14, 2024) ¶ 2. Courtney, who was six years old at the time,
was at his aunt's house in Houston when she sat him down and told him about the bombing.
Courtney Johnson Decl. ¶ 5. He remembers feeling terrified and confused, explaining, "I cried…
afraid I didn't have a mom anymore." *Id.* In the days that followed, he recalls a blur of driving,
plane rides, and his dad panicking. *Id.*

When Courtney finally saw his mother in the hospital, he felt scared by her scars and
injuries, overwhelmed by the thought that something else could happen to her. *Id.* ¶ 6. After her
return home, he noticed a change in her - she seemed more depressed and spent more time alone.
*Id.* ¶ 7. Reflecting on the impact of the bombing, Courtney says that anytime he hears about Saudi
Arabia, his mind goes to that traumatic event, which ultimately made him decide against pursuing
a military career. *Id.* ¶ 8.

### c. Rosie M. Caffey-Mother

Rosie M. Caffey is the mother of Amy Rancier. Decl. of Rosie M. Caffey ("Rosie Caffey
Decl.") (October 30, 2024) ¶ 2. Rosie describes her bond with Amy as deeply close, saying, "My
daughter is my mini me," sharing not only similar looks but also values and a strong work ethic.
Rosie Caffey Decl. ¶ 5. At the time of the attack, Amy's son, Courtney, was temporarily living
with Rosie and her family to attend kindergarten. *Id.* ¶ 6. The last time Rosie saw Amy before the
Khobar Towers attack was Christmas 1995, just months before the bombing. *Id.*

Rosie recalls the morning of June 26, 1996, when her then son-in-law called to say that Amy had been in a bombing, but he had no other information. *Id*. ¶ 7. Rosie felt immediate terror, recounting that she "began crying and hollering" and was overwhelmed by shock, fear, and anger. *Id*. ¶ 8. She spent days watching the news, anxiously awaiting word on her daughter's condition. *Id*. Two days later, Amy's unit informed them that she had survived but was hospitalized with cuts and bruises. *Id*. ¶ 9.

When Amy returned to Wichita, Rosie, her husband, and daughter drove from Memphis to care for her. *Id*. ¶ 11. Amy was covered in bandages and stitches, visibly bruised, and even experiencing hair loss. *Id*. Rosie and her family supported her by cooking, cleaning, and looking after Courtney, though their anger and fear remained, fueled by uncertainty about who was responsible for the attack and whether it could happen again. *Id*. ¶¶ 11-12. Seeking peace, they turned to spiritual counseling and leaned on their church for prayers. *Id*. ¶ 12.

Since the bombing, Rosie notices Amy's change in demeanor. *Id*. ¶ 13. "She became more sensitive, combative, and easily frustrated," Rosie reflects, describing the strain it has placed on their relationship. *Id*. Rosie's own trauma lingers, triggered by news of war or bombings, and she feels constantly overprotective, limiting her travel to accompany Amy. *Id*. ¶¶ 14-15. The bombing, she says, "has been the most traumatic event in our lives." *Id*. ¶ 14.

### d.  Manuel Caffey-Stepfather

Manuel Caffey is the stepfather of Amy Rancier. Decl. of Manuel Caffey ("Manuel Caffey Decl.") (October 28, 2024) ¶ 2. Manuel raised Amy from the age of two, providing for her like his own child. Manuel Caffey Decl. ¶ 5. "She always calls me 'daddy,' not stepdad," he notes, describing their deep bond. *Id*. On June 26, 1996, Manuel's then son-in-law informed him and his wife that Amy had been in a bombing but offered no further information. *Id*. ¶ 8. Manuel spent

hours glued to the news, "in shock, angry, depressed, and afraid," fearing for his daughter's life. *Id*. ¶ 9.

Two days later, Manuel learned that Amy had survived but was hospitalized with multiple cuts and bruises. *Id*. ¶ 10. When Amy returned home, Manuel drove nine hours from Memphis to Wichita with his wife and other daughter to see her. *Id*. ¶ 12. Manuel and his family cared for Amy once she returned home, cooking, cleaning, and helping her with her young son. *Id*.

The attack has left Manuel constantly fearful, anxious, and haunted by the trauma. *Id*. ¶ ¶ 13 & 15. "Every time I see a terrorist attack or war on the news I'm reminded of the Khobar Towers bombing," he says. *Id*. ¶ 15. He now lives in fear for his family's safety, insisting they stay close to home to avoid harm. *Id*. ¶ 17. For Manuel, the bombing remains a tragedy they continue to relive whenever they hear news of violence. *Id*. ¶ 16.

### e.   Tonya T. Caffey-Half-Sister

Tonya T. Caffey is the half-sister of Amy Rancier. Tonya and Amy grew up together, with Amy serving as a protector and caretaker. Decl. of Tonya T. Caffey ("Tonya Caffey Decl.") (October 28, 2024) ¶ 2. Amy "always watched over [Tonya]" and sent Tonya clothes and jewelry from wherever she was stationed in the Air Force. Tonya Caffey Decl. ¶ 5. The last time Tonya saw Amy before the Khobar Towers bombing was in December 1995 when Amy flew her family out to visit her in Wichita. *Id*. ¶ 6.

Tonya first heard about the attack from her father, Manuel Caffey, on June 26, 1996. *Id*. ¶ 7. Overwhelmed by shock and fear, she contacted Amy's husband for more information. *Id*. For several days, Tonya lived in fear, unsure of her sister's condition. *Id*. When Amy's survival was confirmed, Tonya was relieved but remained anxious. *Id*. ¶ 9. She experienced nightmares about her sister and found herself constantly watching the news. *Id*.

When Amy returned home, Tonya and her parents drove nine hours to be with her, helping with daily tasks as she recovered from her injuries. *Id*. ¶ 10. Tonya felt that Amy a returned changed woman, more sensitive, irritable, and often on edge, which strained their once-close relationship. *Id*. ¶ 12.

The trauma of the bombing has stayed with Tonya. *Id*. ¶ ¶ 14-15. Events like 9/11 trigger intense anxiety, and hearing gunshots or fireworks in her neighborhood heightens her fear. *Id*. ¶ 14. She is now highly protective of Amy, refusing to let her go anywhere alone when she visits, and feels the lingering impact of the attack in her everyday life. *Id*. ¶ 15.

**18. *Lakisha S. Robertson and Seven Family Members***

**a. Lakisha S. Robertson-Surviving Service Member**

On June 25, 1996, Senior Airman Lakisha S. Robertson was stationed at Khobar Towers in Dhahran, Saudi Arabia, as a supply management craftsman with the United States Air Force. Decl. of Lakisha S. Robertson ("Lakisha Robertson Decl.") (October 14, 2024) ¶ 2. That evening, while watching television with her suitemates in the dayroom of her suite at Khobar Towers, she heard a loud thud, followed by the glass balcony doors shattering and imploding into the room. Lakisha Robertson Decl. ¶ 5. "My heart was racing," she recalls, as she ducked behind the couch to avoid the flying glass, then crawled to the hallway, uncertain if they were under attack. *Id*. Huddling with her roommate Melinda Caines, they hugged each other and cried, fearing they might not survive. *Id*. ¶ 6.

Outside, Lakisha witnessed injured people and bloody footprints on the sidewalk as she and others crowded in the complex's center, praying and hugging one another. *Id*. "The day of the attack was the most terrifying thing I have experienced in my life," she remembers, thinking she might never see her husband, son, family or friends again. *Id*. ¶ 7.

In the month following the attack, Robertson struggled with sleep, lost weight, and could no longer feel safe at Khobar Towers. *Id.* ¶ 8. The trauma followed her, causing her to avoid future deployments and ultimately leave the military. *Id.* ¶ 9. Since then, she has endured depression, anxiety, irritability, and paranoia, impacting her relationships and daily life. *Id.* ¶ 10. "I drink to numb the pain," she admits, after years of suffering in silence and refusing to accept her PTSD diagnosis. *Id.* Finally, she sought help through the VA for the PTSD but is still scared to discuss everything she has been through. *Id.* She has a combined 60 percent VA disability rating, with 50% for the PTSD caused by the Khobar Towers attack. *Id.* ¶ 11.

**b. Curtis E. Robertson, Sr.-Husband**

Curtis E. Robertson, Sr. is the husband of Lakisha Robertson. Decl. of Curtis E. Robertson, Sr. ("Curtis Robertson, Sr. Decl.") (October 15, 2024) ¶ 2. Curtis and Lakisha had an emotional farewell as he dropped Lakisha off at the airport for her deployment to Saudi Arabia, holding back tears and wishing her a safe return to him and their son. Curtis Robertson, Sr. Decl. ¶ 6. On the night of the attack, Curtis was alone in their apartment in North Las Vegas when he saw the news about the bombing on television. *Id.* ¶ 7. Instantly gripped by "complete and utter terror," he became physically sick, overwhelmed with worry, and unable to contact Lakisha due to inoperable phone lines. *Id.*

For 24 agonizing hours, Curtis remained in a state of uncertainty, constantly switching news channels but receiving no information. *Id.* ¶ 8. When Lakisha finally called, he felt immense relief, only to have the call abruptly disconnected 90 seconds later, throwing him back into panic until they reconnected hours later. *Id.* Although Lakisha returned home safely, Curtis says she has "never been the same" mentally or emotionally, describing their marriage as filled with challenges from her PTSD, nightmares, and emotional detachment. *Id.* ¶¶ 11-13.

The bombing has left lasting scars on Curtis as well. His own struggles with nightmares, flashbacks, and anxiety persist, affecting his concentration, sleep, and even physical health. *Id*. ¶ 14. Curtis reflects that while the experience has brought him closer to his wife, it has also imposed deep emotional burdens on their marriage, which they continue to work through with counseling and support from their church. *Id*. ¶¶ 13-15.

### c.   Curtis E. Robertson, II-Son

Curtis E. Robertson, II is the son of Lakisha Robertson. Decl. of Curtis E. Robertson, II. ("Curtis Robertson, II Decl.") (October 14, 2024) ¶ 2. At the time of the attack, Curtis was only two and a half years old and did not fully understand the impact it had on his mother. Curtis Robertson, II Decl. ¶ 5. As he grew older, Curtis came to realize how deeply the bombing had affected her. *Id*. "My mom acts very paranoid and extra protective," he recalls, noting her constant vigilance and wariness of potentially dangerous situations. *Id*.

Throughout his school years and whenever terrorist attacks are mentioned in the news, Curtis is reminded of the Khobar Towers bombing. *Id*. ¶ 6. He feels relieved that his mother survived, but he also carries sadness over the lives lost and the lasting toll it has taken on her life. *Id*. The bombing has left a permanent mark on their family, shaping Curtis's perception of his mother's trauma and their shared experience.

### d. Dilcia H. Fernandez-Mother

Dilcia H. Fernandez is the mother of Lakisha Robertson. Decl. of Dilcia H. Fernandez ("Dilcia Fernandez Decl.") (October 15, 2024) ¶ 2. Lakisha is Dilcia's oldest child, and before the attack, they were very close, talking daily. Dilcia Fernandez Decl. ¶ 5. Dilcia recalls the last time she saw Lakisha before the bombing as being "her loveable self," always laughing and enjoying time with family. *Id*.

Dilcia learned of the bombing through a call from the Red Cross, leaving her "scared, nervous, and upset." *Id*. ¶ 6. For over 24 hours, she had no confirmation of her daughter's survival, anxiously awaiting updates. *Id*. When she finally heard Lakisha's voice, Dilcia "screamed with joy" and thanked God, but she sensed that her daughter would never be the same. *Id*. ¶ 8. During her extended deployment after the bombing, Lakisha called her mother whenever she felt anxious or sad, and Dilcia tried to reassure her, reminding her of her family's love and support. *Id*. ¶¶ 9-10.

The bombing has deeply affected Dilcia. *Id*. ¶ 11. She describes feeling devastated, fearful, and angry, noticing that Lakisha has become more anxious and agitated, often crying when she struggles to express her emotions. *Id*. Their relationship has changed, and Lakisha now visits less often, her stress and anxiety palpable. *Id*. "Seeing how this situation changed my daughter has hurt me to the core," Dilcia explains, leaning on her church and community for support as she copes with her own lingering fears and memories of helplessness. *Id*. ¶¶ 11-15.

### e. Kareem H. Brown-Brother

Kareem H. Brown is the brother of Lakisha S. Robertson. Decl. of Kareem H. Brown ("Kareem Brown Decl.") (October 16, 2024) ¶ 2. Growing up, Kareem and Lakisha shared a close bond, describing her as his "best friend" who always brought him happiness. Kareem Brown Decl. ¶ 5. The last time they saw each other before the bombing, Kareem had spent several months visiting Lakisha and her family, creating memories he cherishes. *Id*.

Kareem first heard of the attack on the news the day after it happened. *Id*. ¶ 6. With his family, he immediately tried contacting the Red Cross but received no information. *Id*. "I was scared, crying, and worrying," he recalls, describing the intense fear and helplessness. *Id*. It wasn't

until more than 24 hours later that his brother-in-law contacted their mother with the relief that Lakisha had survived. *Id*.

In the days after, Kareem spoke to his sister and could tell that she had changed, saying it was "sad and heartbreaking" to realize that the happy, outgoing sister he knew was no longer the same. *Id*. ¶ 7. Since then, Kareem has struggled with sadness, anger, and anxiety, especially during news reports of other attacks or incidents of gun violence. *Id*. ¶ 10. The attack's impact on Lakisha continues to weigh heavily on him, bringing tremendous emotional and mental pain, and he hopes every family facing similar trauma has a support network to help them cope. *Id*. ¶¶ 9-10.

**f. Roger P. Dabriel-Brother**

Roger P. Dabriel is the brother of Lakisha S. Robertson. Decl. of Roger P. Dabriel ("Roger Dabriel Decl.") (October 14, 2024) ¶ 2. Roger and Lakisha grew up with a close and loving relationship, describing each other as "the best of friends." Roger Dabriel Decl. ¶ 5. On the day of the bombing, Roger was at football practice when he received a call from his mother with news of the attack. *Id*. ¶ 6. He immediately contacted his siblings, and together they spent over 24 hours in worry, anxiously awaiting confirmation of Lakisha's safety. *Id*.

Several months later, Roger was finally able to see Lakisha in person. *Id*. ¶ 7. Though grateful to reunite with her, he noticed how their once joyful conversations had shifted to focus on the trauma of the bombing. *Id*. ¶ 8. "Our conversations after the attack became much more depressing," he reflects, and he now lives with a constant fear of another attack. *Id*. ¶¶ 8-9. The experience has left him feeling haunted, stating, "I wish I hadn't been born yet to witness the attack that has forever changed my sister." *Id*. ¶ 9.

### g.  Cassandra J. Johnson-Half-Sister

Cassandra J. Johnson is the half-sister of Lakisha Robertson. Decl. of Cassandra J. Johnson ("Cassandra Johnson Decl.") (October 14, 2024) ¶ 2. At the time of the attack, Cassandra was in elementary school, living at home with her parents. Cassandra Johnson Decl. ¶ 5. When her father told her about the bombing, Cassandra recalls feeling "really scared," bursting into tears and struggling with intense worry and sadness. *Id*. Days passed before they finally received a call from Lakisha, confirming she was safe, bringing Cassandra a sense of relief from the fear that had gripped her. *Id*.

After the attack, Cassandra noticed a significant change in her relationship with her sister. *Id*. ¶ 7. They once spoke regularly, with Lakisha often bringing gifts from her travels, but after the bombing, "the phone calls slowed down," leaving Cassandra feeling distanced and deeply missing her sister. *Id*. She turned to her church and pastor, praying for Lakisha's healing and well-being. *Id*. ¶ 8.

Over time, their relationship has mended, though Lakisha remains somewhat distant, which Cassandra now realizes can happen with PTSD. *Id*. ¶ 9. Cassandra now takes the initiative to reach out more, and when they reconnect, it feels "like we never missed a beat." *Id*.

### h.  Latoya T. Sapp-Half-Sister

Latoya T. Sapp is the half-sister of Lakisha Robertson. Decl. of Latoya T. Sapp ("Latoya Sapp Decl.") (October 14, 2024) ¶ 2. Latoya, who was eleven years old at the time of the Khobar Towers bombing, shared a close bond with Lakisha. Latoya Sapp Decl. ¶ 5. "I always looked up to her," she recalls, crediting Lakisha for inspiring her career in Human Resources. *Id*.

Latoya first heard of the attack while at home, with her family watching the news. *Id*. ¶ 6. Confused at first, her fear set in when her older brother explained that Lakisha was at Khobar

Towers during the bombing. *Id*. "I became extremely scared and started crying," she remembers, imagining the worst and longing for her sister to come home. It wasn't until over 24 hours later that they received word that Lakisha had survived. *Id*.

The attack changed Lakisha, leaving her more withdrawn and distant. *Id*. ¶ 8. "My relationship with her changed for the worse after the attack," Latoya explains, noticing that her sister's once outgoing and positive nature had been replaced with visible stress and anxiety. *Id*. Latoya herself now feels anxious whenever she sees news of terrorist attacks or violence, reflecting on how the incident impacted her family. *Id*. ¶ 9. "I hate how this changed her and affected myself, my siblings, and my mother," she says, saddened by how profoundly the attack altered their lives. *Id*. ¶ 10.

### 19. *Dale O. Robinson*

On June 25, 1996, Staff Sergeant Dale O. Robinson was deployed to Dhahran, Saudi Arabia, as a heavy equipment operator with the U.S. Air Force. Decl. of Dale O. Robinson ("Dale Robinson Decl.") (October 21, 2024) ¶ 3. That evening, he was in bed on the fourth floor of Building 133 of the Khobar Towers complex when a massive blast suddenly jolted him awake, shattering glass throughout his room. Dale Robinson Decl. ¶¶ 5 & 7. "I thought it was a bad dream," he recalls, as he scrambled to put on his sneakers, only to cut his toe on glass inside. *Id*. ¶ 7. Grabbing his sandals, he made his way to the hallway, where he joined other airmen navigating the wreckage and blood splatter coating the ceilings and walls. *Id*. ¶¶ 7-8.

Dale assisted in carrying the wounded on makeshift stretchers fashioned from doors and noticed with shock that the phone booth he just tried to use to reach his wife was completely destroyed. *Id*. ¶¶ 6 & 8. A fellow airman told Dale he had cuts on his shoulders and back and helped him clean the wounds. *Id*. ¶ 9. Later, while on duty transporting dump trucks, Dale was

startled when a guard pointed an M-16 at him, an incident that left him shaken. *Id*. ¶ 11. The next morning, he joined others in the dining area, where part of the hall had been turned into a triage area, and he observed "plastic on the floor and blood was all over it, but they still expected us to eat in there". *Id*. ¶ 12.

Returning home, Dale struggled with PTSD, recurring nightmares, and an overwhelming sense of anger. *Id*. ¶¶ 17-21. His initial request for help was dismissed, leaving him feeling isolated and turning to alcohol for relief. *Id*. ¶ 21. Though he ultimately sought therapy, the trauma continued to impact him, including during a later deployment when explosions triggered panic attacks. *Id*. ¶¶ 19 & 21. Dale was awarded the Purple Heart for his injuries, and the Air Force Commendation Medal with Valor Device for Heroism for "ignoring [his] own safety to locate and assist victims after the Dhahran bombing". *Id*. ¶¶ 14-16; Exhibit 4 (Purple Heart Certificate, dated November 15, 1996); Exhibit 5 (Air Force Commendation Medal with Valor Device for Heroism, dated November 27, 1996); Exhibit 6 (Newspaper article reporting Purple Heart and Commendation Medal awards). Today, he holds an 80% VA disability rating, with 70% for the post-traumatic stress disorder with alcohol use disorder caused by the Khobar Towers attack. *Id*. ¶ 22. Exhibit 7 (Letter from VA, dated May 5, 2017).

### 20. *Morgan S. Spruill and One Family Member*

### a. Morgan S. Spruill-Surviving Service Member

On June 25, 1996, Technical Sergeant Morgan S. Spruill was deployed to Dhahran, Saudi Arabia, as part of the 4404th Civil Engineer Squadron, staying in Building 133 at Khobar Towers. Decl. of Morgan S. Spruill ("Morgan Spruill Decl.") (October 14, 2024) ¶ 3. That night, he was watching movies in a dayroom with a fellow airman when a massive explosion suddenly threw him from his chair into a nearby wall, covering him in glass and debris. Morgan Spruill Decl. ¶¶

6-7. Bleeding heavily and disoriented, he checked his injuries, finding a deep cut in his left calf that extended down to the bone. *Id*. ¶ 7. Amidst screams from fellow airmen, Morgan helped a man escape from a glass-covered phone booth by placing a rug beneath his feet, then made his way outside, fighting nausea and blood loss. *Id*.

Morgan was taken to King Abdulaziz Hospital, where he received over 100 stitches, including 50 on his left shin. *Id*. ¶¶ 7-8. He vividly remembers being startled by the sound of a can opening nearby, an early sign of his trauma and lasting sensitivity to noise. *Id*. ¶ 8. Over the following days, he was transported to Landstuhl hospital in Germany, and then flown to multiple locations in the states, before finally reuniting with his wife back in the U.S. *Id*. ¶¶ 9-10.

Since the bombing, Morgan has suffered from numerous physical injuries as a result of the attack, including sciatica from a cracked vertebra, retinal detachment, and a painful jaw misalignment. *Id*. ¶ 11. Emotionally, he endures severe PTSD, a constant fear of loud noises, and difficulty with short-term memory, which has affected his daily life and work. *Id*. ¶ 12. He was awarded the Purple Heart for his injuries, as well as the Air Force Commendation Medal with 4 oak leaf clusters, and the Armed Forces Expeditionary Medal. *Id*. ¶¶ 13-14; Exhibit 5 (Purple Heart Certificate and Special Order, dated July 2, 1996; *see* Exhibit 2 (Certificate of Discharge); Exhibit 6 (Armed Forces Expeditionary Medal Certificate, dated June 27, 1996). He holds a 100% VA disability rating, with 20% for degenerative joint disease, thoracolumbar spine with degenerative arthritis; 50% for post traumatic stress disorder; 10% for right lower extremity radiculopathy; 30% for traumatic injuries, right knee with degenerative changes; 50% for obstructive sleep apnea; 10% for status post pneumatic retinopexy, right eye; 10% for tinnitus; 30% for traumatic injuries, left knee with degenerative changes; 10% for scar, left mid-calf, status

post blast injury; and 10% neuralgia, right facial nerve, all of which were caused by the Khobar Towers bombing. *Id*. ¶ 15; Exhibit 7 (VA ebenefits website disability ratings page).

### b. Rhonda L. Spruill-Wife

Rhonda L. Spruill is the wife of Morgan Spruill. Decl. of Rhonda L. Spruill ("Rhonda Spruill Decl.") (October 15, 2024) ¶ 2. Rhonda recalls saying goodbye to her husband, who was supposed to return a week before the bombing but was delayed due to a training issue. Rhonda Spruill Decl. ¶¶ 5-6. On the day of the attack, Rhonda was returning from work when friends began calling, asking about Morgan. *Id*. ¶ 6. "I had no idea what had happened," she remembers, describing her frantic attempts to contact base operations to confirm his safety. *Id*. For hours, she received only fragmented details, fearing the worst until finally, late that night, she was told Morgan was "accounted for" but soon learned he had been injured. *Id*. ¶¶ 6-9.

Three days after the bombing, she received a call from Morgan, who was weak and in a German hospital after surgery for loss of blood and a severe laceration. *Id*. ¶ 11. "I had never been so thankful to hear his voice even though it was weak," she reflects. *Id*. When Morgan returned to the States, Rhonda met him on the runway, seeing him strapped to a stretcher with extensive bandages. *Id*. ¶ 12. She recalls the pain of watching him struggle with his injuries, from nerve damage to a later-detached retina, and helping him through medical appointments and counseling. *Id*. ¶¶ 13-14.

The bombing changed their lives, with Morgan frequently waking from nightmares and jumping at sudden noises, leaving Rhonda to comfort him through flashbacks. *Id*. ¶ 14. This experience left her proud of her husband, yet hesitant about military service for her own son. *Id*. ¶ 15. After the attack, Rhonda held her husband closer, cherishing each day with renewed appreciation, yet "dreaded the thought of him ever being deployed again." *Id*. ¶ 17.

21. *Patrick R. Stark*

On June 25, 1996, Master Sergeant Patrick R. Stark was stationed at Khobar Towers in Dhahran, Saudi Arabia, serving with the United States Air Force. Decl. of Patrick R. Stark ("Patrick Stark Decl.") (October 14, 2024) ¶ 3. That night, he was watching television in his room when a powerful blast shattered the glass doors beside him, sending him across the room and slamming him into a concrete wall. Patrick Stark Decl. ¶¶ 5-6. Patrick dislocated his left shoulder and sustained several cuts from glass shards, but he immediately ran downstairs to his clinic to treat the flood of wounded. *Id*. ¶ 6. "Almost immediately, our small medical clinic was overrun with casualties," he recalls, working tirelessly to stabilize and triage the injured as best as they could, despite the chaos and lack of communication. *Id*. ¶ 7. The experience of seeing severely injured airmen and having his office transformed into a makeshift morgue left Patrick haunted. *Id*.

In the days that followed, Patrick and his team worked around the clock, identifying the dead, treating the wounded, and managing the flow of casualties to local hospitals. *Id*. When he finally returned home, Patrick struggled with PTSD, finding himself detached and unable to trust anyone outside his inner circle. *Id*. ¶ 9. "My wife…still misses the person I was before I left," he reflects, explaining how the attack has permanently altered his life and relationships. *Id*. ¶¶ 9-10. Ultimately, Patrick underwent orthopedic surgery to his left shoulder to help fix and stabilize his shoulder from the injuries in the bombing, but it left him with a weakened shoulder. *Id*. ¶ 8. Patrick was awarded the Purple Heart for his injuries. *Id*. ¶ 11; Exhibit 4 (Purple Heart Certificate and Special Order, dated August 6, 1996). He holds a combined 80% VA disability rating, with 70 percent for post traumatic stress disorder, 10 percent for neuropathy, ulnar left mild with weakness in hand, left medial epicondyle postoperative, and 10 percent for residuals, subluxation, left

shoulder, postoperative, all of which were caused by the Khobar Towers bombing. *Id*. ¶ 12; Exhibit 5 (Letters from VA, dated October 21, 1999 and June 17, 2022).

### 22. *One Family Member of Airman Martin L. Wheeler*

Martin L. Wheeler, a Senior Airman in the United States Air Force, stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *53. He was injured in the bombing and was awarded $6 million for his pain and suffering. *Id*. at *75. His mother, Jane C. Strader, is a plaintiff in this lawsuit.

#### a. Jane C. Strader-Mother

Jane C. Strader is the mother of *Schooley* plaintiff Martin Wheeler. Decl. of Jane C. Strader ("Jane Strader Decl.") (October 30, 2024) ¶¶ 2-3. On the day of the attack, Jane first heard about a bombing near her son's base over the radio but didn't imagine that he might be affected. Jane Strader Decl. ¶ 6. Later, her daughter-in-law called with news that Martin had been in the blast, leaving Jane in "a crazy, whirlwind, frantic moment," desperate for information. *Id*. She immediately attempted to contact the Red Cross, but with no updates available, she endured an agonizing thirty-six-hour wait before finally learning that Martin was alive but injured. *Id*.

The trauma of that day has left Jane with recurring sleep issues and anxiety. *Id*. ¶¶ 7-9. She often wakes up from nightmares and feels a pressing need to know that her son is safe. *Id*. ¶ 9. Now retired, Jane finds herself frequently checking on Martin and her other sons, more than ever before, especially during her "episodes" of heightened worry. *Id*. The experience has left a permanent mark on her, changing her view of military service and intensifying her need to connect with her family for reassurance. *Id*. ¶¶ 7-9.

### 23. *One Family Member of Airman Jefferson A. Craven*

Jefferson A. Craven, a service member in the United States Air Force, stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *47. He was injured in the bombing and was awarded $7 million for his pain and suffering. *Id*. at *75. His daughter, Trisha L. Weber, is a plaintiff in this lawsuit.

### a. Trisha L. Weber-Daughter

Trisha L. Weber is the daughter of *Schooley* plaintiff Jefferson Craven. Decl. of Trisha L. Weber ("Trisha Weber Decl.") (October 14, 2024) ¶ 2. Trisha, who was nine years old at the time, recalls being at home with her mother and sisters when her mom received a call that left her visibly upset, retreating to her room to hide her emotions. Trisha Weber Decl. ¶ 6. Trisha remembers the confusion and fear as they waited to learn if her father was alive and how badly he might have been hurt. *Id*. ¶ 6.

Eventually, Trisha saw footage of her father on television, lying in a hospital bed, with someone explaining that it took six men to carry him out of the building due to his injuries. *Id*. ¶ 7. "It was truly shocking to see," she recalls, describing how seeing his physical state deeply affected her. *Id*. When her father returned home, Trisha watched him struggle with PTSD, anxiety, and physical pain, often isolating himself and drinking to cope. She recalls how he would sit in his chair, detached, and ask her to bring him drink after drink until he passed out. *Id*. ¶¶ 8-10.

The bombing's impact on her father led to an environment filled with tension, sadness, and verbal outbursts. *Id*. ¶ 12. Trisha felt alone and burdened by responsibilities, often staying up late to care for her younger sister while her mother worked. *Id*. Her father's pain and trauma made her feel as though she had to "be careful and quiet" to avoid upsetting him. *Id*. The family dynamics

changed drastically, and Trisha found solace in attending church with her sister, seeking a break from the strain at home. *Id*.

   24. ***Two Family Members of Airman Aaron R. Weimer***

   Aaron R. Weimer, an Airman First Class in the United States Air Force, stationed at Khobar Towers in Dhahran, Saudi Arabia, was a plaintiff in *Schooley*. *Schooley*, 2019 WL 2717888, at *26. He was injured in the bombing and was awarded $7 million for his pain and suffering. *Id*. at *75. His parents, James L. Weimer and Bonita J. Weimer, are plaintiffs in this lawsuit.

   **a. James L. Weimer-Father**

   James L. Weimer is the father of *Schooley* plaintiff Aaron Weimer. Decl. of James L. Weimer ("James Weimer Decl.") (October 28, 2024) ¶ 2. James recalls that on the day of the attack, he was coming home from work when he heard a news report about an American barracks bombing in Saudi Arabia. James Weimer Decl. ¶ 6. Immediately alarmed, he and his wife realized that Aaron, who was stationed in Saudi Arabia, could have been affected. *Id*. Desperate for information, they called the Red Cross but received no help. *Id.* Seeking support, they contacted their local news station, Channel 4, which came out to interview them as they waited anxiously for news. *Id*.

   After a long, agonizing wait, they finally heard from Aaron six hours after the bombing; he let them know he survived and not to worry. *Id*. Over the years, Aaron went on six more deployments, and each time James and his wife were consumed with worry, unable to relax until Aaron safely returned to the U.S. *Id*. ¶ 8.

   Reflecting on that day, James states that he thinks about it "almost every day" and feels profoundly grateful to still have his son. *Id*. ¶ 9.

### b. Bonita J. Weimer-Mother

Bonita J. Weimer is the mother of *Schooley* plaintiff Aaron Weimer. Decl. of Bonita J. Weimer ("Bonita Weimer Decl.") (October 14, 2024) ¶ 2. Bonita recalls being in her kitchen that evening, preparing dinner with the news on in the background, when she heard a report that a U.S. military barrack in Saudi Arabia had been bombed. Bonita Weimer Decl. ¶ 6. Immediately panicked, Bonita and her husband tried to contact the Red Cross for more information but were unsuccessful. *Id.* In desperation, she reached out to the local Channel 4 news station, who sent a crew to her home for an interview. *Id.*

After a grueling six-hour wait, Aaron was able to make a brief call home, telling them he was safe but unable to speak further. *Id.* ¶ 7. "[I]t provided us with such relief to know he was alive," she reflects, although the incident left a lasting mark on the family. *Id.* ¶¶ 7-9. Each subsequent deployment made Bonita anxious and on edge until Aaron safely returned home. *Id.* ¶ 8. Even now, Bonita feels a deep sense of gratitude whenever she sees Aaron, often finding herself mentally transported back to that evening in her kitchen, reliving the fear and uncertainty of that day. *Id.* ¶ 9.

## III. STANDARD OF REVIEW

In the case of a defaulting sovereign defendant, the FSIA "requires only that a plaintiff 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Owens v. Rep. of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2016) (quoting 28 U.S.C. § 1608(e)). The FSIA's evidentiary requirements mirror the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(d). *Schooley v. Islamic Rep. of Iran,* No. CV 17-1376, 2019 WL 2717888, at *67 (D.D.C. June 27, 2019) (Howell, C.J.) "[W]hen the defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely

how much and what kinds of evidence the plaintiff must provide, requiring only that it be satisfactory to the court." *Han Kim v. Dem. People's Rep. of Korea*, 774 F.3d 1044, 1047, (D.C. Cir. 2014) (internal quotation omitted).

> In evaluating a plaintiff's claims in support of default judgment in FSIA cases, courts
>
>> may look to numerous evidentiary sources to satisfy their statutory obligation. As an initial matter, a court can rely upon plaintiff's uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence. Moreover, in addition to traditional documentary and testimonial evidence in the record, upon which the court may rely, plaintiffs in FSIA cases may also submit evidence in the form of affidavits. Finally, a court may take judicial notice of related proceedings and records in cases before the same court.

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171, (D.C. Cir. 2010) (internal quotation and citation omitted). Courts in this district have accepted uncontroverted affidavits and other documentary evidence in FSIA claims. *See, e.g., Schooley*, at * 67 (explaining that courts may rely upon affidavit evidence in FSIA cases); *Harrison*, 882 F. Supp. 2d at 28 (in evaluating a plaintiff's claims, "a court may accept as true the plaintiffs' uncontroverted evidence, including proof by affidavit") (internal quotation and citation omitted); *Campuzano v. Islamic Rep. of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) ("In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit.")

A Court is permitted to enter a default judgment in a FSIA case when: (1) the Court has subject matter jurisdiction over the claims; (2) personal jurisdiction is properly exercised over the defendants; (3) the plaintiffs have presented satisfactory evidence to establish defendant's liability; and (4) the plaintiffs establish that they are entitled to the money damages sought. *Schooley*, 2019 WL 2717888, at *66-67. All of these elements have been met, as explained in detail below. Courts routinely enter default judgments for plaintiffs in FSIA cases upon a motion for default and

affidavit evidence. *See, e.g., Aceto v. Islamic Republic of Iran*, No. CV 19-CV-464 (BAH) (D.D.C. Feb. 25, 2019) (Howell, C.J.) (entry of default for plaintiff-victims in Khobar Towers attack).

## IV. THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS FSIA CASE

### A.    The Jurisdictional Elements of Subject Matter Jurisdiction Have Been Met

"The FSIA is the sole basis for jurisdiction over foreign states in our courts." *In re Islamic Rep. of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 39 (D.D.C. 2009). Pursuant to the Foreign Sovereign's Immunity Act's terrorism exception to the jurisdictional immunity of a foreign state, 28 USC §1605A, Plaintiffs must initially establish that this Court has jurisdiction to hear their claims and that the defendants are not immune from suit.

Judge Lamberth of this District Court has explained the five elements that must be met for jurisdiction under §1605(A):

> (1) money damages are sought (2) against that state for (3) personal injury or death that (4) was "caused by" (5) an act of torture, extrajudicial killing ... or the provision of material support of resources for such an act if such act or provision of material support or resources is engaged in by an official, employee or agent of such foreign state while acting within the scope of his or her office, employment or agency." . . . With regard to § 1605A's causation requirement, in this Circuit there must be some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.

*Harrison*, 882 F. Supp. 2d at 29 (internal quotations and citations omitted).

### 1.    Money Damages Against the State for Personal Injury or Death

The first two elements are met here because plaintiffs seek solely "money damages" against Iran. 28 U.S.C. § 1605A(a)(1). Plaintiffs meet the third element because they have all presented claims for damages resulting from personal injury or wrongful death.

## 2.    Causation

The evidence presented to prove causation shows that Iran aided Hezbollah in executing the bombing.  With respect to causation, there is no `but-for' causation requirement for claims made under the FSIA, and proximate causation is sufficient. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). In *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* a case which interpreted the substantially similar § 1605(a)(7) that is now § 1605A, this Circuit noted that in the FSIA, "the words `but for' simply do not appear; only `caused by' do." 376 F.3d 1123, 1128 (D.C. Cir. 2004). Adopting the Supreme Court's approach to a different but similarly worded jurisdictional statute, the Circuit interpreted the causation element "to require only a showing of `proximate cause.'" *Id.* (citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 536-38 (1995)). Proximate cause exists so long as there is `some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.' *Valore at 66* (internal quotations omitted).

Here, there are several reasonable alleged connections between Iran's acts and the physical and emotional injuries suffered by plaintiffs: plaintiffs allege that the bombing of Khobar Towers was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran. Plaintiffs therefore have sufficiently alleged causation. On the evidence presented, there is a reasonable connection between the acts of defendants and the damages which the plaintiffs have suffered, and proximate cause has been proven.

## 3.    Defendant's Material Support of the Khobar Towers Bombing, which Killed Nineteen U.S. Service Members

The Khobar Towers bombing was an extrajudicial killing of nineteen United States Airmen for which Defendants provided material support and resources. The FSIA provides that the term "extrajudicial killing," 28 U.S.C. § 1605A(h)(7), has the meaning given it in section 3 of the

Torture Victims Protection Act of 1991, which defines an "extrajudicial killing" as a "deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note. This case meets the requirements articulated in *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1063 (D.C. Cir. 2024), which held that jurisdiction under 28 U.S.C. § 1605A requires a completed extrajudicial killing. The Khobar Towers bombing, resulting in the deaths of nineteen United States Airmen, clearly satisfies this standard.

With respect to the provision of material support, the FSIA provides that the term "material support or resources," 28 U.S.C. § 1605A(h)(3), has the meaning provided by 18 U.S.C. § 2339A, which states that support means any "property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(1).

The element of "material support" has been met when "the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Gates v. Syrian Arab Rep.,* 580 F. Supp. 2d 53, 67 (D.D.C. 2008). In *Gates*, Judge Collyer expounded on what types of evidence can establish material support:

> The types of support that have been identified as "material" have included, for example, financing and running camps that provided military and other training to terrorist operatives, allowing terrorist groups to use its banking institutions to launder money, and allowing terrorist groups to use its territory as a meeting place and safe haven, Such support has been found to have contributed to the actual terrorist act that resulted in a plaintiff's

damages when experts testify that the terrorist acts could not have occurred without such support, or that a particular act exhibited a level of sophistication in planning and execution that was consistent with the advanced training that had been supplied by the defendant state, or when the support facilitated the terrorist group's development of the expertise, networks, military training, munitions, and financial resources necessary to plan and carry out the attack, (expert testimony that the "attack might have been possible, but would not have been as easy" without defendant's support).

*Id*. at 67-68. Although the Court considers the evidence, it is well aware that nonetheless, "the defendant bears the burden of proving that that plaintiff's allegations do not bring its case within a statutory exception to immunity." *Harrison*, 882 F. Supp. 2d at 29, n.7 (internal alteration and quotation omitted).

There is no evidence that these killings were judicially sanctioned by any judicial body and clearly was not sanctioned by one that affords judicial guarantees. Defendant thus committed an extrajudicial killing through their agent Saudi Hezbollah. The evidence establishes that defendant's military arm, the IRGC provided materials and shelter for members of Saudi Hezbollah in planning and preparing the attack, that Iran financed the operation, and that MOIS provided members of Saudi Hezbollah with false documents and expert advice for the purpose of executing the bombing for the purpose of killing U.S. military service member. These constitute the provision of material support or resources.

**B.    The Plaintiffs have met the FSIA's Requirements for Having their Claims Heard**

The FSIA further provides that courts shall hear a claim under §1605(A) where (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section," (2) "the claimant or the victim was, at the time of the act . . . a national of the United States [or] a member of the armed forces [or]

otherwise an employee of the Government of the United States . . . acting within the scope of the employee's employment," and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(i)-(iii).

The evidence establishes that these three provisions are fulfilled. Iran has been designated a state sponsor of terrorism by the U.S. Secretary of State continuously since January 19, 1984 pursuant to section 6(j) of the Export Administration Act of 1979, U.S. Department of State, *Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836, Jan. 23, 1984.

Section 1605A requires that only one of *either* the injured victim of state-sponsored terrorism *or* his immediate family member who is claiming solatium damages needs to be a United States national at the time of the attack to give rise to the cause of action. *See, e.g., Doe v. DPK Min. of For. Aff's.*, (recognizing that because "the family member plaintiffs' claims all derive from U.S. nationals or U.S. armed forces members, the Court must hear their claims"); *Doe v. Islamic Rep. of Iran*, 808 F. Supp. 2d 1, 13 (D.D.C. 2011) (hearing claims of foreign nationals under FSIA whose claims derived from the U.S. government employee plaintiffs); *see also Mohammedi v. Islamic Republic of Iran*, 782 F. 3d 9, 14 (D.C. Cir. 2015).

Here, Plaintiffs' documentary evidence demonstrates that in June 1996, each of the injured Plaintiffs were service members of the United States Air Force, were stationed in Dhahran, Saudi Arabia, and resided in the Khobar Towers complex. Plaintiffs have submitted documentary evidence proving that all Plaintiffs are, and were on June 25, 1996, citizens of the United States or that their claim derives from a U.S. Citizen.

As for the arbitration requirement under § 1605A(a)(2)(A)(iii), Plaintiffs were not required to extend an offer to Iran to arbitrate because this requirement applies only when the terrorist act occurred in the foreign state against which the claim is brought.  Since the attack occurred in Saudi Arabia, not in Iran, the arbitration provision does not apply.

Plaintiffs have brought forth sufficient evidence as to jurisdiction to meet the standard for default judgment under Federal Rule of Civil Procedure 55(d) for all defendants. As each of these defendants was properly served under 28 U.S.C. § 1608, did not appear in this action, and "bears the burden of proving that that plaintiff's allegations do not bring its case within a statutory exception to immunity," the Court finds that jurisdiction has been established. *Harrison*, 882 F. Supp. 2d at 29, n.7 (internal alteration and quotation omitted).

Finally, the statute of limitations period in 28 U.S.C. § 1605A(b) is not jurisdictional. Defendants have forfeited any attempt to *raise* an affirmative statute of limitations defense "by failing to raise it in" this Court. *See, e.g., Owens*, 864 F.3d at 804; *Schooley*, 2019 WL 2717888, at *68, n.7

## V.   PERSONAL JURISDICTION HAS BEEN ESTABLISHED BECAUSE THE DEFENDANT WAS PROPERLY SERVED UNDER 28 U.S.C. 1608.

Service under the FSIA is sufficient to establish personal jurisdiction over the defendants. "The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state ... as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. §1330(a). "Personal jurisdiction over a foreign state shall exist as to every claim of relief over which the district courts have jurisdiction … where service has been made under [Section] 1608 of this title." 28 U.S.C. §1330(b).

Plaintiffs have complied with all requirements for service on defendant the Islamic Republic of Iran under 28 U.S.C. Section 1608(a), which provides for service over a foreign sovereign and its political subdivisions in one of four ways. The first two, by (1) "special arrangement for service between the plaintiff and the foreign state," and (2) "in accordance with an applicable international convention on service of judicial documents," are inapplicable here.[5] Section 1608(a)(3), requiring attempted service "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," was attempted here. *See* ECF No. 10 (requesting service under 28 U.S.C. 1608(a)(4) because service under (a)(3) could not be completed).

If service cannot be made pursuant to any of the first three subdivisions of Section 1608(a), after the lapse of at least 30 days, subdivision (a)(4) of that provision authorizes "diplomatic service" by requesting the Clerk of the Court to send two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when papers were transmitted." The State Department has sent to the Clerk of the Court a letter attesting to transmission of the required papers through diplomatic

---

[5] *See, e.g., Braun v. Islamic Republic of Iran*, CA No.15-cv-1136 (BAH) (D.D.C. Jan. 9, 2017) Memo. Opinion at 15 ("Defendants have neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service….")

channels pursuant to 28 U.S.C. 1608(a)(4), and a certified copy of the diplomatic note attesting to transmission of the required papers to the foreign minister of Iran on May 7, 2024. ECF No. 13.

Since service was successfully accomplished pursuant to Section 1608(a)(4), the Court has personal jurisdiction over defendant Iran. *See* e.g., *Cohen v. Islamic Republic of Iran,* CA12-cv-01496 (CRC) (D.D.C. March 1, 2017) at 12 ("Personal jurisdiction over foreign states exists as long as the Court can exercise original jurisdiction under 28 U.S.C. § 1330 (a) and service of process meets the standards set forth by 28 U.S.C. § 1608.").

## VI.    VENUE

Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4). Actions for personal injury and related torts perpetrated by foreign state sponsors of terrorism through their officials, employees, and agents fall within the meaning of 28 U.S.C. § 1605A generally.

## VII.    IRAN IS LIABLE TO THE SERVICE MEMBER PLAINTIFFS FOR ASSAULT, BATTERY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

As set forth in Section I of this Memo *supra*, there is sufficient evidence to conclude that as a result of its support Iran caused Hezbollah to be able to plan and execute its attack against Khobar Towers, which led to the injuries sustained by the plaintiffs. Defendant is liable to plaintiffs for personal injury and death under the private right of action under FSIA § 1605A(c) and are liable for compensatory damages including damages for pain and suffering, and solatium.

### A.    Choice of Law

In *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004), the D.C. Circuit held that neither the terrorism exception to foreign sovereign immunity, 28 U.S.C. § 1605(a)(7), nor the Flatow Amendment, Pub.L. No. 104–208, § 589, 110 Stat. 3009 –1, 3007–172 (1996) (codified at 28 U.S.C. § 1605 note), created a private right of action against foreign states for terrorism related injuries. It further held that 28 U.S.C. § 1605(a)(7) only provided federal

courts with jurisdiction to hear terrorism related claims and that each individual plaintiff must plead a cause of action under the particular tort law applicable to their claims. *Id*. at 1036. Following *Cicippio*, the courts, in most cases, looked to the law of the state in which the plaintiff was domiciled for the applicable tort law. *See, e.g., Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261 (D.D.C. 2005). As a result, it was not uncommon for the courts to apply more than one state's tort law in the same case, resulting in inconsistent damage awards to similarly situated plaintiffs. *See, e.g., Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 44-45 (D.D.C. 2007).

Recognizing the strong federal interest in creating uniformity in this area of foreign affairs, however, in 2008 Congress repealed 28 U.S.C. § 1605(a)(7) and enacted 28 U.S.C. § 1605A, the statute under which this lawsuit was brought. See § 1083, Pub.L. 110-181; *see also In re Islamic Republic of Iran Terrorism Litig*., 659 F. Supp. 2d 31, 58-59 (D.D.C. 2009).

Following its enactment, in cases such as this in which plaintiffs state a cause of action under 28 U.S.C. § 1605A, the district courts are no longer required to engage in a choice of law analysis, looking instead to the generally established principles of tort law. *See, e.g., Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010); *Rimkus v. Islamic Republic of Iran,* 750 F. Supp. 2d 163, 176 (D.D.C. 2010); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 157 (D.D.C. 2011); *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 224-25 (D.D.C. 2011). Accordingly, in assessing defendants' liability for plaintiffs' 28 U.S.C. § 1605A(c) claims, courts in this district look to, *inter alia*, the Restatements—including the Restatement (Second) of Torts (1965)—as well as the relevant decisions of this District. *See, e.g., Valore*, 700 F. Supp. 2d at 76.

## B.    Battery

Service member plaintiffs have established through evidence that Iran intentionally sought to harm them through the Khobar Towers bombing by means of providing Saudi Hezbollah with material support. Plaintiffs' evidence shows that the harmful contact occurred.

Iran is "liable for battery if, when they provided material support and resources for the attack, they acted 'intending to cause a harmful or offensive contact ... or an imminent apprehension of such a contact' with those attacked, and 'a harmful contact with [those attacked] directly or indirectly results.'" *Schooley*, 2019 WL 2717888, at *76 (quoting Restatement (Second) of Torts § 13). A harmful contact is one that results in "any physical impairment of the condition of another's body, or physical pain or illness." Restatement (Second) of Torts at § 15.  Here, both elements have been established. The evidence plainly establishes that Iran, in providing Saudi Hezbollah with the money, materials, and training necessary to detonate a significant explosion near an Air Force residence, acted with an intent to harm plaintiffs. Moreover, as set forth below, the injured airmen submitted declarations and documentary evidence providing uncontroverted evidence that they suffered significant physical injuries as a result of the attack on Khobar Towers. On the basis of this evidence, Iran is responsible for the injured service member plaintiffs' injuries under a battery theory (Count I).

## C.    Assault

Iran is liable for assault on the injured service member plaintiffs if, "when they provided material support and resources for the Attack, they acted 'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact' with those attacked and those attacked were 'thereby put in such imminent apprehension.'" *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 80 (D.D.C. 2017) (quoting Restatement (Second) Torts §21(1) (1979)).

The terrorist attack on the Khobar Towers complex "and other similar acts are intended to cause harm or, at least, fear of such harm among those targeted." *Id.* As this Court has previously recognized, terrorism literally means "'the use of violent acts to frighten the people in an area as a way of trying to achieve a political goal.'" *Id.* (quoting Terrorism, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/terrorism). Just as terrorist acts are designed to harm others physically, they are also designed to inflict psychological terror by instilling fear of future harm into the victims. *Valore,* 700 F.Supp.2d at 76.

The actions of Iran here certainly qualify under this standard. The evidence set forth in the plaintiffs' declarations indicates that the service member plaintiffs were all struck with fear following the attack and were put in imminent apprehension of harm. The plaintiffs have thus demonstrated that the defendant is liable for assault (Count II).

### D.    Intentional Infliction of Emotional Distress Against Injured Service Member Plaintiffs

This District has long recognized that "'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'" *Valore*, 700 F. Supp. 2d at 77 (quoting Restatement (Second) of Torts § 46(1) (1979)). "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *accord Schooley*, 2019 WL 2717888, at *72. Indeed, acts of terrorism are "by their very nature, intended to harm and terrify others." *Valore,* 700 F. Supp. 2d at 77.

Here, Iran, in working with Saudi Hezbollah to plan and execute the attack, sought to cause severe emotional distress to United States Air Force personnel living in the Khobar Towers complex. The plaintiffs who were stationed at Khobar Towers at the time of the explosion certainly

were afflicted with emotional distress. Iran "engaged in conduct that is extreme and outrageous by providing material support and resources to a known terrorist organization," *Schooley*, 2019 WL 2717888, at *72, and caused plaintiffs severe emotional distress.

### E.    Intentional Infliction of Emotional Distress/Loss of Solatium Against Immediate Family Members

Plaintiffs who are the immediate family members of injured service member plaintiffs bring a claim that defendant is liable to them for intentional infliction of emotional distress and loss of solatium (Count IV). They assert that the actions by defendant when it provided material support and resources for the Khobar Towers bombing were undertaken deliberately and recklessly, with knowledge that they would cause severe emotional distress to the immediate relatives of the United States Air Force personnel injured in the bombing.

The family members of the injured service members were aware that the bombing of the Khobar Towers had taken place, knew that their loved ones were present at the Khobar Towers, feared that their loved ones were killed or injured, and ultimately learned that their loved ones survived but were injured in the attack.  The actions of the defendants were the cause in fact of the plaintiffs suffering severe emotional distress.

A defendant is liable for intentional infliction of emotional distress to an injured person's family members if "the defendant engaged in extreme and outrageous conduct which 1) was directed at persons other than plaintiffs and 2) intentionally or recklessly caused severe emotional distress, but not necessarily bodily harm, to such persons' immediate family members, who were present at the time such conduct occurred." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015) (citing Restatement (Second) of Torts § 46(1)-(2)(a) (1965)). As with claims for intentional infliction of emotional distress for those physically injured plaintiffs, courts in this district recognize for family members' IIED claims, "[a]cts of terrorism are by their very

definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Id.* (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).

This Court has previously concluded, in line with the other jurisprudence in this District, that Iran's "conduct in materially supporting Saudi Hezbollah was 'sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present,' such that a victim's family members need not have been present to recover for their emotional distress." *Schooley*, at 2019 WL 2717888, at *73 (quoting *Heiser II*, 659 F. Supp. 2d at 27); *see also Valore*, 700 F. Supp. 2d at 80 ("One [ ] need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result.").

A solatium claim under the FSIA is identical to a claim for intentional infliction of emotional distress. *Valore*, 700 F.Supp.2d at 85 (citing *Heiser II*, 659 F.Supp.2d at 27 n. 4). Solatium refers to compensation for the "mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Id.*

Plaintiffs who are family members of injured airmen are entitled to solatium damages. Solatium damages compensate for the mental anguish, bereavement and grief that those with a close personal relationship to an injured or killed family member experience as the result of that person's injury or death, as well as the harm caused by the loss of that person's society and comfort. *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 88 (D.D.C. 2011). A close family member has been generally (but not always) recognized "as one's spouse, parents, siblings, and children." *Heiser II*, 659 F. Supp. 2d at 28.

Here, all family member plaintiffs have established that they are entitled to recover solatium damages for their intentional infliction of emotional distress claims. They are either close family members of the injured claimant, or the functional equivalent thereof, and have suffered emotional distress as a result of their injured family member's loss of society and companionship after the Khobar Towers bombing. The amount of those requested solatium damages for each family member is set forth below.

### 1. Certain Plaintiffs are the Functional Equivalent of Immediate Family Members of Injured Service Members of the Khobar Towers Attack, and thus Entitled to Recover Solatium Damages

The second prong of the Restatement's requirements for a plaintiff to be eligible to recover solatium damages is that they are "an immediate family member" of the person to whom the conduct was directed. Restatement (Second) of Torts § 46 (1965). Courts have traditionally defined "immediate family" to include parents, children, siblings, and spouses. *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 (D.D.C. 2001).

Here, two plaintiffs who were not legally related to the injured plaintiffs at the time of the Khobar Towers bombing in June 1996 claims to be the functional equivalent of "immediate family members" of the injured service members. John E. Kazmar and Manuel Caffey are the non-adoptive stepparents of injured airmen Travis S. Leeper and Amy Rancier.

The Court of Appeals for the D.C. Circuit addressed the question of the eligibility of non-immediate family members to recover solatium damages in the FSIA context in *Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003), where it rejected solatium claims brought by the nieces and nephews of a terrorism victim, none of whom were members of the victim's household. The *Bettis* court hinted at the rare exception to the "immediate family" requirement: "In a few limited circumstances, some courts have allowed relatives who either *resided in the same household* with the victim or were *legal guardians* to recover for negligent infliction of emotional

73

distress. In these cases, the parties in issue were members of the victim's household, and they were viewed as the functional equivalents of immediate family members." *Id*. at 337 (emphasis in original). To illustrate what it meant by "functional equivalent," the *Bettis* court cited *Sullivan v. Ford Motor Co*. No. 97-CV-0593 (RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000). In *Sullivan*, the court awarded solatium damages to an aunt who was the legal custodian of her nephew, "performed all the duties and responsibilities of a natural or adoptive parent," and was "the only family with whom [the nephew] shared his life on a daily basis from the time he was an infant of 12 months until his death." *Id*. at *11 & n.3.

Other FSIA cases have applied the "functional equivalent" language from *Bettis*. In *Heiser II*, the court emphasized the importance of cohabitation, noting that "in those rare cases in which the parties at issue had lived in the victim's immediate household and had been in other important respects like a spouse, parent, sibling, or child to the victim, circumstances may require a slight stretching of the immediate-family requirement" 659 F. Supp. 2d 20, 29 (D.D.C. 2009). On this logic, the *Heiser II* court awarded solatium damages to two non-adoptive stepfathers who were found to be the "functional equivalents of fathers" because they lived in the same household while their stepsons were minors and treated them as their own sons in every sense, financially, emotionally and socially. *Id*.

In the same case, the Court considered the intentional infliction of emotional distress claim of a non-adopted stepson who was treated by his stepfather like he was his biological father, where they maintained their close relationships until the day his stepfather died, and where after his stepfather married his mother, his stepfather was financially responsible for him. The Court found that the stepson had been the functional equivalent of a son, satisfying the immediate-family test, and awarded him solatium damages. *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d

20, 29 (D.D.C. 2009).  *See also Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 27 (D.D.C. 2011) (awarding solatium damages to grandson for grief over grandfather who was like "a second father to him").

In *Valore v. Islamic Republic of Iran*, the Court followed the rationale it had adopted in *Heiser II*, awarding solatium damages to a non-adoptive stepfather and stepbrother, who were the functional equivalent of a father and brother, but denying them to an uncle and niece. 700 F. Supp. 2d 52, 79 (D.D.C. 2010). While the decision is sparse on details about the family relationships, the court remarked that the stepfather and stepbrother treated victims as a son and a brother, respectively, and would engage in activities such as hunting and fishing together.  *Id*. at 79-80.

In *Heiser I*, 466 F. Supp. 2d 229 (D.D.C. 2006), two non-adopted stepchildren of a deceased victim of the Khobar Towers bombing were able to recover in a FSIA action as beneficiaries to his estate and for their own personal claims arising out of their stepfather's death. *Id*. at 313, n. 47. The stepchildren were able to show clear and convincing evidence that the decedent would have adopted his stepchildren but for a legal barrier. *Id*. The decedent became their stepfather when they were both still minors, and he would have adopted them but for the inability to locate their biological father. *Id*. The court was also persuaded by evidence that the decedent held his stepchildren as his own children and provided sole financial care for them.  *Id*. In *Heiser I*, the applicable law was the California Probate Code 2008, as this case was prior to the repeal of 28 U.S.C. § 1605(a)(7) and the enactment of 28 U.S.C. §1605A.

This Court in *Schooley v. Islamic Republic of Iran*, 17-1376 (D.D.C. 2019) and *Ackley v. Islamic Republic of Iran* 20-621 (D.D.C. 2022), awarded non-adopted stepchildren and a non-adoptive stepfather of injured airmen solatium damages. *Id*., 2019 WL 2717888, at *77, 78; 2022 WL 3354720 at *48, 49.

Therefore, the lack of a formal legal relationship at the time of the injury is not necessarily a bar to recovery for solatium damages. Rather, in such instances, the Court's inquiry turns on whether these family members were "members of the victim's household" such that they were "viewed as the functional equivalents of family members[.]" *Valore*, 700 F. Supp. 2d at 78-80.

Although it has not been adopted by this Court, the Restatement (Third) of Torts section on negligent infliction of emotional distress provides guidance with its use of the broader term "close family member," instead of "immediate family member" and calls for a "functional approach" in determining who qualifies for recovery. Restat. 3d of the Law, Torts: Liability for Physical and Emotional Harm, § 48 (3rd 2010) (citing Principles of the Law of Family, Dissolution: Analysis and Recommendations § 2.03(1)(c) and Comment *c*).

This section of the Restatement (Third) provides that "An actor who negligently causes sudden serious bodily injury to a third person is subject to liability for serious emotional harm caused thereby to a person who: (a) perceives the event contemporaneously, and (b) is a close family member of the person suffering the bodily injury." *Id*. at §48.

In describing a "close family member," the Restatement (Third) states, "Sometimes people live functionally in a nuclear family without formal legal family ties. When defining what constitutes a close family relationship, courts should take into account changing practices and social norms and employ a functional approach to determine what constitutes a family." *Id*. at §48 Comment h.

As set out below, plaintiffs John E. Kazmar and Manuel Caffey have submitted evidence, including declarations, that they are the functional equivalents of immediate family members and are entitled to recover solatium damages.

    a.  *John E. Kazmar*

John E. Kazmar is the functional equivalent of a father to injured plaintiff Travis S. Leeper. John met Travis's mother when Travis was eight years old and married her when Travis was nine years old. John Kazmar Decl. ¶ 5. Over time, John and Travis developed a strong father-son bond. *Id*. Despite Travis's initial hesitation to view John as a father, Kazmar remained committed to supporting him as a parent. *Id*. This included not only financial and emotional support but also active engagement in Travis's sports and activities. *Id.* They lived together as a cohesive family unit, with John providing for the household and all four children, establishing himself as a permanent father figure.

The bond John and Travis share continued beyond Travis's childhood. John and his wife maintained contact with Travis during his military service, traveling to attend his boot camp graduation in San Antonio, Texas, and remaining engaged in his life. *Id*. ¶ 6. After the Khobar Towers bombing, John's deep concern for Travis's well-being highlights the close connection they share. John was profoundly affected by the incident, consoling his wife and worrying about Travis's physical and mental state. *Id*. ¶ 8.

When Travis returned to the U.S., John traveled to see him and continued to offer emotional support, particularly as Travis struggled with sleep disturbances and ongoing psychological impacts. *Id*. ¶ 9.

In light of the evidence that John was the functional equivalent of a father to plaintiff Travis Leeper at the time of the bombing on June 25, 1996, he should be eligible to recover solatium damages.

b.  *Manuel Caffey*

Manuel Caffey is the functional equivalent of a father to injured plaintiff Amy Rancier. Manuel met Amy when she was just two years old and married her mother shortly thereafter.

Manuel Caffey Decl. ¶ 5. He raised Amy as his own child, providing her with housing, food, clothing, and unwavering support until she reached adulthood. *Id*. ¶¶ 5-7. Amy called him "daddy," and both have continually acknowledged and honored their father-daughter relationship. *Id*. ¶¶ 5-6.

Manuel actively participated in Amy's life, visiting her, supporting her family, and caring for her son when Amy was unable to enroll him in school locally. *Id*. ¶ 7. This depth of involvement further demonstrates his role as a dedicated and loving father figure.

Manuel's reaction to the news of the Khobar Towers bombing on June 25, 1996, underscores his deep bond with Amy. The days of uncertainty regarding her safety left him shocked, anxious, and devastated. *Id*. ¶ 9. When he learned she had survived, he felt overwhelming relief but continued to experience trauma, nightmares and feared for Amy's safety. *Id*. ¶ 10-13. Manuel was so impacted by this traumatic event that he sought support from spiritual counselors and remained emotionally affected long after. *Id*. ¶ 13.

Upon Amy's return to the U.S., Manuel and his family traveled a long distance to support her, helping her with daily tasks, such as cleaning, grocery shopping, cooking, and caring for her son. *Id*. ¶ 12. Manuel continues to live with constant reminders of the bombing, and events like 9/11 and ongoing conflicts renew his fears, demonstrating the lasting impact on him as Amy's father. *Id*. ¶ 15-17.

In light of the evidence that Manuel was the functional equivalent of a father to plaintiff Amy Rancier at the time of the bombing on June 25, 1996, he should be eligible to recover solatium damages.

## VIII.  DAMAGES

Damages available under the FSIA-created cause of action "include economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c). The service members who survived the Khobar Towers bombing can recover damages for their pain and suffering, as well as any other economic losses caused by their injuries; estates of those who did not survive can recover economic losses stemming from the wrongful death of the decedent; family members can recover solatium for their emotional injury.

"Upon obtaining a default judgment, successful plaintiffs may recover damages by proving 'that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.'" *Schooley*, 2019 WL 2717888, at *73 (quoting *Fraenkel*, 892 F.3d at 353 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003)).

This Court "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018). Plaintiffs have proven that the defendants' commission of acts of extrajudicial killing and provision of material support and resources for such killing was reasonably certain to, and indeed intended to, cause injury to plaintiffs. *See Schooley*, 2019 WL 2717888, at * 74 (finding that injuries suffered by victims of terrorism and family members as a result of Iran's material support of the Khobar Towers bombing "were reasonably certain and were actually the intended consequences of the defendants' material support of Saudi Hezbollah").

### A.  Damages Framework

"In determining the appropriate compensatory damages for each plaintiff's pain and suffering, this Court is guided not only by prior decisions awarding damages for pain and suffering, but also by those which awarded damages for solatium." *Haim v. Iran,* 425 F. Supp. 2d 56, 71 (D.D.C. 2006).

### 1.  Pain and Suffering Amount for Surviving Service Members

Each of the injured surviving servicemen have sought pain and suffering awards associated with their claims for battery. The claimants have provided uncontroverted evidence of physical and emotional injuries in the form of declarations, medical records, Purple Heart citations, V.A. disability ratings and other supporting personal documents such as news clippings and photographs. In *Schooley v. Islamic Republic of Iran*, this Court adopted the "following rubric" for determining damages awards in FSIA cases:

> those service member plaintiffs rated by the VA up to 30% disabled, whether due to mental or physical injuries, or a combination of both, will receive a baseline award of $5,000,000 each; those plaintiffs rated 40–60% disabled by the VA will receive an upward departure, for a total award of $6,000,000 each; and those service member plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of $7,000,000 each.[16] The fourteen injured service member plaintiffs who have not been rated as disabled by the VA will be awarded damages based on the severity of their injuries as discernable from their filings

*Schooley*, 2019 WL 2717888, at *75.

Where no VA disability rating is available, but the person suffered "'severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe

psychological pain,'" then a baseline award of $5,000,000 is warranted. *Schooley*, 2019 WL 2717888, at *75 (quoting *Khaliq*, 33 F. Supp. 3d at 33).[6]

## 2. Solatium Amount for Family Members of Surviving and Killed Service Members

In determining the amount of compensatory damages awards to family members of a surviving victim, this District Court has held that these awards are determined by the "nature of the relationship" between the family member and victim, and "the severity of the pain suffered by the family member." *Haim,* 425 F.Supp.2d at 75. Parents of victims typically receive smaller awards than spouses, but receive larger awards than siblings. *Id.* Moreover, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Heiser I* at 59-60.

In *Schooley*, this Court set forth the appropriate levels of compensation for family member solatium claims, largely applying the *Heiser* framework:

> As a baseline, the *Heiser* framework awards "spouses of deceased victims ... approximately $8 million, while parents and children received $5 million and siblings received $2.5 million." *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010). As noted, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim*, 425 F. Supp. 2d at 75). Accordingly, "in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where 'awards are valued at half of the awards to family members of the deceased,'" *i.e.,* $4,000,000 to spouses of surviving victims, $2,500,000 to parents of surviving victims, *Wultz*, 864 F. Supp. 2d at 39 (internal quotation marks omitted) (citing authorities), and "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014).

---

[6] The baseline here refers to that amount for substantial injuries set forth in *Valencia v. Islamic Republic of Iran,* 774 F. Supp. 2d 1 (D.D.C. 2010). *Schooley* rejected an across the board application of Valencia in favor looking to available VA ratings because those ratings facilitate "an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides a relatively objective measure of comparative injuries[.]" *Id.*, at *74.

*Schooley*, 2019 WL 2717888, at * 77.

However, "[t]hese numbers serve only as a baseline from which the Court may deviate to compensate for specific circumstances." *Id.* The Court retains the discretion to "'deviate from the starting points provided by the *Heiser* framework'" based on the facts of each case. *Id.* (quoting *Oveissi*, 879 F. Supp. 2d at 26). In applying this framework, courts must be wary that "[t]hese numbers . . . are not set in stone," *Murphy,* 740 F.Supp.2d at 74, and that deviations may be warranted when, *inter alia,* "evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi,* 768 F.Supp.2d at 26-27; *see also Fraenkel*, 892 F.3d at 351 (explaining that *Heiser* "may serve as a useful reference point" but that District Court judges have discretion to adjudicate solatium claims "based on the particular facts of each case").

## B.    Awards for damages

Upon the Court's examination of the nature of the injuries of each of the servicemen, Plaintiffs respectfully request the Court make the following findings about the compensatory damages for the surviving servicemen arising out of their respective battery, assault, and IIED claims, and the IIED and loss of solatium claims of their family members. Plaintiffs are not presenting evidence for lost wages or other economic losses and therefore no economic damages should be awarded.

### 1.    Individual pain and suffering awards to injured airmen

Eight of the twelve injured service members plaintiffs have a VA disability rating of 70% or higher: Jason M. Breezee, Bradley J. Donaghue, James A. Mings, James E. Porter, Amy Rancier, Dale O. Robinson, Morgan S. Spruill, and Patrick R. Stark. Accordingly, these eight

plaintiffs should be awarded an upward departure from the baseline award, for a total award to each of $7,000,000 for their pain and suffering as survivors of the bombing.

Two of the twelve injured service member plaintiffs have a VA disability rating of 40-60%: Kenneth P. Giddens and Lakisha S. Robertson. Accordingly, these two plaintiffs should be awarded an upward departure from the baseline award for a total award to each of $6,000,000 for their pain and suffering as survivors of the bombing.

One of the twelve injured service member plaintiffs has a VA disability rating of up to 30%: Steven Kerr. Accordingly, Steven should be entitled to the baseline award of $5,000,000 for his pain and suffering as a survivor of the bombing.

One of the 12 injured service member plaintiffs has not received a VA disability rating: Travis S. Leeper. Review of Travis' "uncontroverted factual allegations" in his affidavit, *Roth*, 78 F. Supp. at 386, and exhibits, demonstrates that he suffered severe physical injury as well as lasting and severe psychological pain," *See Valore*, 700 F. Supp. 2d at 83-84; *see also* Travis Leeper Decl. ¶ 7, 10, 12-13 (describing bloodied feet from shattered glass and the severe psychological symptoms of chronic insomnia, frequent anxiety and panic attacks, and ongoing difficulty with personal relationships). Travis was awarded the Air Force Achievement Medal for "react[ing] courageously in the hours immediately following the Khobar Towers bombing." Travis Leeper Decl. ¶ 4; Ex. 4 (Air Force Achievement Medal, dated November 25, 1996). Travis should be entitled to an award of $5 million for the cuts and lacerations he sustained in the bombing and the psychological symptoms he has suffered since. *See Gration*, 2023 WL 5221955, at *30.

### 2. Solatium awards to family member plaintiffs

The thirty-nine family member plaintiffs have each suffered from seeing the effects of the Khobar Towers bombing on their loved ones. In light of the framework of *Heiser* and *Schooley*,

the damages awards for plaintiff spouses are addressed first, followed by parents and children, and then siblings.

        a.   *Spouses*

Four of the thirty-nine family member plaintiffs were spouses of service member plaintiffs at the time of the attack and continued in the marriage dealing with the concomitant adverse effects of the 1996 bombing:  Maria A. Hale, Karen Kerr, Curtis E. Robertson, Sr., and Rhonda L. Spruill. Each spouse described their fear for their spouses' physical well-being in the immediate aftermath of the attack as they waited for information on the status of their spouses, and the emotional toll of the physical and psychological after-effects of the attack once their spouses returned home.[7] Accordingly, the spouses should be entitled to a baseline award of $4,000,000.  *See Akins*, 332 F. Supp. 3d at 44 (awarding $4,000,000 as a baseline for the spouses of injured service members); *see also Schooley*, 2019 WL 2717888, at *76.

        b.   *Parents*

Ten of the thirty-nine family member of plaintiffs are parents of service members who were stationed at Khobar Towers at the time of the bombing:  Judith K. Kazmar, John E. Kazmar, Albert J. Mings, Deborah L. Mings, Rosie M. Caffey, Manuel Caffey, Dilcia H. Fernandez, Jane C. Strader, James L. Weimer, and Bonita J. Weimer.  Each has described their fear for their respective children upon learning about the attack, and the ongoing difficulty of witnessing and trying to help their children cope with the physical and psychological after-effects of the attack.[8]  The parents of

---

[7] *See* Maria Hale Decl. ¶¶ 6-10; Karen Kerr Decl. ¶ 5-14; Curtis Robertson, Sr. Decl. ¶¶ 7-15; Rhonda Spruill Decl. ¶¶ 6-17.

[8] *See* Judith Kazmar Decl. ¶¶ 5-7; John Kazmar Decl. ¶¶ 7-9; Albert Mings Decl. ¶¶  6-12; Estate of Deborah Mings Decl. ¶¶ 6-13; Rosie Caffey Decl. ¶¶ 7-15; Manuel Caffey ¶¶ 8-17; Dilcia Fernandez Decl. ¶¶ 6-15; Jane Strader Decl. ¶¶ 6-9; James Weimer Decl. ¶¶ 6-9; Bonita Weimer Decl. ¶¶ 6-9.

the injured service members should be entitled to a baseline award of $2,500,000.  *See Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service members); *see also Schooley*, 2019 WL 2717888, at *78.

       c.   *Children*

Seven of the thirty-nine family member plaintiffs are children of service member plaintiffs injured in the Khobar Towers Attack: Kyle M. Bump, Emily R. Edman, Robert M. Edman, Angelique U.M. Mercier, Courtney T.E. Johnson, Curtis E. Robertson II, and Trisha L. Weber. Consistent with the court's recognition in *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 271 (D.D.C. 2020), and *Estate of Johnson*, 2024 WL 3225954, at *15 (D.D.C. June 28, 2024), each child should be entitled to an award of $2,500,000. The court in *Sheikh* reasoned that "children who lose parents are likely to suffer as much as parents who lose children," acknowledging the significant lifelong impacts suffered by children of injured victims. Each plaintiff in this category has expressed the enduring toll their parents' injuries have had on their family dynamic and individual well-being:

1.    **Kyle M. Bump.** The Khobar Towers bombing fundamentally changed Kyle's father, who became short-tempered and emotionally detached. Kyle grew up fearful of his father's reactions, leading to a lack of a meaningful father-son relationship. This emotional distance caused Kyle to rely solely on his mother for support and led to feelings of isolation and loss, as he never experienced the guidance and nurturing that a father should provide. Kyle Bump Decl. ¶¶ 6-8.

2.    **Emily R. Edman.** During the thirteen hours following the bombing, Emily Edman experienced extreme fear and sadness, uncertain whether her father was alive or dead.  Seeing her father in a severely injured state upon his return was deeply distressing. The attack's aftermath

contributed to her developing Borderline Personality Disorder, which she connects to the trauma of separation from her father and the instability caused by his PTSD. Emily Edman Decl. ¶¶ 6-10.

3.    **Robert M. Edman.** Robert Edman witnessed his father's ongoing struggles with survivor's guilt and severe claustrophobia, which worsened over time. His father's emotional breakdowns, including waking up crying at night, profoundly affected Robert, as he grappled with the weight of his father's grief and the lives lost during the attack. Robert Edman Decl. ¶¶ 6-7.

4.    **Angelique U.M. Mercier.** Following the attack, Angelique Mercier's father became an angry and abusive figure, a stark contrast to the loving parent he had been. The loss of her father's emotional support drove Angelique into destructive behaviors, including substance abuse, as she struggled to cope with feelings of abandonment and grief for the father she once knew. Angelique Mercier Decl. ¶¶ 6-8.

5.    **Courtney T.E. Johnson.** At six years old, Courtney Johnson faced the fear and uncertainty of not knowing if his mother had survived the bombing. Seeing her physical scars upon her return intensified his sense of vulnerability. The attack's traumatic impact on his mother and her emotional withdrawal deeply affected his life choices, leading him to abandon aspirations of military service. Courtney Johnson Decl. ¶¶ 5-8.

6.    **Curtis E. Robertson II.** Curtis grew up under the shadow of his mother's PTSD, characterized by paranoia and overprotectiveness. These changes in her behavior altered the family dynamic, leaving Curtis with profound sadness over the impact of the bombing on her personality and their relationship. Curtis Robertson Decl. ¶¶ 5-6.

7.    **Trisha L. Weber.** The severe injuries and PTSD suffered by Trisha's father created an environment of emotional instability within their home. Trisha assumed caregiving responsibilities for her younger sister while her father coped with depression and alcohol

dependency. His emotional absence and volatile reactions left Trisha feeling alone, scared, and burdened during her childhood. Trisha Weber Decl. ¶¶ 6-12.

Given the significant lifelong impacts on each of these children an award of $2,500,000 per child is justified. This aligns with the evolving precedent that acknowledges the profound emotional and psychological toll on children whose parents are victims of terrorism.

### d. Siblings

Eighteen of the thirty-nine family member plaintiffs are each siblings of service members who were injured by the Khobar Towers bombing:  Christopher L. Burnham, Sandra B. Madden, Alexandria L. Capaccio, Vincent D. Capaccio, Anthony J. Coleman, Jason L. Coleman, Phillip Coleman, Jr., Temeke Coleman, Denise R. Rodriguez, David J. Giddens, Timothy P. Giddens, Eunice B. Holman, Jeffrey J. Jiron, Tonya T. Caffey, Kareem H. Brown, Roger P. Dabriel, Cassandra J. Johnson, and Latoya Sapp. Each has described the emotional distress they experienced when they first learned of the bombing, and the struggle witnessing the psychological after-effects on their siblings.[9] Consistent with the *Heiser* and *Schooley* framework, the siblings of the injured service members should be entitled to an award of $1,250,000.  *See Akins*, 332 F. Supp. At 45 (awarding a baseline amount of $1,250,000 to the siblings of injured service members); *see also Schooley*, 2019 WL 2717888, at *79.

### C. PUNITIVE DAMAGES

Plaintiffs' claims are brought under 28 U.S.C. § 1605A(c), which creates a "[p]rivate right of action ... for personal injury or death," and currently provides that, "[i]n any such action,

---

[9] *See* Christopher Burnham Decl. ¶¶ 6-7; Sandra Madden Decl. ¶¶ 5-7; Alexandria Capaccio Decl. ¶¶ 5-7; Vincent Capaccio Decl. ¶¶ 5-12; Anthony Coleman Decl. ¶¶ 5-9; Jason Coleman Decl. ¶¶ 7-12; Phillip Coleman, Jr. Decl. 6-10 ¶¶; Temeke Coleman Decl. ¶¶ 7-9; Denise Rodriguez Decl. ¶¶ 7-12; David Giddens Decl. ¶¶ 6-11; Timothy Giddens Decl. ¶¶ 6-13; Eunice Holman Decl. ¶¶ 8-12; Jeffrey Jiron Decl. ¶¶ 6-15; Tonya Caffey Decl. ¶¶ 7-15; Kareem Brown Decl. ¶¶ 6-10; Roger Dabriel Decl. ¶¶ 6-9; Cassandra Johnson Decl. ¶¶ 5-9; Latoya Sapp Decl. ¶¶ 6-10.

damages may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). In *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020), the Supreme Court held that Congress clearly authorized plaintiffs suing under § 1605A(c) to seek punitive damages for pre-2008 conduct. 140 S. Ct. at 1608. As this Court has recognized, "after *Opati*, then, plaintiffs, who are proceeding under § 1605A(c), may seek punitive damages." *Id.* Citing (*Ewan v. Islamic Republic of Iran*, No. 17-cv-1628 (JDB), 2020 WL 3081939, at *10 (D.D.C. June 10, 2020)).

Punitive damages are intended to "punish and deter" defendants for their bad acts. *Valore*, 700 F. Supp. 2d at 87. Courts calculate punitive damages by considering "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 18, 27 (D.D.C. 2017).

This Court awarded punitive damages in cases brought by victims of the Khobar Towers bombing." *Christie v. Islamic Republic of Iran*, No. 19-1289, 2020 WL 3606273 at * 22 (D.D.C. Jul. 2, 2020) (Howell, C.J.); *Blank v. Islamic Republic of Iran*, No. 19-3645, 2021 WL 3021450 at * 13 (D.D.C. Jul. 19, 2021) (Howell, C.J.)  In so holding, the Court nevertheless recognized that the "defendant's conduct was incredibly reprehensible — "the result of intentional malice," not "mere accident"" *Christie*, 2020 WL 3606273 at * 28 (internal quotations and citations omitted). And that, "the Khobar Towers bombing caused the death of nineteen people and physical injuries to hundreds more." *Id.* This Court also recognized that, "physical assault or trauma" is the most serious type of harm that a defendant can do to a plaintiff, and the type of harm most deserving of punitive damages. *Id.* (internal quotation and alteration omitted).

In *Christie* and *Blank*, this Court imposed punitive damages equal to compensatory damages; cases which are based on the same event at issue in the present case.  *Christie*, 2020 WL

3606273 at *22; *Blank*, 2021 WL 3021450 at *13. The same is warranted here. For these reasons, the Court should impose punitive damages on Iran in an amount equal to compensatory damages.

## IX.  CONCLUSION

For the forgoing reasons, plaintiffs request that final default judgment be entered in favor of plaintiffs and against Iran, in the amounts set forth above, plus any applicable post-judgment interest at the statutory rate, 28 U.S.C. § 1961(a)[10] to be allocated in the following manner:

| CLAIMANT | RELATIONSHIP TO INJURED CLAIMANT | AMOUNT OF COMPENSATORY DAMAGES |
| --- | --- | --- |
| **Jason M. Breezee** | Injured Claimant | $7 million |
| Kyle M. Bump | Child (*Schooley* plaintiff Shannon K. Bump) | $2.5 million |
| Christopher L. Burnham | Sibling (*Schooley* plaintiff Dwayne Burnham) | $1.25 million |
| Sandra B. Madden | Sibling (*Schooley* plaintiff Dwayne Burnham) | $1.25 million |
| Alexandria L. Capaccio | Sibling (*Schooley* plaintiff Salvatore Capaccio) | $1.25 million |
| Vincent D. Capaccio | Sibling (*Schooley* plaintiff Salvatore Capaccio) | $1.25 million |
| Anthony J. Coleman | Sibling (*Schooley* plaintiff Artis R. Coleman) | $1.25 million |
| Jason L. Coleman | Sibling (*Schooley* plaintiff Artis R. Coleman) | $1.25 million |
| Phillip Coleman, Jr. | Sibling (*Schooley* plaintiff Artis R. Coleman) | $1.25 million |
| Temeke Coleman | Sibling (*Schooley* plaintiff Artis R. Coleman) | $1.25 million |
| **Bradley J. Donaghue** | Injured Claimant | $7 million |
| Emily R. Edman | Child (*Schooley* plaintiff Thomas F. Edman) | $2.5 million |

---

[10] *See Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013) (allowing post-judgment interest against a foreign sovereign under the FSIA).

| | | |
|---|---|---|
| Robert M. Edman | Child (*Schooley* plaintiff Thomas F. Edman) | $2.5 million |
| **Kenneth P. Giddens** | Injured Claimant | $6 million |
| Denise R. Rodriguez | Sibling | $1.25 million |
| David J. Giddens | Sibling | $1.25 million |
| Timothy P. Giddens | Sibling | $1.25 million |
| Maria A. Hale | Spouse (*Schooley* plaintiff Shawn K. Hale) | $4 million |
| Eunice B. Holman | Sibling (*Schooley* plaintiff Leighton J. Reid) | $1.25 million |
| Jeffrey J. Jiron | Sibling (*Ackley* plaintiff Richard R. Jiron) | $1.25 million |
| **Steven Kerr** | **Injured Claimant** | **$5 million** |
| Karen Kerr | Spouse | $4 million |
| **Travis S. Leeper** | **Injured Claimant** | **$5 million** |
| Judith K. Kazmar | Parent | $2.5 million |
| John E. Kazmar | Parent | $2.5 million |
| Angelique U.M. Mercier | Child (*Schooley* plaintiff George P. Nicholaou) | $2.5 million |
| **James A. Mings** | Injured Claimant | $7 million |
| Albert J. Mings | Parent | $2.5 million |
| Deborah L. Mings | Parent | $2.5 million |
| **James E. Porter** | Injured Claimant | $7 million |
| **Amy Rancier** | Injured Claimant | $7 million |
| Courtney T.E. Johnson | Child | $2.5 million |
| Rosie M. Caffey | Parent | $2.5 million |
| Manuel Caffey | Parent | $2.5 million |
| Tonya T. Caffey | Sibling | $1.25 million |
| **Lakisha S. Robertson** | Injured Claimant | $ 6 million |
| Curtis E. Robertson, Sr. | Spouse | $4 million |
| Curtis E. Robertson, II | Child | $2.5 million |
| Dilcia H. Fernandez | Parent | $2.5 million |
| Kareem H. Brown | Sibling | $1.25 million |
| Roger P. Dabriel | Sibling | $1.25 million |

| | | |
|---|---|---|
| Cassandra J. Johnson | Sibling | $1.25 million |
| Latoya Sapp | Sibling | $1.25 million |
| **Dale O. Robinson** | Injured Claimant | $7 million |
| **Morgan S. Spruill** | Injured Claimant | $7 million |
| Rhonda L. Spruill | Spouse | $4 million |
| **Patrick R. Stark** | Injured Claimant | $7 million |
| Jane C. Strader | Parent (*Schooley* plaintiff Martin L. Wheeler) | $2.5 million |
| Trisha L. Weber | Child (*Schooley* plaintiff Jefferson A. Craven) | $2.5 million |
| James L. Weimer | Parent (*Schooley* plaintiff Aaron R. Weimer) | $2.5 million |
| Bonita J. Weimer | Parent (*Schooley* plaintiff Aaron R. Weimer) | $2.5 million |

Total compensatory damages: $159,000,000

IT IS FURTHER ORDERED that plaintiffs, at their own cost and consistent with the requirements of 28 U.S.C. § 1608(e), send a copy of this Judgment and the Findings of Fact and Conclusions of Law issued this date to Defendant.

Respectfully Submitted,

 /s/ Joshua M. Ambush
Joshua M. Ambush
Bar No. MD 27025
Law Offices of Joshua M. Ambush, LLC
106 Old Court Road, Suite 303
Baltimore, Maryland 21208
Phone: (410) 484-2070
Facsimile: (410) 484-9330
joshua@ambushlaw.com

Dated: December 19, 2024                    Attorney for Plaintiffs.