## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JASON M. BREEZEE, *et al.*, | |
| Plaintiffs, | Civil Action No. 23-3392 (BAH) |
| v. | Judge Beryl A. Howell |
| ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

### MEMORANDUM OPINION

This action, brought by 49 plaintiffs, arises out of the June 25, 1996, bombing of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel. *See* Second Am. Compl. ("SAC") ¶¶ 1, 61, ECF No. 82. The bombing killed nineteen U.S. Air Force personnel and injured hundreds more, including injuring the eleven servicemember plaintiffs in this case. *Id.* ¶¶ 1, 67. The plaintiffs in this case also include the immediate family members both of the eleven injured servicemember plaintiffs and of other servicemembers who were injured in the bombing and were previously awarded compensatory damages in other cases arising out of the Khobar Towers bombing. *See id.* ¶ 1. Based on allegations that defendant, the Islamic Republic of Iran ("Iran"), provided "funds, training, and direction to Hezbollah for its terrorist activities, including the June 25, 1996, terrorist attack on Khobar Towers," *id.* ¶ 60; *see also, e.g., id.* ¶ 70 (alleging that "[t]he terrorist attack on the Khobar Towers was approved by Ayatollah Khamenei, the Supreme leader of Iran at the time"), plaintiffs seek damages for their injuries suffered as a result of the attack under the terrorism exception to the Foreign Sovereign Immunities Act's ("FSIA"), 28 U.S.C. § 1605A. Despite plaintiffs' compliance with the FSIA's requirements for effectuating service on a sovereign defendant, Iran has failed to enter an

appearance or otherwise defend against this action. *See* 28 U.S.C. § 1608(a)(4); Return of Service/Aff., ECF No. 13; Clerk's Entry of Default ("2d Entry of Default"), ECF No. 84. Plaintiffs now seek the entry of default judgment against Iran as to liability and damages. Pls.' Renewed Mot. for Default J. & to Take Judicial Notice of Evid. in Prior Related Cases ("Pls.' Mot."), ECF No. 85. For the reasons detailed below, plaintiffs' motion is granted in part and denied in part.

## I.    BACKGROUND

Numerous prior decisions of this Court have found Iran liable for the Khobar Towers bombing. *See, e.g.*, *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (Lamberth, J.); *Est. of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229 (D.D.C. 2006) (Lamberth, J.); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010) (Lamberth, C.J.); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020) (Howell, C.J.); *Christie v. Islamic Republic of Iran*, No. 19-cv-1289 (BAH), 2020 WL 3606273 (D.D.C. July 2, 2020) (Howell, C.J.); *Blank v. Islamic Republic of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) (Howell, C.J.); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL 3354720 (D.D.C. Aug. 12, 2022) (Howell, C.J.); *Mustard v. Islamic Republic of Iran*, No. 21-cv-163 (BAH), 2023 WL 1778193 (D.D.C. Feb. 6, 2023) (Howell, C.J.); *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) (Howell, J.); *Thole v. Islamic Republic of Iran*, No. 23-cv-793 (BAH), 2024 WL 2208208 (D.D.C. May 16, 2024) (Howell, J.); *Est. of Johnson v. Islamic Republic of Iran*, No. 23-cv-1689 (BAH), 2024 WL 3225954 (D.D.C. June 28, 2024) (Howell, J.).

In *Blais* and *Heiser I*, the Court heard evidence and witness testimony about the connection between Iran and the attack on the Khobar Towers. *See Blais*, 459 F. Supp. 2d at 46 n.4, 48-49;

*Heiser I*, 466 F. Supp. 2d at 250.  In *Heiser I* alone, the plaintiffs' examination of witnesses, including seven expert witnesses, and presentation of other evidence took 17 days.  *See* 466 F. Supp. 2d at 250.[1]  Other cases, including *Rimkus*, *Akins*, and *Schooley*, have concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus*, 750 F. Supp. 2d at 173; *Akins*, 332 F. Supp. 3d at 9-11; *Schooley*, 2019 WL 2717888, at *2, and plaintiffs here request that "[t]his Court . . . take judicial notice of the related records and proceedings from other cases before the District Court for the District of Columbia, where Iran has already been found liable for this same attack," since these cases "arose out of the bombing of Khobar Towers and address identical issues regarding the liability of Iran for the attack on Khobar Towers," Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. ("Pls.' Mem.") at 3-4, ECF No. 85-1.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).[2]  In this District, Rule 201 has been applied frequently to take judicial notice of factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendant[]," *Akins*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017)

---

[1]    The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former director of the Federal Bureau of Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism; (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former deputy counterterrorism chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260-65, 263 n.18; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on the grief process, *see id.* at 269-70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273-74.

[2]    "[A]djudicative facts are simply the facts of the particular case." *Nat'l Org. for Women v. Social Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (quoting FED. R. EVID. 201, Advisory Committee Note).  The Rule does not govern judicial notice of "legislative facts," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

3

(citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).  Using judicial notice in this way avoids "the formality of having that evidence reproduced" in each new case. *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011) (quoting *Rimkus*, 750 F. Supp. 2d at 172)); *see also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation" (internal quotation marks and citation omitted)); *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (Lamberth, C.J.) (taking "judicial notice of the evidence presented in the earlier cases").  Importantly, taking judicial notice of prior findings "does not conclusively establish the facts found" as to the instant case.  *Foley*, 249 F. Supp. 3d at 191.  Instead, "based on judicial notice of the evidence presented in the earlier cases[,] . . . courts may reach their own independent findings of fact."  *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (Lamberth, C.J.); *see also Rimkus*, 750 F. Supp. 2d at 172 ("[C]ourts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them."). The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases.  *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049, 1051 (D.C. Cir. 2014) (finding that plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice).

Persuaded that this approach is both "efficient and sufficiently protective of the absent defendant['s] interests," *Akins*, 332 F. Supp. 3d at 11, plaintiffs' request to take judicial notice of

the evidence presented in *Heiser I*, *Blais*, *Rimkus*, and *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010) (Lamberth, C.J.), is granted. *See Akins*, 332 F. Supp. 3d at 11 (stating that "factual evidence developed in other cases involving the same conduct by the same defendants is admissible and may be relied upon in this case"); Pls.' Mem. at 3-4 (requesting judicial notice be taken of the findings in these four cases). The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

A.    **The Attack on Khobar Towers**

"The Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47. Shortly before 10:00 pm on June 25, 1996, "a large gasoline tanker truck" drove up to the Khobar Towers complex and parked "alongside the perimeter wall." *Heiser I*, 466 F. Supp. 2d at 252; *see also* SAC ¶ 65. After parking, the driver of the truck "jumped out, ran into a waiting car that had pulled up near the truck, and sped off." *Heiser I*, 466 F. Supp. 2d at 252; *see also* SAC ¶ 65. Although security guards stationed near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252; *see also* SAC ¶ 66. The blast "sheared off the face of Building 131," *Heiser I*, 466 F. Supp. 2d at 252; "damaged every other building in the complex," SAC ¶ 67; and "shattered windows up to half a mile away" from the explosion, *Aceto*, 2020 WL 619925, at *2 (citation omitted). Investigations of the attack "determined that the force of the explosion was the equivalent of 20,000 pounds of TNT," which the U.S. Department of Defense described as "the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252.

### B.    Defendant Iran's Role in the Attack

The U.S. Department of State has designated Iran as a state sponsor of terrorism since January 19, 1984. *Blais*, 459 F. Supp. 2d at 47 (citation omitted); *see also, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism [https://perma.cc/VF4X-JQU4] (last visited Sept. 22, 2025). Prior proceedings have found that Iran planned and supported the Khobar Towers bombing. Both Ayatollah Ali Khamenei, the Supreme leader of Iran at the time of the attack, and Iran's Minister of Intelligence and Security "approved" the attack. *Heiser I*, 466 F. Supp. 2d at 252. The truck bomb used in the attack was "assembled" at a base in Lebanon's Bekaa Valley, which base was "jointly operated by the [Iranian Revolutionary Guard Corps ('IRGC')] and by the terrorist organization known as Hezbollah." *Id.* The individuals who carried out the bombing drove the bomb from this base to Dhahran and called themselves "Saudi Hezbollah." *Id.*

These factual findings are based in part on testimony provided by four key expert witnesses in *Blais* and *Heiser I*, including Louis Freeh, the director of the FBI at the time of the bombing, and Dale Watson, who was the deputy counterterrorism chief of the FBI at the same time. The testimony of both Freeh and Watson in *Heiser I* was based on their oversight of the FBI's "massive and thorough investigation of the attack," which investigation involved "over 250 agents." *Id.*; *see also id.* at 260-62 (describing the testimony of Freeh and Watson and the basis for each expert's knowledge of the incident).[3] Based on information gathered in their investigations, both Freeh

---

[3]    During this investigation, the FBI interviewed six members of Saudi Hezbollah, each of whom admitted "their complicity in the attack on Khobar Towers, and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers." *Heiser I*, 466 F. Supp. 2d at 253. This investigation ultimately resulted in an indictment, returned by a grand jury in Alexandria, Virginia, "against 13 identified members of the pro-Iran Saudi Hezbollah organization." *Id.* at 252.

and Watson testified to their conclusions that "Iran, [the Ministry of Information and Security [("MOIS")], and IRGC were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah." *Id.* at 264; *see also Blais*, 459 F. Supp. 2d at 48.

Additional expert testimony was provided in *Heiser I* by Dr. Patrick Clawson, who based his opinions on "his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials," and "his academic research on the subject." 466 F. Supp. 2d at 262. According to Clawson, "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and . . . Saudi Hezbollah carried out the attack under their direction." *Id.* at 253. This opinion was also supported by Dr. Bruce Tefft, a former founding member of the CIA's counterterrorism bureau, who testified, based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA and from his security clearances since that time," that there was "no question" that Iran and the IRGC "were responsible for planning and supporting the attack on the Khobar Towers" and specifically that the attack "wouldn't have happened without Iranian support." *Id.* at 254.

## C.    The Instant Plaintiffs

The forty-nine plaintiffs in this lawsuit include eleven servicemembers who "suffered physical and/or mental and emotional injuries" as a result of the Khobar Towers bombing and nineteen of their immediate family members, as well as nineteen immediate family members of other servicemembers awarded damages in two previous actions arising out of the attack on the Khobar Towers. SAC ¶ 1 (explaining that eighteen family member plaintiffs are immediate family members of injured servicemembers who were plaintiffs in *Schooley*, 2019 WL 2717888, and one is the immediate family member of an injured servicemember who was a plaintiff in *Ackley*, 2022 WL 3354720). Each of the eleven servicemember plaintiffs and associated family members are

7

described below, followed by the plaintiffs who are family members of servicemembers awarded damages in *Schooley* and *Ackley*.

### 1.  *Jason M. Breezee*

On June 25, 1996, Jason M. Breezee was a Senior Airman in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers.  Decl. of Jason M. Breezee ("Breezee Decl.") ¶ 3, ECF No. 109; *see also* SAC ¶ 6.[4]  At the time of the bombing, Breezee was using the restroom in his dorm room.  Breezee Decl. ¶ 5.  When the bomb detonated, "all the windows [in the building] imploded inward," and Breezee was "launched" into the bathtub, cutting his finger on glass.  *Id*. ¶ 6.  He crawled out of the bathtub and found his roommate bleeding.  *Id*.  After evacuating the building, Breezee and his roommate "encountered utter chaos," including people with "glass in their eyes and all over their bodies," and people from buildings closer to the explosion with "broken legs and arms."  *Id*.  Instead of seeking medical treatment, they started "triaging people," assisting those who needed the most help by "splinting them with [their] belts, with kitchen chair legs that [they] broke off, anything that [they] could find to keep their broken bones as straight as possible."  *Id*.

After the bombing, Breezee returned to work but felt "terrified."  *Id*. ¶ 7.  He described himself as "forever traumatized" by the sight of the bodies of the nineteen killed airman, *id.* ¶ 8, and was ultimately diagnosed with PTSD, *id.* ¶ 9.  He is impacted by the experience "every day," making him uncomfortable in big crowds, uncomfortable around people in general, and quick to anger.  *Id.* ¶ 9.  He also has trouble sleeping and experiencing loud noises.  *Id.* ¶ 10.

---

[4]    Each plaintiff submitted both a sealed declaration (and associated exhibits) and a redacted but not sealed version of the same documents.  Where possible, the unsealed, publicly available documents are cited, except where citation to sealed documents is necessary to explain the Court's reasoning. "[I]nsofar as [this opinion] refer[s] to information derived from" various sealed declarations and evidence submitted by plaintiffs, "it is unsealed to the limited extent referenced in this opinion, although the full document shall remain physically withheld from public review." *United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009); *see also Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955, at *3 n.5 (D.D.C. Aug. 15, 2023).

Breezee has a 100% combined disability rating from the U.S. Department of Veterans Affairs ("VA") from his military service.  *Id.* ¶ 11.  At least three of his disabilities were "developed as a result of the Khobar Towers bombing," including 50% for PTSD; 50% for sleep apnea, and 10% for tinnitus.  *Id.*; *see also* Sealed Decl. of Jason M. Breezee, ECF No. 86, Ex. 7, Breezee VA Disability Rating at 6, ECF No. 86 at 18 (providing a detailed breakdown of plaintiff Breezee's VA disability rating).  Calculating the portion of Breezee's combined disability rating attributable to the Khobar Towers bombing "involves more than adding up" the three "individual ratings" that resulted from the attack.  *About Disability Ratings* ("*VA Combined Disability Rating Table*"), U.S. Dep't of Veterans Affs., https://www.va.gov/disability/about-disability-ratings [https://perma.cc/Y4Q9-9V7B] (last visited Sept. 22, 2025).  Instead, when a veteran has multiple individual disability ratings, the VA uses its combined disability ratings table to calculate the combined disability rating.  *Id.*[5]  Here, the VA's combined disability ratings table produces a combined disability rating of 78% for Breezee's three Khobar Towers-related injuries.  *See id.* (using the information under the "Combined ratings table (not rounded)" header to first combine the 50% for PTSD and 50% for sleep apnea, which produces a combined rating of 75%, and then combining this 75% rating with the 10% for tinnitus, which produces a combined rating of 78%). Since the VA then rounds the combined rating "to the nearest 10%," *id.*, Breezee's combined disability rating for his injuries from the Khobar Towers attack is 80%.

---

[5] This multi-step process is described under the "How we use the combined ratings table" header of the *VA Combined Disability Rating Table* website, with "Step 5" specifically describing the process for combining more than two individual disability ratings.  Neither Breezee's Declaration nor the VA Disability Rating documentation submitted by him specifies what disability rating the VA would have assigned to him based only on his Khobar Towers-related injuries.  Breezee Decl. ¶ 11; Breezee VA Disability Rating.  Although his declaration specifies that his PTSD, sleep apnea, and tinnitus stemmed from the attack, he does not say which, if any, of the other injuries listed on his VA Disability Rating report resulted from the attack or from other aspects of his service.  Breezee Decl. ¶ 11. Therefore, only the injuries Breezee specifically attributed to the Khobar Towers attack are used in this calculation, and the same method is applied to the other servicemember plaintiffs.

### 2. *Bradley J. Donaghue*

At the time of the attack, Bradley J. Donaghue was deployed to Dhahran as an Airman First Class in the U.S. Air Force and quartered at Khobar Towers. Decl. of Bradley J. Donaghue ("Donaghue Decl.") ¶ 3, ECF No. 114; *see also* SAC ¶ 16. When the bomb was detonated, Donaghue was inspecting the exhaust pipe of an F-16 aircraft a quarter of a mile away from the blast site. Donaghue Decl. ¶ 5. The bomb's explosion "sent shockwave blasts through the intake of the jet and caused rapid acceleration," blowing Donaghue out of the exhaust and causing him to fall to the concrete floor "four to five feet below" where he was working, "hitting [his] head, scuffing up [his] hands, and wrecking [his] knees" in the process. *Id.* The fall knocked Donaghue unconscious, and after regaining consciousness, he was temporarily unable to see and experienced an intense ringing in his ears. *Id.* He was "dizzy, nauseous, and left with a headache that lasted for days." *Id.*

Donaghue experiences lasting physical and emotional harm from the bombing, including back and knee trouble, dizziness, a ringing in his ears, and "great emotional trauma." *Id.* ¶¶ 9-10. He has PTSD and high anxiety, which have caused tension in his personal relationships and contributed to his divorce and estrangement from his sons. *Id.* ¶ 10. He has a 90% combined VA disability rating from his military service, including two individual disabilities attributable to the Khobar Towers bombing: "40% for traumatic brain injury with benign paroxysmal positional vertigo, and 50% for post-traumatic headaches as secondary to traumatic brain injury with benign paroxysmal positional vertigo." *Id.* ¶ 13; *see also* Sealed Decl. of Bradley J. Donaghue, ECF No. 91, Ex. 3, Donaghue VA Disability Rating at 1, ECF No. 91 at 9 (describing these two disabilities). Using the VA's combined disability ratings table, *see supra* n.5 and associated text (describing the process of calculating combined VA disability ratings), Donaghue's combined disability rating attributable to the Khobar Towers bombing is 70%, *see VA Combined Disability Rating Table*

(calculating a 70% combined disability rating from combining a 50% disability with a 40% disability).

### 3. *James E. Porter*

On June 25, 1996, James E. Porter was a Senior Airman in the U.S. Air Force, deployed to Dhahran and quartered at Khobar Towers. Decl. of James E. Porter ("Porter Decl.") ¶ 3, ECF No. 123; *see also* SAC ¶ 35. At the time of the explosion, he was in his room in the complex, getting ready for work. Porter Decl. ¶ 5. He felt the explosion and was shortly thereafter told to evacuate "because [they] were under attack." *Id.* ¶ 6. He witnessed "pure and utter chaos," seeing "people covered in blood everywhere," and was "in a constant state of fear," feeling "vulnerable and exposed while hiding at the base of [his] building." *Id.* ¶ 7.

Since the bombing, he has become "extremely jumpy" and struggles with nightmares, as well as "anxiety attacks when in crowded places or in large groups of people" or during "thunderstorms or high winds." *Id.* ¶ 9. He was diagnosed with PTSD and has an 80% combined VA disability rating from his military service, including 70% for the PTSD from the Khobar Towers bombing. *Id.* ¶¶ 10-11; Sealed Decl. of James E. Porter, ECF No. 100, Ex. 4, Porter VA Disability Rating at 1, ECF No. 100 at 11.

### 4. *Dale O. Robinson*

On June 25, 1996, Dale O. Robinson was a Staff Sergeant in the U.S. Air Force, deployed to Dhahran and quartered at Khobar Towers. Decl. of Dale O. Robinson ("Robinson Decl.") ¶ 3, ECF No. 126; *see also* SAC ¶ 47. He was in bed at the time of the bombing. *Id.* ¶ 5. The sound and impact of the blast woke him up, and his room and bed were covered with broken glass from the window in his room. *Id.* ¶ 7. While evacuating the building, he saw "blood splatter on the ceilings," and he and his friends helped carry someone out of the building on a door that had come off its hinges. *Id.* ¶ 8. Once outside, he was "feeling numb" and unable to go back into the

building; someone came up to him and cleaned up cuts on his shoulders and back with a first aid kit. *Id.* ¶ 9. He was awarded a Purple Heart for the injuries he suffered, *id.* ¶ 14, as well as the Air Force Commendation Medal with Valor, *id.* ¶ 15.

After the attack, Robinson struggled with nightmares, sleep problems, and anger issues. *Id.* ¶¶ 17-18; *see also id.* ¶ 20. He also suffered from anxiety attacks and starting drinking more "to cope." *Id.* ¶ 21. He has a combined VA disability rating of 80% from his military service, including 70% for PTSD with alcohol use disorder as a result of the Khobar Towers bombing. *Id.* ¶ 22; *see also* Sealed Decl. of Dale O. Robinson, ECF No. 103, Ex. 7, Robinson VA Disability Rating at 1, ECF No. 103 at 20 (describing this 70% disability).

### 5. *Patrick R. Stark*

On June 25, 1996, Patrick R. Stark was a Master Sergeant in the U.S. Air Force deployed to Saudi Arabia and quartered at Khobar Towers in Dhahran. Decl. of Patrick R. Stark ("Stark Decl.") ¶ 3, ECF No. 128; *see also* SAC ¶ 50. When the bomb exploded, he was sitting in the medical group clinic, where he was in charge and which is located in the Khobar Towers complex. *Id.* ¶¶ 5-6. The sliding glass doors next to him shattered, and he flew across the room and hit an internal concrete wall, dislocating his shoulder. *Id.* ¶ 6. He also sustained several cuts from glass shards. *Id.* After popping his shoulder back into place, he started organizing the clinic staff to triage incoming casualties as best as possible, but the clinic was soon "overrun." *Id.* ¶¶ 6-7; *see also id.* ¶ 7 (describing some of the severe injuries treated). Over a 24-hour period, Stark and the rest of the staff treated and transferred to local hospitals "over 496 wounded, even while some of [the staff] were wounded" themselves. *Id.* ¶ 7. Stark additionally served as part of the mortuary affairs team that located and identified the 19 individuals killed in the attack. *Id.* Throughout this period, "[a]s the senior enlisted lead" of the clinic, he "listened to and relived all the horror stories of [the] staff and comforted them the best [he] could." *Id.* He described himself as "angry and

scarred for life" by what he had experienced and witnessed. *Id.* He received a Purple Heart for the injuries he suffered in the bombing. *Id.* ¶ 11.

When he returned home, he had surgery on his shoulder to "fix and stabilize" it from the injuries he suffered. *Id.* ¶ 8. His personal relationships, including with his wife, have also suffered, *id.* ¶¶ 9-10, and he has trouble in social settings and with trusting people, *id.* ¶ 9. He has a combined 80% disability rating from the VA from his military service, including 70% for PTSD and 10% each for two additional individual disabilities, all three of which were caused by the Khobar Towers bombing. *Id.* ¶ 12; *see also* Sealed Decl. of Patrick R. Stark, ECF No. 105, Ex. 5, Stark VA Disability Rating at 3-5, ECF No. 105 at 15 (describing in more detail his disability ratings). Combining these three individual disability ratings produces a combined disability rating attributable to the Khobar Towers attack of 76%, which rating is rounded to 80%. *See VA Combined Disability Ratings Table; supra* n.5 and associated text (describing the process of calculating combined VA disability ratings).

### 6. *Kenneth P. Giddens and Three Family Members*

On June 25, 1996, Kenneth P. Giddens was an Airman First Class in the U.S. Air Force, working as a tactical aircraft maintenance craftsman in Dhahran and quartered at Khobar Towers. Decl. of Kenneth P. Giddens ("K. Giddens Decl.") ¶ 3, ECF No. 116; *see also* SAC ¶ 19. The bomb detonated while Giddens was in the fitness center at the Khobar Towers complex, K. Giddens Decl. ¶ 5, and Giddens was struck by flying glass and debris with glass embedding into his forearms, hands, and legs. *Id.* ¶ 6. After running out of the gym toward the buildings where his squadron was located, Giddens saw many people who were "injured or covered in glass shards," including one friend, who had a "chunk of glass stuck in the side of his head," and another friend who was "barefoot and leaving bloody footprints behind him." *Id.* ¶ 7. Two other of his

close friends were among the 19 killed in the bombing. *Id.* ¶ 12. Giddens was awarded a Purple Heart for the injuries he sustained in the bombing, *id.* ¶ 9.

Since the attack, Giddens has experienced issues with "anxiety, depression, insomnia, nightmares [and] loud noises." *Id.* ¶ 13. He has a combined 60% disability rating, including 50% for PTSD and 10% for tinnitus, both of which were caused by the Khobar Tower bombings. *Id.* ¶ 14; *see also* Sealed Decl. of Kenneth P. Giddens, ECF No. 93, Ex. 8, Giddens VA Disability Rating, ECF No. 93 at 25 (providing a detailed explanation of Giddens's combined disability rating). Combining these two individual disability ratings produces a combined disability rating attributable to the Khobar Towers attack of 55%, which rating is rounded to 60%. *See VA Combined Disability Ratings Table; supra* n.5 and associated text (describing the process of calculating combined VA disability ratings).

Three of Giddens's family members are also plaintiffs in this lawsuit: his sister, Denise R. Rodriguez, and his two brothers, David J. and Timothy P. Giddens. *See* SAC ¶¶ 20-22. Rodriguez, who spent a lot of time with her brother growing up and into adulthood due to their closeness in age, learned of the bombing from a family member. K. Giddens Decl., Attach. 1, Decl. of Denise R. Rodriguez ("Rodriguez Decl.") ¶¶ 5, 7, ECF No. 116 at 26. She left work immediately upon finding out and described herself as "hysterical" while trying to contact her brother and waiting for news about his status. *Id.* ¶¶ 7-8. She suffered from depression for a "long while" after the attack and sought help from her church to keep her focused on providing support for her brother, *id.* ¶ 10, as his "mental injuries started to surface" in the years following the attack, *id.* ¶ 9.

David Giddens was "very close" with his brother Kenneth growing up. K. Giddens Decl., Attach. 2, Decl. of David J. Giddens ("D. Giddens Decl.") ¶ 5, ECF No. 116 at 31. David learned about the Khobar Towers bombing "while watching the news on the Armed Forces Network

during [his] overseas tour [with the U.S. Army] in Darmstadt, Germany." *Id.* ¶ 6. While waiting for news about his brother, David Giddens "experienced a myriad of emotions and was in a state of disbelief trying to comprehend what happened." *Id.* In the days after the attack, he was "in a state of shock and disbelief" and experienced fear that, since he was also stationed overseas, he could be a victim of a similar attack. *Id.* ¶ 7. The attack has led to David's "increased anxiety, fear, vulnerability, and a deep sadness," particularly given his continued military service in the abroad, including at the time of the filing of his declaration in the instant case, where he has "been near numerous terrorist attacks in the recent past." *Id.* ¶ 11.

Timothy Giddens had a "great relationship" with his brother Kenneth while growing up. K. Giddens Decl., Attach. 3, Decl. of Timothy P. Giddens ("T. Giddens Decl.") ¶ 5, ECF No. 116 at 36. He learned about the bombing of Khobar Towers while working at Hurlburt Field Air Force Base and was "worried and concerned" about his brother, leading him to seek information from people at his own base and his brother's base. *Id.* ¶ 6. After the attack, he experienced a range of emotions, including anger "about the lack of security" at the Khobar Towers and "empt[iness] and sad[ness]" when he went to see his brother upon his return. *Id.* ¶¶ 7-8. He has experienced "long-term impact[s] of th[e] attack" from "trying to deal with the emotional and psychological issues that [his] brother has felt" and regrets "not seek[ing] professional help immediately after the attack." *Id.* ¶¶ 12-13.

### 7. *Travis S. Leeper and Two Family Members*

On June 25, 1996, Travis S. Leeper was an Airman First Class in the U.S. Air Force, working as an aircraft armament systems journeyman deployed to Dhahran and quartered at Khobar Towers. Decl. of Travis S. Leeper ("Leeper Decl.") ¶ 3, ECF No. 120; *see also* SAC ¶ 26. He was sleeping when the bomb exploded, and the force of the explosion threw him from his bed onto the floor. Leeper Decl. ¶¶ 5-6. After checking on everyone in his dormitory to make sure

they were okay, he noticed his feet were bleeding from walking on broken glass. *Id.* ¶ 6. Although he was "terrified after the bomb went off," he helped to evacuate the building and then assisted with first aid and transportation of injured soldiers from other dorms, *id.* ¶ 7, for which actions he was awarded the Air Force Achievement Medal, *id.* ¶ 8. To this day, he struggles to sleep, needing "sleep aids to help . . . get a full night's sleep" and "wak[ing] up to any type of sound." *Id.* ¶ 12. He also suffers anxiety and panic attacks and has struggled with relationships and emotions. *Id.* ¶ 13.

Two of Leeper's family members are also plaintiffs in this lawsuit: his mother, Judith K. Kazmar, and his stepfather, John E. Kazmar. *See* SAC ¶¶ 27-28. Both found out about the bombing after returning from work, when Judith Kazmar's daughter called her and told her that Travis had survived. Leeper Decl., Attach. 1, Decl. of Judith K. Kazmar ("Ju. Kazmar Decl.") ¶ 5, ECF No. 120 at 16. After hearing this news, Judith Kazmar "became very worried" and spent the night worrying about her son. *Id.* In the months following the attack, she experienced worry and anxiety at the "possibility of losing" her son, particularly after his tour was extended by "several months." *Id.* ¶ 6.

John and Judith married when Travis was nine years old. Leeper Decl., Attach. 2, Decl. of John E. Kazmar ("Jo. Kazmar Decl.") ¶ 5, ECF No. 120 at 20. John and his stepson eventually "became very close, like father and son"; John was "involved in all his sports," and "provided financial support, housing, food, clothing, and education expenses." *Id.* After the bombing, John also experienced worry for his stepson's "well-being" and "stayed on alert for days following the attack, worrying about Travis." *Id.* ¶ 8. When Travis finally returned home and they were able to see him in person, John and Judith "felt comfortable that he was physically okay" but remained worried about his difficulties sleeping, which continues to this day. *Id.* ¶ 9.

16

### 8. *James A. Mings and Two Family Members*

At the time of the attack, James A. Mings was a Senior Airman in the U.S. Air Force, deployed to Dhahran as a security policeman and quartered at Khobar Towers. Decl. of James A. Mings ("J. Mings Decl.") ¶ 4, ECF No. 122; *see also* SAC ¶ 30. When the bomb was detonated, he was "on a mobile patrol on the aircraft parking ramp." J. Mings Decl. ¶ 6. He "immediately went into reaction mode," helping to (1) "ensure the safety and security of . . . resources in case more attacks were to follow"; (2) establish routes for medical personnel transporting injured servicemembers; and (3) develop "an emergency traffic control plan to expedite all emergency vehicles transporting wounded personnel to a nearby hospital." *Id.* ¶¶ 6-7. For his leadership in these efforts, he was awarded the Air Force Commendation Medal. *Id.* ¶ 9.

Mings was "diagnosed with PTSD as a result of the attack." *Id.* ¶ 10. While he previously was very outgoing, he now "do[es] everything [he] can to avoid going out in public." *Id.* He struggles with anxiety and, despite "numerous hours in therapy," cannot let his fear go. *Id.* He has a 100% combined VA disability rating from his military service, which includes 50% for PTSD and 50% for sleep apnea, both of which were "developed as a result of the Khobar Towers bombing." *Id.* ¶ 12; *see also* Sealed Decl. of James A. Mings, ECF No. 99, Ex. 4, Mings VA Disability Rating at 3-4, ECF No. 99 at 11 (providing a detailed breakdown of Mings's disability rating). Using the VA's combined disability ratings table to calculate a combined rating attributable to the Khobar Towers attack, *see supra* n.5 and associated text (describing the process of calculating combined VA disability ratings), produces a combined disability rating of 75%, which is rounded up to 80%. *See VA Combined Disability Rating Table* (producing a combined disability rating of 75% when combining two individual disabilities of 50%).

Two of Mings's family members are also plaintiffs in this lawsuit: his father, Albert J. Mings, and his late mother, Deborah L. Mings, who is represented by her estate. *See* SAC ¶¶ 31-

17

32. After learning about the bombing, the parents "sat in front of the television and cried." J. Mings Decl., Attach. 1, Decl. of Albert J. Mings ("1st A. Mings Decl.") ¶ 6, ECF No. 122 at 15. Albert stated that he felt "lost and unsure" while waiting for news whether "James was okay." *Id.* Even after James returned home, he was "very concern[ed]" and "heartbroken" by his son's emotional state. *Id.* ¶ 9.

Similarly, Deborah was initially filled with "anxiety and worry." J. Mings Decl., Attach. 2, Decl. of Albert J. Mings as Proposed Personal Representative of the Est. of Deborah L. Mings ("2d A. Mings Decl.") ¶ 8, ECF No. 122 at 20.[6] Watching James struggle with the impact of the attack was "very hard" and "caused her to second guess herself as a mother," because she felt unable to protect and keep him safe. *Id.* ¶ 10.

### 9. *Amy Rancier and Four Family Members*

On June 25, 1996, Amy Rancier was a Staff Sergeant in the U.S. Air Force, deployed to Dhahran and assigned to live at Khobar Towers on a 90-day temporary duty assignment rotation. Decl. of Amy Rancier ("Rancier Decl.") ¶¶ 3, 5, ECF No. 124; *see also* SAC ¶ 34. When the bomb exploded, she was sitting on the couch in her living quarters and was thrown off the couch into a wall on the other side of the room, knocking her unconscious. Rancier Decl. ¶¶ 10-11. Someone dragged her outside the building, and she was later helped to the medical triage building, where she was then sent to a Saudi hospital to receive care for her injuries. *Id.* ¶¶ 11-13. She ultimately received stitches for cuts on her face, performed with no anesthesia because the hospital had run

---

[6] As of October 15, 2024, the date this affidavit was signed, Albert Mings was "in the process of becoming appointed the personal representative of the estate of [his] late wife, Deborah L. Mings." 2d A. Mings Decl. ¶ 1; *see also* SAC ¶ 32.

out, and was kept in the hospital approximately one to three days. *Id.* ¶ 14. She was awarded a Purple Heart for the injuries she sustained from the bombing. *Id.* ¶ 15.

To this day, Rancier "feels as though this trauma just happened . . . yesterday." *Id.* ¶ 17. She struggles with sleep, and some days struggles to get out of bed or interact with people. *Id.* She also has "problems with trust, intimacy, and concentrating." *Id.* She has a combined disability rating of 100% from the VA, including 70 percent for PTSD with traumatic brain injury and 30% for tension headaches as secondary to PTSD with traumatic brain injury, which were caused by the Khobar Towers bombing. *Id.* ¶ 18; Sealed Decl. of Amy Rancier, ECF No. 101, Ex. 7, Rancier VA Disability Rating at 1, ECF No. 101 at 24. Using the VA's combined disability ratings table to calculate a combined rating attributable to the Khobar Towers attack, *see supra* n.5 and associated text (describing the process of calculating combined VA disability ratings), produces a combined disability rating of 79% for these two individual disabilities, which is rounded up to 80%. *See VA Combined Disability Rating Table* (producing a combined disability rating of 79% when combining individual ratings of 70% and 30%).

Four of Amy Rancier's family members are plaintiffs in this lawsuit: her son, Courtney T. E. Johnson; her mother, Rosie M. Caffey; her stepfather, Manuel Caffey; and her half-sister, Tonya T. Caffey. *See* SAC ¶¶ 35-38. Courtney Johnson was six years old at the time of the attack, and remembers feeling "afraid," and "confused and stuck," in the days after the attack, particularly since "no one could reassure [him] that [his mom] was okay." Rancier Decl., Attach. 1, Decl. of Courtney T. E. Johnson ("Co. Johnson Decl.") ¶ 5, ECF No. 124 at 34. The first time he saw his mom after the attack, "she was in the hospital, and all bandaged up." *Id.* ¶ 6. He remembers that

"[t]he scars scared [him]," *id.*, and that his mom "seemed more depressed" and "spent a lot more time alone" when she came home, *id.* ¶ 7.

Rosie M. Caffey, Rancier's mother, learned about the attack when her then-son-in-law called her to tell her the bombing had occurred and that they had no additional information at that time. Rancier Decl., Attach. 2, Decl. of Rosie M. Caffey ("R. Caffey Decl.") ¶ 7, ECF No. 124 at 38. She did not learn that her daughter had survived until two days after the bombing, during which time she "was in shock, angry, depressed, and afraid." *Id.* ¶ 8. Even after finding out her daughter was alive, she "experienced nightmares . . . and became irritable and short-tempered." *Id.* ¶ 10. Since the attack her relationship with her daughter "has been strained," as her daughter has become "more sensitive, combative, and easily frustrated." *Id.* ¶ 13. She says the attack "has been the most traumatic event in [their] lives," and they "constantly fear it could happen again." *Id.* ¶ 14.

Manuel Caffey married Rancier's mother when Rancier was two years old and "raised [her] like she was [his] own biological child," providing "housing, food, and clothes the entire time she lived with [them]." Rancier Decl., Attach. 3, Decl. of Manuel Caffey ("M. Caffey Decl.") ¶ 5, ECF No. 124 at 43; *see also id.* ¶ 6 (describing other ways he provided for Rancier). After the attack, while waiting for news about Rancier, he "was in shock, traumatized, depressed, afraid, and anxious." *Id.* ¶ 11. Even after his stepdaughter returned home, he continued to "live in fear" as a result of the bombing, *id.* ¶ 16, and constantly fears for the safety of his wife and daughters, *id.* ¶ 17. While he was previously "very close" with Rancier, *id.* ¶ 6, their relationship "has had some difficulties" since the attack, because she is "more sensitive, combative, irritated, easily frustrated, always annoyed about something, and on edge," *id.* ¶ 14.

Tonya T. Caffey grew up in the same household with Rancier, her half-sister, who she

describes as "always watch[ing] over [her], protect[ing] [her], g[iving her] birthday parties, [and] help[ing] take care of [her]."  Rancier Decl., Attach. 4, Decl. of Tonya T. Caffey ("T. Caffey Decl.") ¶ 5, ECF No. 124 at 49.  Like her parents, in the days following the attack, she was "in shock, traumatized, depressed, afraid, and anxious."  *Id*. ¶ 9.  Like her father, she also had nightmares about her sister "being blown up in a bombing" and became "irritable and short with people when asked a question."  *Id*.  When her sister returned home, their relationship "changed for the worse," since Rancier had become "more sensitive, combative, irritated, easily frustrated, always annoyed about something and on edge."  *Id*. ¶ 12.  Tonya Caffey sought emotional help after the attack, seeing a psychiatrist for depression and PTSD.  *Id*. ¶ 13.

### 10. *Lakisha S. Robertson and Seven Family Members*

On June 25, 1996, Lakisha S. Robertson was a Senior Airman in the U.S. Air Force, deployed to Dhahran and quartered at Khobar Towers.  Decl. of Lakisha S. Robertson ("L. Robertson Decl.") ¶ 3, ECF No. 125; *see also* SAC ¶ 39.  When the bomb exploded, she huddled behind the couch in her dormitory's dayroom to avoid being hit by shards of glass, *id.* ¶ 5, and then evacuated the building, *id.* ¶ 6.  She was "terrified" and "scared for her life."  *Id.* ¶ 7.  In the aftermath, Robertson's "quality of life" has been "severely impacted," and she has experienced "depression, anxiety, suspiciousness, panic attacks," and being startled easily, as well as trust issues, difficulty controlling her temper, "trouble sleeping, nightmares," loss of appetite, and other impacts.  *Id.* ¶ 10.  She has been diagnosed with PTSD.  *Id.*  She has a combined 60% disability rating from the VA, which includes 50% for PTSD caused by the Khobar Towers bombing.  *Id.* ¶ 11; *see also* Sealed Decl. of Lakisha S. Robertson, ECF No. 102, Ex. 3, Robertson VA Disability Rating at 1, ECF No. 102 at 9 (describing Robertson's combined disability rating and rating for her PTSD disability).

Seven of Lakisha Robertson's family members are plaintiffs in this lawsuit: her husband

Curtis E. Robertson, Sr.; her son, Curtis E. Robertson, II; her mother, Dilcia H. Fernandez; her brother, Kareem H. Brown; her brother, Roger P. Dabriel; her half-sister, Cassandra J. Johnson; and her half-sister, Latoya T. Sapp. *See* SAC ¶¶ 40-46.

Curtis Robertson, Sr., felt "complete and utter terror" upon learning of the bombing. L. Robertson Decl., Attach. 1, Decl. of Curtis E. Robertson, Sr. ("C. Robertson Sr. Decl.") ¶ 7, ECF No. 125 at 14. His "emotionally fragile" state made it "extremely difficult to perform [his] professional duties" as an Air Force Air Traffic Controller. *Id.* ¶ 9. The impact has continued into the present day, since his wife "has never been the same mentally or emotionally since the attack," and both she and Curtis "have struggled with recovering" from the emotional and mental impacts, *id.* ¶ 11; *see also id.* ¶ 13, including "[n]ightmares and flashbacks," difficulties with "sleep patterns, eating habits, . . . emotional dysregulation, and mental concentration," *id.* ¶ 14.

Curtis Robertson II was only two years old at the time of the bombing and does not remember the events firsthand. L. Robertson Decl., Attach. 2, Decl. of Curtis E. Robertson II ("C. Robertson II Decl.") ¶ 5, ECF No. 125 at 22. He was affected by his mother's PTSD, however, which made her "very paranoid and extra protective" throughout his life, *id.*, and has experienced "great sadness" at how the bombing "forever changed [his] mother," *id.* ¶ 6.

Dilcia Fernandez was "very close" with her daughter and talked with her "every day" before the attack. L. Robertson Decl., Attach. 3, Decl. of Dilcia H. Fernandez ("Fernandez Decl.") ¶ 5, ECF No. 125 at 26. After the bombing, she did not find out that her daughter survived the attack for "more than 24 hours," and she was "scared, nervous and upset" while waiting for news. *Id.* ¶ 6. When her daughter remained deployed after the attack, she "began to constantly worry about her." *Id.* ¶ 9. After the attack, "[t]hings changed for the worse" for her daughter, and Dilcia felt "devastated, overwhelmed with emotions, scared, and angry." *Id.* ¶ 11. Her relationship with

22

her daughter has also been affected, and they speak and see each other less frequently. *Id.* The entire situation has "hurt [her] to the core." *Id.* ¶ 14.

Growing up, Kareem Brown said his sister Lakisha was his "best friend." L. Robertson Decl., Attach. 4, Decl. of Kareem H. Brown ("Brown Decl.") ¶ 5, ECF No. 125 at 31. After finding out about the attack, he "was in a panicked state of mind," *id.* ¶ 6, and even after finding out she had survived the bombing, he felt "worried, scared, sad, hurt and confused," *id.* ¶ 7. Over time, their relationship "changed for the worse," since his sister became "mentally and emotionally unavailable and distant." *Id.* ¶ 9. He has suffered "a tremendous amount of emotional and mental pain" because of the impact of the bombing on Lakisha, who has "never been the same after the attacks." *Id.* ¶ 10.

Roger Dabriel and his sister Lakisha had a "very loving, caring, and close sibling relationship" while growing up together. L. Robertson Decl., Attach. 5, Decl. of Roger P. Dabriel ("Dabriel Decl.") ¶ 5, ECF No. 125 at 35. After learning about the bombing, he was "in a state of worry" for more than a day while waiting for news about his sister. *Id.* ¶ 6. Their previously "fun, carefree sibling relationship" changed after the attack as his sister struggled with the ongoing impacts of the events, *id.* ¶ 8, and he "live[s] in fear every day of another attack," *id.* ¶ 9.

Cassandra Johnson, sister to Lakisha, was in elementary school at the time of the attack but remembers feeling "really scared" and beginning to cry when she learned about the bombing. L. Robertson Decl., Attach. 6, Decl. of Cassandra J. Johnson ("Ca. Johnson Decl.") ¶ 5, ECF No. 125 at 39. Their relationship, which had previously been close, "suffered after the attack," and they did not speak as frequently. *Id.* ¶ 7. She remembers that she and her family "were concerned" about her sister's mental state, and she missed the close relationship she previously had with her sister. *Id.* As she has gotten older, she now understands more about the impacts of PTSD and

reaches out to her sister more, which has improved their relationship, although her sister can still be "a little distant."  *Id.* ¶ 9.

Latoya Sapp, another sister to Lakisha, was eleven years old at the time of the Khobar Towers attack and was close to her sister, explaining that she "always looked up to her."  L. Robertson Decl., Attach. 7, Decl. of Latoya T. Sapp ("Sapp Decl.") ¶ 5, ECF No. 125 at 43.  When her family learned of the attack, she was "filled with a lot of anxiety, stress, confusion and sadness" while worrying about whether Lakisha was alive or had been badly injured.  *Id.* ¶ 6.  After the attack, their relationship "changed for the worse," as Lakisha "distanced herself and became emotionally unavailable."  *Id.* ¶ 8.  The bombing and its aftermath have caused "a lot of mental and emotional stress" on her and her entire family and has had a "lasting effect" on her "emotionally and mentally."  *Id.* ¶ 10.

### 11. *Morgan S. Spruill and One Family Member*

On June 25, 1996, Morgan S. Spruill was a Technical Sergeant in the U.S. Air Force, deployed to Saudi Arabia, and quartered at Khobar Towers in Dhahran.  Decl. of Morgan S. Spruill ("M. Spruill Decl.") ¶ 3, ECF No. 127; *see also* SAC ¶ 48.  He was in a dorm room in the complex when the bomb exploded, and he was thrown out of a chair and into a wall.  Spruill Decl. ¶¶ 6-7.  He was able to stand up and noticed that he was "bleeding from everywhere" and had "a very large and deep cut in [his] left calf muscle" that went down to the bone.  *Id.* ¶ 7.  Some of the other people in the dorm room were "obviously seriously injured and needed assistance," so he walked downstairs, where he "started feeling very nauseous and faint and sat down."  *Id.*  He was then taken to the triage building, where he was bandaged up and then sent to the hospital.  *Id.*  After receiving roughly 100 stitches, he was medevac'd to Germany two days later.  *Id.* ¶¶ 8-9.

Ultimately, Spruill suffered "cuts and lacerations from head to toe," and developed a number of other medical conditions in the years after the bombing, including sciatica, a retinal

detachment, back issues that led to surgery, jaw clicking, and tinnitus. *Id.* ¶ 11. He also struggles to sleep without Ambien, *id.*, and has an aversion to loud noises, as well as other impacts from PTSD, including memory issues, *id.* ¶ 12. He was awarded a Purple Heart for his injuries, *id.* ¶ 13, and received the Air Force Commendation Medal and the Armed Forces Expeditionary Medal, *id.* ¶ 14. He has a combined 100% VA disability rating, including at least nine individual disabilities attributed to the Khobar Towers bombing. *Id.* ¶ 15; *see also* Sealed Decl. of Morgan S. Spruill, ECF No. 104, Ex. 7, Spruill VA Disability Rating, ECF No. 104 at 33 (describing Spruill's combined and individual disability ratings).

Spruill's wife, Rhonda Spruill, is also a plaintiff in this lawsuit. *See* SAC ¶ 49. When she found out about the bombing, she described being in "a haze" as she tried to get more information. M. Spruill Decl., Attach. 1, Decl. of Rhonda L. Spruill ("R. Spruill Decl.") ¶ 6, ECF No. 127 at 35; *see also id.* ¶¶ 7-8. When her husband returned home, she described as "traumatic" seeing "the multiple bandages from his legs to above his head/ear." *Id.* ¶ 12. She has helped her husband's recovery process as much as possible and experienced the effects of his PTSD. *See id.* ¶¶ 13-14. According to Rhonda, the bombing "changed [them] in so many ways." *Id.* ¶ 17.

### 12. *Kyle M. Bump*

Plaintiff Kyle M. Bump is the son of servicemember Shannon K. Bump, who was a member of the Air Force on June 25, 1996, and was injured in the Khobar Towers bombing. Decl. of Kyle M. Bump ("Bump Decl.") ¶ 2, ECF No. 110; *see also* SAC ¶ 7. Shannon Bump was a plaintiff in *Schooley* and was awarded $3,000,000 in pain and suffering damages for his injuries. *See* 2019 WL 2717888, at *6, *75.[7] Kyle Bump, who was "only a year old" at the time of the

---

[7]     Neither Shannon Bump nor any other plaintiff in *Schooley* received punitive damages, because plaintiffs in that case withdrew their punitive damages demand on the basis that, under *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), the FSIA as of 1996 did not allow for punitive damages and subsequent amendments allowing

bombing, has no memory of the attack itself but knows that "the attack fundamentally changed [his] father" from an "easygoing, happy and carefree" person to someone with a "short temper" who was "very hard" on him and to whom he was "scared to go to . . . out of fear he may lose his temper."  Bump Decl. ¶ 6.  Due to these changes as a result of the Khobar Towers bombing, he feels like he was "robbed" of a "strong relationship" with his father.  *Id.* ¶¶ 6, 8.

### 13. *Maria A. Hale*

Plaintiff Maria A. Hale is the wife of servicemember Shawn K. Hale, who was an Airman First Class in the U.S. Air Force when he was injured in the Khobar Towers bombing.  Decl. of Maria A. Hale ("Hale Decl.") ¶ 2, ECF No. 117; *see also* SAC ¶ 23.  Shawn Hale was a plaintiff in *Schooley* and was awarded $6,000,000 in pain and suffering damages for his injuries.  2019 WL 2717888, at *10, *75.

Maria Hale learned about the attack when her sister-in-law called to tell her and then she spent "three anxiety-filled days" before she learned the severity of her husband's condition.  Hale Decl. ¶ 6.  After her husband returned home, she traveled to Walter Reed Medical Center to "support him through a number of surgeries" and "cared for" his medical needs in a number of ways.  *Id.* ¶ 8.  Over the years, the attack and its aftermath have "taken its toll emotionally" on both her and her husband, and they are "keenly aware" of the impact "every day."  *Id.* ¶ 9.

### 14. *Eunice B. Holman*

Plaintiff Eunice B. Holman is the sister of Leighton J. Reid, a servicemember in the U.S. Air Force who suffered injuries in the Khobar Towers bombing.  Decl. of Eunice B. Holman ("Holman Decl.") ¶ 2, ECF No. 118; *see also* SAC ¶ 24.  Leighton Reid was a plaintiff in *Schooley*

---

punitive damages did not authorize such damages retroactively.  *See Schooley*, 2019 WL 2717888, at *70 n.9.  *Owens* was overruled the following year by *Opati v. Republic of Sudan*, 590 U.S. 418 (2020).

and was awarded $6,000,000 in pain and suffering damages for his injuries. 2019 WL 2717888, at *18, *75.

Eunice Holman "was a major caretaker in [her] brother's life as he was growing up," since their parents "worked very long hours and depended on [her] for his care." Holman Decl. ¶ 6. In 1970, her husband became Leighton's legal guardian, and Leighton moved with them to Germany for approximately three years, until he graduated from high school. *Id.* ¶ 7. Eunice learned about the Khobar Towers bombing while watching the news, and she was "shocked, stunned and crying," telling her family members "that's where my brother is!" *Id.* ¶ 8. She waited "in limbo" for multiple days before learning that her brother had survived the attack but "had been wounded." *Id.* ¶ 9. She suffered "great emotional distress" throughout this time and this distress only "ease[d]" after she was able to see her brother in person. *Id.* ¶ 10. Since the bombing, she has "watched a steady decline in [her] brother's health," which has caused her to "continually stress over his worsening conditions," *id.* ¶ 11, and the bombing still "haunts" her, *id.* ¶ 12.

### 15. *Angelique U.M. Mercier*

Plaintiff Angelique U.M. Mercier is the daughter of George P. Nicholaou, a U.S. Air Force Senior Master Sergeant injured in the Khobar Towers bombing. Decl. of Angelique U.M. Mercier ("Mercier Decl.") ¶ 2, ECF No. 121; *see also* SAC ¶ 29. George Nicholaou was a plaintiff in *Schooley* and was awarded $7,000,000 in pain and suffering damages for his injuries. 2019 WL 2717888, at *39, *75.

Angelique Mercier learned about the bombing from her mother, who told her "there was no news" about whether her father "was alive or dead." Mercier Decl. ¶ 6. Upon hearing the news, she "was in shock and afraid" and "felt like a zombie" at work that night. *Id.* When her father returned home, "he was a different person." *Id.* ¶ 7. While he had previously been "protective, playful and sweet," he "became an angry shell" and "was mean a lot of the time,"

including "yelling and physical abuse." *Id.* As a result, "anxiety took over, and [she] started drinking and partying to cope." *Id.* She describes feeling like she "had a dad that never came home" after the attack, a feeling from which she is "just starting to heal." *Id.* ¶ 8.

### 16. *Jane C. Strader*

Plaintiff Jane C. Strader is the mother of Martin L. Wheeler, a Senior Airman in the U.S. Air Force injured in the Khobar Towers attack. Decl. of Jane C. Strader ("Strader Decl.") ¶ 2, ECF No. 131; *see also* SAC ¶ 51; *Schooley*, 2019 WL 2717888, at *53. Martin Wheeler was a plaintiff in *Schooley* and was awarded $6,000,000 in pain and suffering damages for his injuries. 2019 WL 2717888, at *53, *75.

Jane Strader learned that her son had been "in the attack" from her daughter-in-law and described finding out as "a crazy, whirlwind, frantic moment." Strader Decl. ¶ 6. The 36-hour wait to learn whether her son was alive "lasted for what seemed like an eternity." *Id.* After the bombing and up until the present, she has continued to have "periodic moments pop up during any given day," as well as "nightmares," about the bombing and "the helplessness" of "not knowing anything regarding [her] son's status/condition" and "not being able to contact anyone for additional information." *Id.* ¶ 7. She still struggles with "sleep issues" and worries much more about her sons than she did previously. *Id.* ¶ 9.

### 17. *Trisha L. Weber*

Plaintiff Trisha L. Weber is the daughter of Jefferson A. Craven, a U.S. Air Force servicemember injured in the Khobar Towers attack. Decl. of Trisha L. Weber ("Weber Decl.") ¶ 2, ECF No. 129; *see also* SAC ¶ 52. Jefferson Craven was a plaintiff in *Schooley* and was awarded $7,000,000 in pain and suffering damages for his injuries. 2019 WL 2717888 at *47, *75.

28

Trisha Weber was nine years old when the bombing occurred and remembers seeing her dad "lying in a hospital bed in very bad shape on television."  Weber Decl. ¶¶ 6-7.  When her father returned home, Weber took on a number of caretaking responsibilities for her younger sister, since her mom was working and her dad was "dealing with his injuries, zoned out on Prozac, or just not there."  *Id.* ¶ 8.  Even when her dad was home, "it was like he wasn't," since he "drank more . . . to deal with anxiety and depression" and "wasn't mentally present a lot of the time."  *Id.* ¶ 9.  He also struggled with various symptoms of PTSD, which "affected each [member of the family] differently mentally and emotionally."  *Id.* ¶ 10.  Weber sometimes felt "alone, sad, scared or anxious for [herself] and [her father]."  *Id.*  She describes the bombing as causing "a shockwave to [her] family," an event that was "traumatizing."  *Id.* ¶ 12.

### 18. *Jeffrey J. Jiron*

Plaintiff Jeffrey J. Jiron is the brother of Richard R. Jiron, a Staff Sergeant in the U.S. Air Force who suffered injuries in the Khobar Towers bombing.  Decl. of Jeffrey J. Jiron ("Jiron Decl.") ¶ 2, ECF No. 119; *see also* SAC ¶ 25; *Ackley*, 2022 WL 3354720, at *28.  Richard Jiron was a plaintiff in *Ackley* and was awarded $6,000,000 in pain and suffering damages and $6,000,000 in punitive damages, for a combined total of $12,000,000 in damages.  2022 WL 3354720, at *28, *53.

Jeffrey Jiron found about the bombing through a phone call from his mother and "felt scared with lots of anxiety" while waiting for news about his brother.  Jiron Decl. ¶ 6.  He described the hours waiting as "some of the worst hours of [his] families' lives."  *Id.*  Even after they learned that his brother was alive, they "remained terrified" that other bombings would follow.  *Id.*  After his brother returned home, Jeffrey continued to "worry about him, his family, and his health," particularly his "inability to talk about the attacks," his increased smoking, and "his physical health deteriorat[ion]."  *Id.* ¶ 9.  The attack has also impacted Jeffrey and his own family.  *Id.* ¶ 10.  The

attack caused him to become "depressed as though [he] were a victim of trauma" and "changed the way [he] felt about the world," causing him to "suspend[] most of the recurring family events" in which they once participated, "such as annual barbecues, vacations . . . , and holiday gatherings." *Id.* ¶ 13. To this day, Jeffrey "see[s] so many of the effects the attack had" on his brother's life, his own life, and everyone is his family. *Id.* ¶ 7. He describes his family as one "suffer[ing] together with fear, anxiety, anger, avoidance and pain." *Id.* ¶ 15.

### 19. *Two Family Members of Dwayne A. Burnham*

Plaintiffs Christopher L. Burnham and Sandra B. Madden are the brother and sister, respectively, of Dwayne A. Burnham, a Senior Airman in the U.S. Air Force injured in the Khobar Towers attack. Decl. of Christopher L. Burnham ("Burnham Decl.") ¶ 2, ECF No. 111; *id.*, Attach. 1, Decl. of Sandra B. Madden ("Madden Decl.") ¶ 2, ECF No. 111 at 7; *see also* SAC ¶¶ 8-9; *Schooley*, 2019 WL 2717888, at *42. Dwayne Burnham was a plaintiff in *Schooley* and was awarded $6,000,000 in pain and suffering damages for his injuries. *See* 2019 WL 2717888, at *42, *75.

Christopher Burnham did not receive confirmation that his brother had survived until a day after the attack and described the wait as "the longest day of [his] life." Burnham Decl. ¶ 6. "Even though [his] brother survived the attack," Christopher Burnham "felt like [he] lost [his] brother that day." *Id.* ¶ 7. While the siblings had once been close, when Dwayne returned home, he was "withdrawn and on edge," and the relationship "grew more distant." *Id.*

Similarly, Sandra Madden felt "anxiety and panic" while waiting for information about her "baby brother." Madden Decl. ¶ 6. Even after learning that he had survived, she was "stressed" worrying about the trauma he had endured and his "mental status" and "couldn't wait for him to get home" to "see for [her]self that he was okay." *Id.* ¶ 7.

### 20. *Two Family Members of Salvatore Capaccio*

Plaintiffs Alexandria L. Capaccio and Vincent D. Capaccio are the half-sister and brother, respectively, of Salvatore Capaccio, a Senior Airman in the U.S. Air Force injured in the Khobar Towers attack. Decl. of Alexandria L. Capaccio ("A. Capaccio Decl.") ¶ 2, ECF No. 112; *id.*, Attach. 1, Decl. of Vincent D. Capaccio ("V. Capaccio Decl.") ¶ 2, ECF No. 112 at 8; *see also* SAC ¶¶ 10-11; *Schooley*, 2019 WL 2717888, at *50. Salvatore Capaccio was a plaintiff in *Schooley* and was awarded $7,000,000 in pain and suffering damages for his injuries. 2019 WL 2717888, at *50, *75.

Alexandria Capaccio was seven years old on the day of the attack. A. Capaccio Decl. ¶ 6. She was "so scared" that she "slept with [her] mom every night for a long time" after that day and had "recurring nightmares." *Id.* Whenever her half-brother Salvatore would subsequently leave for duty, she would be afraid for him and have nightmares. *Id.* ¶ 7. She was also concerned "that [her] dad was going to go crazy from his worry." *Id.*

Vincent Capaccio was 14 years old when the bombing occurred and was "extremely worried about [his] big brother." V. Capaccio Decl. ¶ 6. Although he had previously been close with his brother, they "fell out of contact for many years," and when he saw his brother, he was "distant, cold, unhappy." *Id.* ¶ 7. Vincent's mother also changed after the attack, and he felt "ignored," leading to him to drop out of high school, "turn[] to drugs," and start hanging out with "the wrong crowd." *Id.* ¶ 8. He also "gained a lot of weight from stress eating." *Id.* These problems carried over into his adult life. *Id.* ¶¶ 9-10. Although he now tries to have a relationship with his brother, "sometimes it is still hard to find anything to say." *Id.* ¶ 11. As a result of these impacts, Vincent believes "this attack changed the outlook on [his] life forever." *Id.* ¶ 12.

31

### 21. *Four Family Members of Artis R. Coleman*

Plaintiffs Anthony J. Coleman, Jason L. Coleman, Phillip Coleman, Jr., and Temeke Coleman are the siblings of Artis R. Coleman, a member of the U.S. Air Force injured in the Khobar Towers attack.  Decl. of Anthony J. Coleman ("A. Coleman Decl.") ¶ 2, ECF No. 113; *id.*, Attach. 1, Decl. of Jason L. Coleman ("J. Coleman Decl.") ¶ 2, ECF No. 113 at 5; A. Coleman Decl., Attach. 2, Decl. of Phillip Coleman, Jr. ("P. Coleman Decl.") ¶ 2, ECF No. 113 at 12; A. Coleman Decl., Attach. 3, Decl. of Temeke Coleman ("T. Coleman Decl.") ¶ 2, ECF No. 113 at 18; *see also* SAC ¶¶ 12-15.[8]  Artis Coleman was a plaintiff in *Schooley* and was awarded $7,000,000 in pain and suffering damages for his injuries.  2019 WL 2717888, at *19, *75.

Anthony Coleman heard about the bombing while watching the news at home and learned from Artis's wife that Artis's "military group had been struck."  A. Coleman Decl. ¶ 6.  The wait for information about his brother's condition "felt like an unbearable number of days."  *Id.*  When Artis returned home, his "health and behavior deteriorated," and he "was never the same after the attack," which left him "unable to do all of the things he loved," "unable to care for his child," and requiring "assistance with walking at all times," among other impacts.  A. Coleman Decl. ¶ 7.  These effects on Artis "always had [Anthony] on edge."  *Id.* ¶ 7.  Anthony "helped [his] brother in any way [he] could, including assisting with recovery," *id.* ¶ 8, but was "struck with depression after the bombing," *id.* ¶ 9.  After these events, he is "always worried" and "sad knowing that [his] brother will never be the same again."  *Id.*

---

[8]    Plaintiffs' filings are inconsistent as to whether Temeke Coleman is the sister or brother of Artis Coleman. *See* SAC ¶ 15 (describing Temeke as "the sister of Artis R. Coleman, Sr."); T. Coleman Decl. ¶ 2 (describing Temeke as "the brother of Artis R. Coleman").  This Memorandum Opinion will adopt the Temeke's declaration's description and treat Temeke as Artis Coleman's brother.  *See* T. Coleman Decl. ¶ 2; Pls.' Mem. at 18 (also describing Temeke as Artis Coleman's brother).

Jason Coleman and his brother Artis were "very close growing up." J. Coleman Decl. ¶ 6. After learning about the bombing from Artis's wife, he was "very upset" and was "left in limbo for several days" while waiting for updates, during which time he was "in disbelief that there was a bombing and that [his] brother had gotten hurt." *Id.* ¶ 7. After his brother Artis returned home, Jason was "very thankful [his] brother survived" but "hated seeing him struggle to walk, talk, and cope with everyday things." *Id.* ¶ 8. Although his "relationship with Artis grew even closer after this attack," *id.* ¶ 9, he was "very sad, angry and upset seeing [his] brother" endure the challenges of his life after the bombing, *id.* ¶ 8, and the impacts of the attack are still felt "emotionally and in many ways through [his] normal" daily life, *id.* ¶ 11.

Phillip Coleman has a "very close bond" with his family, including his younger brother Artis. P. Coleman Decl. ¶ 6. He was "confused and upset" after learning about the bombing, and during the period of "several days before [the family] was told" that Artis had survived, Phillip "couldn't sleep" and "cried a lot." *Id.* When Artis returned home, he needed "round the clock care," and Phillip "had to take a leave from work to pitch in with [h]is daily care." *Id.* ¶ 7. He was "devastated" by the impacts of the bombing and "think[s] about this attack and the impact . . . on [his] family all the time." *Id.* ¶¶ 8-9. He "often get[s] depressed when . . . think[ing] about his brother's struggle and felt "distraught" and unable to "focus on anything but [his] brother." *Id.* ¶ 10.

Temeke Coleman was "raised together" with Artis "as close siblings." T. Coleman Decl. ¶ 6. After learning about the attack, he was "extremely upset and afraid" during the "several days" while waiting for updates on his brother's status. *Id.* ¶ 7. While he was "so happy" to be "reunited" with his brother when Artis returned home, Temeke "hated seeing him struggl[e] to do every day tasks," and he "helped him in every way [he] could." *Id.* ¶ 8.

### 22. *Two Family Members of Thomas F. Edman*

Plaintiffs Emily R. Edman and Robert M. Edman are the daughter and son, respectively, of Thomas F. Edman, a Captain in the U.S. Air Force injured in the Khobar Towers bombing. Decl. of Emily R. Edman ("E. Edman Decl.") ¶ 2, ECF No. 115; *id.*, Attach. 1, Decl. of Robert M. Edman ("R. Edman Decl.") ¶ 2, ECF No. 115 at 5; *see also* SAC ¶¶ 17-18. Thomas Edman was a plaintiff in *Schooley* and was awarded $6,000,000 in pain and suffering damages for his injuries. 2019 WL 2717888, at *8, *75.

Emily Edman was eight years old on June 25, 1996, and learned of the bombing while watching the news with her mother and brother. E. Edman Decl. ¶ 6. She describes "the thirteen hours before the call" telling them that her father was alive as "the most terrifying experience of [her] life," during which time she "experienced extreme fear and sadness." *Id.* When her father returned home, she was "ecstatic to see him," but described that "it was scary to see him in the condition he was in." *Id.* ¶ 7. "The grief of the bombing has stuck with [her]," and "[a]s an adult," she "sought counseling treatment and ha[s] been diagnosed with Borderline Personality Disorder, characterized by an intense fear of abandonment," of which a "possible cause . . . is a traumatic experience during childhood, such as a separation from a parent." *Id.* ¶ 8.

Robert Edman "was nearly seven years old when the attack happened" and remembers hearing the news "talking about a bombing in Saudi Arabia, which frightened and worried [him], as [he] knew that was where [his] dad was deployed at the time." R. Edman Decl. ¶ 6. As he has gotten older, he has "realized how much [his] dad has gone through because of the attack," and it makes him "sad" to "think about the people who died that day." *Id.* He "hate[s]" that his father "has had to endure this pain his entire life." *Id.*

34

### 23. *Two Family Members of Aaron R. Weimer*

Plaintiffs James L. Weimer and Bonita J. Weimer are the father and mother, respectively, of Aaron R. Weimer, an Airman First Class in the U.S. Air Force injured in the Khobar Towers attack.  Decl. of James L. Weimer ("J. Weimer Decl.") ¶ 2, ECF No. 130; *id.*, Attach. 1, Decl. of Bonita J. Weimer ("B. Weimer Decl.") ¶ 2, ECF No. 130 at 7; *see also* SAC ¶¶ 53-54.  Aaron Weimer was a plaintiff in *Schooley* and was awarded $7,000,000 in pain and suffering damages for his injuries.  2019 WL 2717888 at *25, *75.

James Weimer learned about the bombing from the local NBC news channel and "became immediately worried."  J. Weimer Decl. ¶ 6.  He suffered a "long, anxious time" between learning about the bombing and Aaron Weimer calling to tell his parents that he was okay.  *Id.* ¶ 7.  Each time James's son was deployed after the bombing, James and his wife would "become very anxious" and "stay[] on edge . . . until he made it back home" safely.  *Id.* ¶ 8.

Bonita Weimer "[p]anicked" upon learning about the bombing and "immediately called the American Red Cross" to try to find out information about her son.  B. Weimer Decl. ¶ 6.  The wait for news "felt like an eternity."  *Id.* ¶ 7.  After the bombing, when her son went on other deployments, she would "almost instantly get a funny feeling about it," and during the time her son was deployed, she and her husband "would be a little more on edge with each other," suffering from "a tense feeling all around."  *Id.* ¶ 8.  Each time, their lives "would return to normal" only when their son safely returned home.  *Id.*

### D. **Procedural History**

The same forty-nine plaintiffs named in the Second Amended Complaint filed this lawsuit on November 11, 2023, as related cases to *Est. of Johnson*, 2024 WL 3225954, and *Thole*, 2024 WL 2208208.  *See* Compl., ECF No. 1; Pls.' Not. of Related Case, ECF Nos. 2, 3.  As discussed

*infra* in Part III.B, Iran was properly served with the original complaint under the FSIA. When Iran failed to appear, the Clerk's Office entered default, on July 9, 2024. 1st Entry of Default.

Subsequent to the entry of default, plaintiffs filed their First Amended Complaint adding two additional plaintiffs, Steven and Karen Kerr. [First] Amended Complaint ¶ 29-30, ECF No. 16. Plaintiffs then moved for the Court to take judicial notice of prior cases arising out of the Khobar Towers bombing, for entry of default judgment as to liability and damages, and for expedited consideration. *See* Pls.' [First] Mot. for Default J., ECF No. 20; Pls.' Mot. to Expedite, ECF No. 70. This first motion for default judgment was denied because "[p]leadings that add new plaintiffs and their claims to a lawsuit, as the Amended Complaint did with Steven and Karen Kerr in this case, . . . requir[e] service of such a pleading on a defendant in default." *See Breezee v. Islamic Republic of Iran*, No. 23-cv-3392 (BAH), 2025 WL 1927974, *1 (D.D.C. July 14, 2025). Consequently, the Clerk's Entry of Default was vacated. *Id.* at *2. Plaintiffs' motion for reconsideration, Pls.' Mot. for Reconsideration, ECF No. 72, was denied, Minute Order (July 17, 2025). Plaintiffs then began the process of serving Iran with the First Amended Complaint using the procedures described under the FSIA, 28 U.S.C. § 1608(a). Pls.' Request, ECF No. 73; Pls.' Aff. Requesting Foreign Mailing, ECF No. 75; Pls.' Request, ECF No. 76; Pls.' Aff. Requesting Foreign Mailing, ECF No. 78; Pls.' Request, ECF No. 79.

On September 8, 2025, before completion of service of the First Amended Complaint, plaintiffs moved to sever the claims of the two plaintiffs added in the First Amended Complaint and for leave to file a Second Amended Complaint realleging the claims of only the original forty-nine plaintiffs. Pls.' Mot. to Sever, ECF No. 81. That motion was granted the next day, severing the claims of Steven and Karen Kerr. Minute Order (Sept. 9, 2025). Steven and Karen Kerr filed their own, separate action, *Kerr v. Islamic Republic of Iran*, No. 25-cv-3190 (D.D.C.).

The remaining, original plaintiffs in the instant action subsequently filed the Second Amended Complaint and withdrew their attempts to serve Iran with the First Amended Complaint, *see* Pls.' Not. of Withdrawal of Aff. Requesting Foreign Mailing, ECF No. 132.  Following the clerk's entry of default as to the now operative Second Amended Complaint, 2d Entry of Default, plaintiffs again moved, on September 11, 2025, for default judgment, Pls.' Mot., supported by both declarations and exhibits, ECF Nos. 86-108 (sealed documents); ECF Nos. 109-131 (redacted documents).  This motion is now ripe for resolution.

## II.    LEGAL STANDARD

"Rule 55(a) [of the Federal Rules of Civil Procedure] requires the Clerk to enter a default when a defendant 'has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise,'" and, "[o]nce the Clerk does so, the plaintiff may 'apply to the court for a default judgment' under Rule 55(b)." *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1023 (D.C. Cir. 2020) (quoting FED. R. CIV. P. 55(a), (b)(2)).  Rule 55(b)(2) thus permits a court to consider entering a default judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  Since "strong policies favor resolution of disputes on their merits[,] '[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).  At the same time, the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether the court has subject-matter jurisdiction over the action.  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  Consequently, "entry of a default judgment is not automatic." *Id.* at 6 (footnote omitted).

While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, the FSIA's state-sponsored terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047-48 (D.C. Cir. 2014); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019). To this end, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (alterations accepted) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)); *see also Klapprott v. United States*, 335 U.S. 601, 611 (1949) (observing that "statutes and rules have largely left for judicial determination the type of cases in which hearings and proof should precede default judgments").

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Han Kim*, 774 F.3d at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Uncontroverted factual allegations that are supported by admissible evidence are taken as true. FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when the adverse party "fails to properly address another party's assertion of fact"); *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010))).

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018)

(quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory," *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if 'there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted.'" *Owens*, 864 F.3d at 785 (second alteration in original) (quoting *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)).

## III.    DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendant, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek. These requirements are addressed *seriatim*.

### A.    Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title." 28 U.S.C. § 1330(a). In this case, plaintiffs seek *in personam* relief, so the question is whether defendant Iran is entitled to immunity.[9]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C.

---

[9]    This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and defendant has "forfeited its affirmative defense . . . by failing to raise it" here, *Owens*, 864 F.3d at 804; *see also Maalouf*, 923 F.3d at 1114-15 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

Cir. 2015) (citing 28 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13-14; *see also Doe v. Taliban*, 101 F.4th 1, 5 (D.C. Cir. 2024). In the instant case, plaintiffs assert jurisdiction based on the FSIA's terrorism exception, 28 U.S.C. § 1605A, *see* SAC ¶ 2, which provision was enacted "[i]n 1996, [when] Congress withdrew foreign sovereign immunity for lawsuits that seek money damages for personal injury or death from a state sponsor of terrorism that has engaged in an 'act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,'" *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1057 (D.C. Cir. 2024) (quoting the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241); *see also Mark v. Republic of Sudan*, 77 F.4th 892, 895 (D.C. Cir. 2023). As the quoted text indicates, this exception also requires that "the foreign country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)), and also at that time of the act, "the 'claimant or the victim was' a 'national of the United States,'" *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or was a member of the armed forces, 28 U.S.C. § 1605A(a)(2)(A)(ii)(II).[10]

Plaintiffs have satisfactorily proven the applicable elements here. As already stated, Iran has been designated a state sponsor of terrorism since 1984, over a decade before the 1996 Khobar Towers bombing. Moreover, all but one of the plaintiffs have averred in sworn declarations that they were United States citizens at the time of the attack.[11] The one plaintiff who was not a United

---

[10] Finally, the provision requires proof that, "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A)(iii). Since the Khobar Towers attack took place in Saudi Arabia and not Iran, this requirement does not apply in this case.

[11] *See* Breezee Decl. ¶ 1 (attesting to the declarant's United States citizenship); Donaghue Decl. ¶ 1 (same); Porter Decl. ¶ 1 (same); Robinson Decl. ¶ 1 (same); Stark Decl. ¶ 1 (same); K. Giddens Decl. ¶ 1 (same); Rodriguez Decl. ¶ 1 (same); D. Giddens Decl. ¶ 1 (same); T. Giddens Decl. ¶ 1 (same); Leeper Decl. ¶ 1 (same); Ju. Kazmar Decl. ¶ 1 (same); Jo. Kazmar Decl. ¶ 1 (same); J. Mings Decl. ¶ 1; 1st A. Mings Decl. ¶ 1 (same); 2d A. Mings Decl.

States citizen at the time of the attack, Dilcia Fernandez, bases her claim on her daughter servicemember plaintiff Lakisha Robertson, who was both a U.S. citizen and a member of the U.S. armed forces at the time she was a victim of the Khobar Towers bombing. *See* Fernandez Decl. ¶ 4 (describing her daughter's service in the Air Force at the time of the bombing); L. Robertson Decl. ¶ 1 (Fernandez's daughter attesting that she was a citizen at the time of the attack); *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 35 (D.D.C. 2016) (finding subject-matter jurisdiction to adjudicate claims of non-U.S.-citizen family members of U.S.-citizen victims under the FSIA's terrorism exception). Finally, plaintiffs seek damages "for personal injury . . . that was caused by an . . . extrajudicial killing" for which defendant provided "material support or resources." 28 U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors.").

More specifically, the truck bombing that plaintiffs allege caused their injuries was manifestly an "extrajudicial killing" that resulted in the deaths of nineteen American military personnel. *See, e.g.*, *Rimkus*, 750 F. Supp. 2d at 182 ("The actions of defendant[] constituted both an extrajudicial killing and the provision of material support in satisfaction of the first element of liability."); *Akins*, 332 F. Supp. 3d at 33-34 (concluding the same); *Aceto*, 2020 WL 619925, at *13 (same). For the purposes of the FSIA terrorism exception, the term "extrajudicial killing" has

---

¶ 2 (attesting to the U.S. citizenship of the decedent whose estate the declarant seeks to represent); Rancier Decl. ¶ 1 (attesting to the declarant's United States citizenship); Co. Johnson Decl. ¶ 1 (same); R. Caffey Decl. ¶ 1 (same); M. Caffey Decl. ¶ 1 (same); T. Caffey Decl. ¶ 1 (same); L. Robertson Decl. ¶ 1 (same); C. Robertson Sr. Decl. ¶ 1 (same); C. Robertson II Decl. ¶ 1 (same); Brown Decl. ¶ 1 (same); Dabriel Decl. ¶ 1 (same); Ca. Johnson Decl. ¶ 1 (same); Sapp Decl. ¶ 1 (same); M. Spruill Decl. ¶ 1 (same); R. Spruill Decl. ¶ 1 (same); Bump Decl. ¶ 1 (same); Hale Decl. ¶ 1 (same); Holman Decl. ¶ 1 (same); Mercier Decl. ¶ 1 (same); Strader Decl. ¶ 1 (same); Weber Decl. ¶ 1 (same); Jiron Decl. ¶ 1 (same); Burnham Decl. ¶ 1 (same); Madden Decl. ¶ 1 (same); A. Capaccio Decl. ¶ 1 (same); V. Capaccio Decl. ¶ 1 (same); A. Coleman Decl. ¶ 1 (same); J. Coleman Decl. ¶ 1 (same); P. Coleman Decl. ¶ 1 (same); T. Coleman Decl. ¶ 1 (same); E. Edman Decl. ¶ 1 (same); R. Edman Decl. ¶ 1 (same); J. Weimer Decl. ¶ 1 (same); B. Weimer Decl. ¶ 1 (same).

the "meaning given" in "the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7),
which statute defines the term as "a deliberated killing not authorized by a previous judgment
pronounced by a regularly constituted court affording all the judicial guarantees which are
recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73
(1992) (codified at 28 U.S.C. § 1350 note § 3(a)).

The Court additionally takes judicial notice of the evidence presented in *Blais* and *Heiser
I* demonstrating that Iran provided "material support or resources" for the extrajudicial killing
carried out in the Khobar Towers bombing.  As is clear from the evidence in those cases, described
*supra* in Parts I.A-.B, Iran and its agents planned, supported, and "approved" the attack.  *Heiser I*,
466 F. Supp. 2d at 252.  The evidence also shows that Iran played a key role in helping to recruit,
train, fund, supply, and direct Saudi Hezbollah, including in specific preparation for the attack on
the Khobar Towers, *id.* at 262, establishing that Iran's actions were "a 'substantial factor' in the
sequence of events that led to . . . plaintiff[s'] injur[ies]" and that the injuries were "'reasonably
foreseeable or anticipated as a natural consequence' of [Iran]'s conduct."  *Owens*, 864 F.3d at 794
(quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional
standard for causation under the FSIA's terrorism exception is proximate cause).

Therefore, under 28 U.S.C. § 1605A, Iran is not immune from this suit, meaning that
subject-matter jurisdiction may be properly exercised.  *See* 28 U.S.C. § 1330(a).

## B.    Personal Jurisdiction Under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which
the district courts have jurisdiction . . . where service has been made under section 1608 of [the
FSIA]."  28 U.S.C. § 1330(b).  This section prescribes two methods by which service shall
ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)-(2), but these methods were "not available" to
plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C.

2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), because "defendant[] ha[s] neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

For this reason, plaintiffs attempted to effectuate service of the original complaint under § 1608(a)(3) by sending one copy of the summons and complaint, along with a translation of each document in Iran's official language, to Iran's Ministry of Foreign Affairs. *See* Pls.' Aff. Requesting Foreign Mailing, ECF No. 7; Pls.' Request, ECF No. 8; Certificate of Clerk, ECF No. 9. When this method of service was unsuccessful, plaintiffs, following § 1608(a)(4), transmitted the summons, original complaint, and notice of suit, along with translations of each document, to the U.S. Department of State, *see* Pls.' Aff. Requesting Foreign Mailing, ECF No. 10; Pl.s' Request, ECF No. 11; Certificate of Clerk, ECF No. 12, for service "through diplomatic channels," 28 U.S.C. § 1608(a)(4) (allowing resort to this method "if service cannot be made within 30 days under paragraph (3)"). On June 24, 2024, the U.S. Department of State certified that the requirements for diplomatic service under Section 1608(a)(4) had been satisfied. Return of Service/Aff., ECF No. 13.

The now operative Second Amended Complaint has not been served on Iran but is substantially identical to the original Complaint, making only ministerial changes such as indicating that one of the plaintiffs has since passed away and is now represented by her estate. SAC at 3 n.1. The Second Amended Complaint includes the same plaintiffs and relies on the same bases for relief as the original Complaint. *Compare* Compl., *with* SAC. Under Federal Rule of Civil Procedure 5, "[n]o service is required on a party who is in default for failing to appear," FED. R. CIV. P. 5, as Iran is in this case, 2d Entry of Default. Since the Second Amended Complaint

does not "assert[] a new claim for relief against [the defaulting] party," FED. R. CIV. P. 5, plaintiffs' original service, Return of Service/Aff., ECF No. 13, remains effective.  Plaintiffs' executed service under 28 U.S.C. § 1608(a)(4) authorizes this Court to exercise personal jurisdiction over Iran.  *See* 28 U.S.C. § 1330(b); *CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 145 S. Ct. 1572, 1580 (2025) ("[T]he most natural reading of § 1330(b) is that personal jurisdiction over a foreign sovereign is 'automatic' whenever (1) 'an exception to immunity applies' and (2) 'service of process has been accomplished.'" (citation omitted)).

### C.    Iran's Liability

Plaintiffs seek relief under Section 1605A(c) of the FSIA, which creates a private right of action for "personal injury or death" and provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c); *see also* SAC at 38-41 (citing § 1605A(c) in each of the five counts in the Second Amended Complaint).  All plaintiffs bring a claim under 28 U.S.C. § 1605A(c) for intentional infliction of emotional distress ("IIED").  *See* SAC ¶¶ 142-147 (bringing, in Count III, an IIED claim for the surviving injured servicemember plaintiffs); *id.* ¶¶ 148-153 (bringing, in Count IV, an IIED claim for the family member plaintiffs).  In addition, the eleven servicemember plaintiffs bring claims for battery, *id.* ¶¶ 135-138 (Count I), and assault, *id.* ¶¶ 139-141 (Count II), seeking compensatory damages for "imminent apprehension of harm, extreme mental anguish, physical injury, pain and suffering, and past and future economic losses including medical expenses, lost income, and loss of earning capacity," *id.* ¶ 141, the thirty-eight family member plaintiffs bring a claim for loss of solatium, *id.* ¶¶ 148-153 (Count IV), and all forty-nine plaintiffs seek "punitive damages," *id.* ¶¶ 154-155 (Count V).

Despite creating a private right of action that allows for the recovery of "economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c), Section

1605A(c) contains no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages. As a result, courts evaluating such claims "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see also Est. of Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability). The availability of these claims for each plaintiff is discussed below.

### 1. *Servicemember Plaintiffs*

The eleven servicemember plaintiffs—Jason M. Breezee, Bradley J. Donaghue, James E. Porter, Dale O. Robinson, Patrick R. Stark, Kenneth P. Giddens, Travis S. Leeper, James A. Mings, Amy Rancier, Lakisha S. Robertson, and Morgan S. Spruill—were each United States citizens at the time of the attack and, therefore, are expressly covered by, and entitled to bring claims under, Section 1605A(c).

### a. *Assault and Battery*

Battery requires an act "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly results." Restatement (Second) of Torts § 13 (A.L.I. 1965). "Harmful contact" causes a "physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76-77 (D.D.C. 2010) (defining these terms). Iran acted with the intent to cause harmful contact with the residents of the Khobar Towers when it materially supported the truck bombing. *See, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as an act intending to cause harm). Eight of the eleven servicemember plaintiffs in this case aver that some harmful physical contact resulted from the explosion of the bomb, which evidence is sufficient to prove

45

that defendant is liable to these plaintiffs for battery. *See* Breezee Decl. ¶ 6 (describing being "launched" across the room and suffering cuts from glass); Donaghue Decl. ¶ 5 (describing the shockwaves from the blast knocking him out of a jet exhaust he was inspecting and causing him to fall "four to five feet" to the ground); Robinson Decl. ¶ 7 (cuts from glass); Stark Decl. ¶ 6 (cuts and dislocated shoulder); K. Giddens Decl. ¶ 6 (cuts from glass); Leeper Decl. ¶ 6 (describing being thrown from his bed and suffering cuts from glass); Rancier Decl. ¶ 11 (knocked unconscious and cuts from glass); M. Spruill Decl. ¶ 7 (cuts from glass). Servicemember plaintiffs James Porter, James Mings, and Lakisha Robertson, on the other hand, have provided no evidence that any of them suffered a harmful or offensive contact against themselves from the bombing to support a battery claim. *See generally* Porter Decl.; J. Mings Decl.; L. Robertson Decl.

Assault, meanwhile, occurs when a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension." Restatement (Second) of Torts § 21(1). "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs "averred "that they did, in fact, fear such harm because of the attack," defendant may be held liable for assault. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same). Imminence is defined as being "so close to striking distance that [one] can reach the other almost at once." Restatement (Second) of Torts § 29 cmt. b. The nine servicemember plaintiffs who were present in the Khobar Towers complex during the attack—Jason Breezee, James Porter, Dale Robinson, Patrick Stark, Kenneth Giddens, Travis Leeper, Amy Rancier, Lakisha Robertson, and Morgan Spruill—were all clearly within striking distance, given the impacts of the bomb on the whole Khobar Towers complex, *see* Breezee Decl. ¶¶ 5-6; Porter Decl. ¶¶ 5-7; Robinson Decl. ¶¶ 7; Stark

46

Decl. ¶¶ 5-7; Giddens Decl. ¶¶ 5-7; Leeper Decl. ¶¶ 5-7; Rancier Decl. ¶¶ 8, 11; L. Robertson Decl. ¶¶ 5, 7-8; M. Spruill Decl. ¶¶ 5, 7, and thus "were in imminent apprehension of harm," meaning that Iran is liable to these plaintiffs for assault, *Aceto*, 2020 WL 619925, at *15. Bradley Donaghue was physically impacted by the blast of the bomb, *see* Donaghue Decl. ¶ 5, meaning that he too was within striking distance.

In contrast, servicemember plaintiff James Mings was not present at the Khobar Towers complex at the time of the bombing. Mings has provided no evidence that he was close to the bombing either, attesting only that he was "on a mobile patrol on the aircraft parking ramp" at that time, J. Mings Decl. ¶ 6. While Mings might understandably have suffered psychological impacts from his exposure to the aftermath of the bombing, this distance from the detonation site is inconsistent with the "imminent apprehension" required to prove assault. *See* Restatement (Second) of Torts § 29 cmt. b (defining "imminence" as "so close to striking distance that [the person] can reach the other almost at once"); *Aceto*, 2020 WL 619925, at *15 (finding that a plaintiff who was "miles from the Khobar Towers complex at the time of the bombing" could not claim an assault, despite "fear[ing] that the base [she was on] would be attacked next when she felt and saw the blast," because her distance from the explosion was not consistent with the "imminence" requirement).

### b. IIED

"[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to" a plaintiff is liable for intentional infliction of emotional distress. Restatement (Second) of Torts § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 77 (same). Here, all eleven servicemember plaintiffs have

47

demonstrated that they suffered severe emotional and psychological distress as a result of the Khobar Towers attack. *See* Breezee Decl. ¶¶ 8-9 (PTSD); Porter Decl. ¶¶ 10-11 (same); Robinson Decl. ¶ 22 (same); Stark Decl. ¶ 12 (same); Giddens Decl. ¶¶ 12, 14 (same); Leeper Decl. ¶ 13 (anxiety, panic attacks, and other trauma); Rancier Decl. ¶ 18 (PTSD); L. Robertson Decl. ¶ 10 (same); M. Spruill Decl. ¶ 12 (same); Donaghue Decl. ¶ 10 (PTSD and anxiety); J. Mings Decl. ¶¶ 10, 12 (PSTD).

In *Ratemo v. United States*, Nos. 19-cv-2067, 19-cv-2068, 22-cv-646 (JDB), 2025 WL 294934, at *1 (D.D.C. Jan. 24, 2025)—a decision issued after the plaintiffs filed their first motion for default judgment and not addressed in either that motion or plaintiffs' second motion for default judgment—another Judge on this Court considered claims for IIED arising from the detonation of truck bombs outside United States embassies in Kenya and Tanzania in August 1998. Certain plaintiffs in that case had not been present for the bombing itself but claimed IIED from emotional harms suffered while "providing first aid at the scene following the bombings or in witnessing the aftermath of the bombings. *Id.* at *2 (citation omitted). In denying IIED recovery to those plaintiffs who had not been present for the bombing itself, *Ratemo* explained that "not every person who experiences emotional distress from a major terrorist attack—a universe that could be large indeed—can state a claim for IIED." *Id.* at *4 (quoting *Owens*, 684 F.3d at 807). Instead, *Ratemo* found that a terrorist bombing is only "'directed at' those within the bomb's blast radius, *i.e.*, the area physically affected by the explosion itself," since those individuals can claim a "unique[]" harm as compared to the public at large. *Id.* at *5-6.

As already discussed, *see supra* Part III.C.1.a., one servicemember plaintiff in this case, James Mings, has provided no evidence that the aircraft parking ramp on which he was on patrol at the time was impacted physically by the bomb, J. Mings Decl. ¶ 6. The question, therefore, is

whether Mings may nonetheless recover for IIED due to his participation in securing the area and the distress he experienced in this panicked aftermath. The Court finds that he may.

The D.C. Circuit has explained that "unique, foreseeable, and intended" harms, "'directed at' or confined to particular persons," provides a stronger basis for IIED liability than general harms experienced by the general public writ large. *Owens*, 864 F.3d at 811; *see also Ratemo*, 2025 WL 294934, at \*5-6. Unlike in *Ratemo*, where the bombings at issue in that case "d[id] not differentiate among members of the public in whom fear would be instilled," risking turning all members of the public into "potential plaintiffs," 2025 WL 294934, at \*5, the Khobar Towers attack targeted a specific, identifiable subset of people: "the coalition forces charged with monitoring compliance with [United Nations] security council resolutions" who were housed at the complex, *Blais*, 459 F. Supp. 2d at 47. By attacking the specific location housing members of this military force, the bombing created a unique harm for those individuals, as compared to the general public. Specifically, the bombing created a unique insecurity and fear that members of the coalition forces were not safe in Dhahran, even at their living quarters, and would be targeted for further attacks. *See, e.g.*, Breezee Decl. ¶ 7 (describing being "terrified" in the days after the bombing and "wondering, if there was another [attack], how big would it be? Were we under attack and going to war?"). This harm was experienced by all the servicemember plaintiffs in Saudi Arabia in the vicinity of Khobar Towers, whether they were present at the actual bomb site at the time of the attack or in the surrounding area. Mings Decl. ¶ 8 (describing that he "didn't trust anyone to make sure [they] weren't hit again" after the attack). The terrorist attack specifically targeted members of the coalition force, since only they were housed at the Khobar Towers complex. SAC ¶ 61. Moreover, that all members of the coalition forces, whether present at the time of the bombing or not, would experience fear and insecurity as a result of the bombing

was plainly foreseeable and intended by targeting the exact location where these individuals lived, rather than targeting any specific subset of the coalition forces based on their jobs or roles in Dhahran. Since the attack at issue in this case was directed at specific, identifiable subset of individuals and created a unique harm for those individuals, *Ratemo* is inapposite in this case. Since all eleven servicemember plaintiffs in this case have shown that they suffered extreme emotional and psychological harm from the bombing, all eleven servicemember plaintiffs may recover for IIED.

### 2. *Family Member Plaintiffs*

The remaining thirty-eight plaintiffs seek damages as family members of servicemembers present in Dhahran, Saudi Arabia, for the Khobar Towers bombing. Nineteen of these plaintiffs—Denise Rodriguez, David Giddens, Timothy Giddens, Judith Kazmar, John Kazmar, Albert Mings, the estate of Deborah Mings, Courtney Johnson, Rosie Caffey, Manuel Caffey, Tonya Caffey, Curtis Robertson, Sr., Curtis Robertson II, Dilcia Fernandez, Kareem Brown, Roger Dabriel, Cassandra Johnson, Latoya Sapp, and Rhonda Spruill—are family members of servicemember plaintiffs in this suit. Eighteen of the family member plaintiffs—Kyle Bump, Maria Hale, Eunice Holman, Angelique Mercier, Jane Strader, Trisha Weber, Christopher Burnham, Sandra Madden, Alexandria Capaccio, Vincent Capaccio, Anthony Coleman, Jason Coleman, Phillip Coleman, Jr., Temeke Coleman, Emily Edman, Robert Edman, James Weimer, and Bonita Weimer—are family members of servicemembers awarded compensatory damages in *Schooley*. One additional family member plaintiff—Jeffrey Jiron—is related to a servicemember who was awarded compensatory and punitive damages in *Ackley*.

The family members rest their claim of liability on IIED, via the private right of action afforded in 28 U.S.C. § 1605A(c). *See* SAC ¶¶ 148-153 (Count IV). The Restatement permits recovery for those who were not a direct target of a defendant's conduct if (1) "the defendants'

conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present" and (2) the claimant is a member of a victim's immediate family, *Heiser II*, 659 F. Supp. 2d at 26-27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307 (2000)), or the functional equivalent of an immediate family member, *see Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FSIA for IIED to "members of the victim's household" who were "viewed as the functional equivalent of immediate family members"); *see also* Restatement (Second) of Torts § 46, cmt. (leaving "open the possibility of situations in which presence . . . may not be required").

Thirty-two of the plaintiffs in this case are plainly immediate family members—parents, siblings, spouses, and children—of servicemember victims injured in the Khobar Towers attack. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)). Six of the plaintiffs—John Kazmar, Manuel Caffey, Tonya Caffey, Cassandra Johnson, Latoya Sapp, and Alexandria Capaccio—do not fall neatly into these traditional categories, but nonetheless each is the functional equivalent of an immediate family member and may therefore maintain a claim for IIED. Tonya Caffey, Cassandra Johnson, Latoya Sapp, and Alexandria Capaccio, as half-siblings of injured servicemember plaintiffs, "are presumed to recover" as full siblings would, *id.* (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007)), and the evidence here supports application of that presumption: all four attest to their close relationship with their half siblings. *See* T. Caffey Decl. ¶ 5 (describing growing up in the same household as her half-sister and their close relationship); Ca. Johnson Decl. ¶ 7 (describing that, although she did not grow up in the same household with her half-sister, who was significantly older, they had a close sisterly relationship); Sapp Decl. ¶ 5 (describing her close

relationship with and admiration for her half-sister); A. Capaccio Decl. ¶ 7 (describing her attachment to her half-brother). Finally, although John Kazmar is not the biological or adoptive father of Travis Leeper, and Manuel Caffey is not the biological or adoptive father of Amy Rancier, both are the "functional equivalent." *See Bettis*, 315 F.3d at 337. John Kazmar lived with Leeper, as Leeper's mother's husband, and took on various parental responsibilities from the time Leeper was nine years old. Jo. Kazmar Decl. ¶ 5. Similarly, Caffey lived with Rancier, as her mother's husband, and took on parental responsibilities from the time Rancier was two years old. M. Caffey Decl. ¶¶ 5-6. Each of these plaintiffs, therefore, will also be treated as immediate family members who may bring a claim for IIED.

Plaintiff Deborah Mings is represented by her estate in this case. *See supra* Part I.C.9. Courts in this district have previously awarded damages to the estates of deceased servicemembers and the estates of deceased relatives of victims of terrorist attacks. *See, e.g.*, *Est. of Johnson*, 2024 WL 3225954, at *14; *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 38 (D.D.C. 2020). "When, such as here, an estate-plaintiff brings an action under [the] FSIA's private cause of action, the plaintiff must first establish the estate's standing, or '[its] power . . . to bring and maintain legal claims.'" *Barry*, 437 F. Supp. 3d at 36 (alterations in original) (quoting *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017)). Standing of an estate is governed by the law of the state which governed the creation of the estate. *Id.* (citing *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014)).

Here, the estate of Deborah Mings has not provided sufficient information to establish its standing to sue. As of the date of the filing of the declarations, Deborah Mings's husband, Albert Mings, was still "in the process of becoming appointed the personal representative" of the estate, 2d A. Mings Decl. ¶ 1, and no information has been provided that this process has been completed.

Estates may bring suit through their executor, administrator, or any other person authorized by statute, *see* FED. R. CIV. P. 17(a)(1), (b)(3); *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*, 414 F. Supp. 3d 109, 125 (D.D.C. 2019) (making the same point), but no information submitted to this Court has established that Albert Mings currently satisfies any of these requirements, *see generally* 2d A. Mings Decl; Pls.' Mem. at 36-37. Moreover, although "the process of opening her estate has begun in the state of Texas," plaintiffs have not established that her estate was successfully opened there and that the laws of Texas therefore govern, *see* SAC ¶ 32. Given the insufficient information to determine that Deborah Mings's estate has standing to sue, this estate's request for damages is denied.

Plaintiff Dilcia Fernandez is not a "national of the United States" and therefore cannot recover under the private right of action created in 28 U.S.C. § 1605A(c). Section 1605A(c) makes state sponsors of terrorism liable to U.S. nationals and certain other categories of individuals not relevant here. *Id.* § 1605A(c)(1). A "national of the United States," defined by reference to 8 U.S.C. § 1101(a)(22), *see* 28 U.S.C. § 1605A(h)(5), is a citizen of the United States or "a person who, though not a citizen of the United States, owes permanent allegiance to the United States," 8 U.S.C. § 1101(a)(22). "The sole . . . statutory provision that presently confers United States nationality upon non-citizens is 8 U.S.C. § 1408," which covers people born in or having some connection to outlying possessions of the United States. *Mohammadi*, 782 F.3d at 15.

Although plaintiffs' filings are somewhat inconsistent on this point, Dilcia Fernandez appears to be a citizen of the Republic of Panama and a permanent resident of the United States, and therefore not a "national of the United States" under § 1605A(c). *Compare* Fernandez Decl. ¶ 1 (stating Fernandez is a permanent resident of the United States); *id.*, Ex. 1, Fernandez Permanent Resident Card, ECF No. 125 at 30 (same), *with* SAC ¶ 42 (stating she is a citizen of the

United States). While § 1605A(a) abrogates Iran's immunity against Fernandez's claim—because the victim of the attack, Fernandez's daughter Lakisha, was a U.S. citizen—Fernandez must rely upon a substantive source of liability other than § 1605A(c). Fernandez may bring claims "under 'applicable state and/or foreign law,'" *Thuneibat*, 167 F. Supp. 3d at 41 (quoting *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572 (7th Cir. 2012)), typically either the law of the place where the attack occurred, the law of the forum state, or the law of the domicile country of the plaintiff, *id.* (citing *Owens*, 826 F. Supp. 2d at 154). Fernandez must "identify the specific source of law . . . at an appropriate time in the litigation . . . by identifying [her] causes of action." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 840 (D.C. Cir. 2009); *see also Thuneibat*, 167 F. Supp. 3d at 41-47 (conducting choice-of-law analysis and applying Jordanian law identified by plaintiffs as a basis for liability). Here, Fernandez, like the other plaintiffs, has identified only § 1605A(c) as a basis for liability, and her request for damages is denied.

Defendant is liable for IIED to the remaining thirty-six family-member plaintiffs. Defendant's conduct in materially supporting Saudi Hezbollah was "sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] [wa]s not present," such that a victim's immediate family members need not have been at the bombing to recover for their emotional distress. *Heiser II*, 659 F. Supp. 2d at 27 (quoting DOBBS, *supra*, § 307); *see Schooley*, 2019 WL 2717888, at *73 (concluding the same); *Akins*, 332 F. Supp. 3d at 37-38 (same). Finally, the remaining thirty-six family member plaintiffs have shown, through their uncontested declarations, that they suffered significant emotional consequences from the attack, both in the days spent waiting for news of their loved ones and in the years after the attack.[12]

---

[12]    *See* Rodriguez Decl. ¶¶ 7-8, 10; D. Giddens Decl. ¶¶ 6-7, 11; T. Giddens ¶¶ 6-8, 12-13; Ju. Kazmar Decl. ¶¶ 5-6; Jo. Kazmar Decl. ¶¶ 8-9; Co. Johnson Decl. ¶¶ 5-7; R. Caffey Decl. ¶¶ 8, 10, 13-14; M. Caffey Decl. ¶¶ 11, 14, 16-17; T. Caffey Decl. ¶¶ 9, 12-13; C. Robertson Sr. Decl. ¶¶ 9, 11, 13-14; C. Robertson II Decl. ¶ 6; Brown Decl. ¶¶ 6-7, 9-10; Dabriel Decl. ¶¶ 8-9; Ca. Johnson Decl. ¶¶ 5, 7; Sapp Decl. ¶¶ 6, 8, 10; R. Spruill Decl. ¶¶ 6-8, 13-14; Bump

*        *        *

The eleven servicemember plaintiffs and thirty-six of the thirty-eight family member plaintiffs (excepting only Dilcia Fernandez and the estate of Deborah Mings) have established defendant's liability under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress, as outlined above.

### D.    Damages

Turning to the allowable damages, plaintiffs seek to recover pain and suffering, solatium, and punitive damages.  Pls.' Mem. at 77-86 (requesting these three types of damages); *see also id.* at 80 ("Plaintiffs are not presenting evidence for lost wages or other economic losses and therefore no economic damages should be awarded."); SAC ¶¶ 4, 138, 141, 146, 152, 155.  The damage awards to which forty-seven plaintiffs (excepting only plaintiffs Dilcia Fernandez and the estate of Deborah Mings) are entitled are described below.

### 1.    *Legal Standard for Damages under Section 1605A(c)*

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  To recover, the plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate."  *Roth*, 78 F. Supp. 3d at 402 (internal quotation marks omitted) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115-16 (D.D.C. 2005)); *see also Fraenkel*, 892 F.3d at 353 (stating the same).  Courts may look to

---

Decl. ¶¶ 6, 8; Hale Decl. ¶ 9; Holman Decl. ¶¶ 8-12; Mercier Decl. ¶¶ 6-8; Strader Decl. ¶¶ 6-7, 9; Weber Decl. ¶¶ 9-10, 12; Jiron Decl. ¶¶ 6, 9-10, 15; Burnham Decl. ¶¶ 6-7; Madden Decl. ¶¶ 6-7; A. Capaccio Decl. ¶¶ 6-7; V. Capaccio Decl. ¶¶ 6-12; A. Coleman Decl. ¶¶ 6-9; J. Coleman Decl. ¶¶ 7-9, 11; P. Coleman Decl. ¶¶ 6-8, 10; T. Coleman Decl. ¶¶ 7-8; E. Edman Decl. ¶¶ 6-8; R. Edman Decl. ¶ 6; J. Weimer Decl. ¶¶ 7-8; B. Weimer Decl. ¶¶ 7-8; 1st A. Mings Decl. ¶¶ 6, 9.

expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion." *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that the plaintiffs' injuries were reasonably certain and were the intended consequences of the defendants' material support of Saudi Hezbollah. *See Est. of Johnson*, 2024 WL 3225954, at *13 (concluding the same); *Schooley*, 2019 WL 2717888, at *74 (same); *Akins*, 332 F. Supp. 3d at 39 (same). Having concluded this, whether plaintiffs have shown the amount of pain and suffering and solatium damages by a reasonable estimate will be considered next.

### 2. *Pain and Suffering*

As previously discussed, *see supra* Part III.C., defendant is liable to the eleven servicemember plaintiffs for a combination of battery, assault, and intentional infliction of emotional distress, but the bar on multiple recoveries allows these plaintiffs to recover only under one theory, for the single underlying harm. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited."). Within this single-recovery framework, the "baseline assumption" applied in previous cases under the FSIA's terrorism exception is that "'persons suffering injuries in terrorist attacks are entitled to $5 million in damages.'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). This baseline, in turn, may be adjusted either upward or downward, based on individual circumstances. An upward departure would be warranted "in the

presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, . . . or were mistaken for dead.'" *Id.* at 35-36 (quoting *Valore*, 700 F. Supp. 2d at 84). A downward departure would be warranted "in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'" *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify. In *Schooley*, this Court relied in part on an "objective metric"—the VA disability rating—to "determin[e] the relative degree of injury suffered by each service member plaintiff." *Schooley*, 2019 WL 2717888, at *74. That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.* (internal quotation marks omitted). As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id.*; *cf. Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 33 (D.D.C. 2014) ("When calculating damages amounts, 'the Court must take pains to ensure that individuals with similar injuries receive similar awards.'" (quoting *Peterson*, 515 F. Supp. 2d at 54)). *Schooley*'s basic rubric is adopted in this case for the ten servicemember plaintiffs with relevant VA disability ratings. Under this rubric, servicemember plaintiffs rated by the VA up to 30% disabled due to their service injuries stemming from the Khobar Towers attack receive a baseline award of $5,000,000; plaintiffs rated 40 to 60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and service-member plaintiffs rated 70 to 100% disabled by the VA will receive a further upward departure, for a total of $7,000,000. *See, e.g.*, *Schooley*, 2019 WL 2717888, at *75; *Est. of Johnson*, 2024 WL 3225954,

at *14 (using this approach); *Thole*, 2024 WL 2208208, at *14 (same); *Gration*, 2023 WL 5221955, at *30 (same); *Ackley*, 2022 WL 3354720, at *51 (same); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same).  The servicemember plaintiff who has not provided a VA disability rating will be awarded damages based on the descriptive and documentary evidence presented about his injuries.  *See Schooley*, 2019 WL 2717888, at *75 (adopting the same approach); *Akins*, 332 F. Supp. 3d at 40-41 (same).

Eight servicemember plaintiffs—Jason Breezee, Bradley Donaghue, James Porter, Dale Robinson, Patrick Stark, James Mings, Amy Rancier, and Morgan Spruill—can recover in the 70-100% disabled category.  *See supra* Part I.C.1 (describing Breezee's disability rating and finding that an 80% rating is attributable to injuries suffered in the Khobar Towers bombing); *supra* Part I.C.2 (describing Donaghue's disability rating and finding that a 70% rating is attributable to injuries suffered in the Khobar Towers bombing); *supra* Part I.C.3 (describing Porter's disability rating and finding that a 70% rating is attributable to the Khobar Towers bombing); *supra* Part I.C.4 (describing Robinson's disability rating and finding that a 70% rating is attributable to the Khobar Towers bombing); *supra* Part I.C.5 (describing Stark's disability rating and finding that an 80% rating is attributable to the Khobar Towers bombing); *supra* Part I.C.8 (describing Mings's disability rating and finding that an 80% rating is attributable to the Khobar Towers bombing); *supra* Part I.C.9 (describing Rancier's disability rating and finding that an 80% rating is attributable to the Khobar Towers bombing); *supra* Part I.C.11 (describing Spruill's disability rating and finding that the entire 100% rating is attributable to the Khobar Towers bombing).  Each of these eight plaintiffs will therefore receive an award of $7,000,000.

Two servicemember plaintiffs—Kenneth Giddens and Lakisha Robertson—can recover in the 40-60% disabled category.  *See supra* Part I.C.6 (describing Giddens's disability rating and

finding that a 60% rating is attributable to the Khobar Towers bombing); *supra* Part I.C.10 (describing Robertson's disability rating and finding that a 50% rating is attributable to the Khobar Towers bombing). Giddens and Robertson will thus each receive an award of $6,000,000.

Review of the affidavits and supporting evidence submitted by the remaining servicemember plaintiff, Travis Leeper, demonstrates that he is entitled to an award of $3,500,000 for the impact and cuts he received in the bombing and the psychological symptoms he suffered as a result. *See* Leeper Decl. ¶¶ 6, 12-13 (describing being thrown from bed, cuts on his feet, and psychological symptoms suffered since returning home). These injuries are consistent with the "'minor shrapnel injuries or minor injury from small-arms fire,'" *Schooley*, 2019 WL 2717888, at *74-75 (quoting *Kaplan*, 213 F. Supp. 3d at 35) (awarding $3,000,000 for such injuries), with the added injury of being thrown from his bed by the explosion and the trauma of participating in first aid for dozens of other more severely injured individuals, Leeper Decl. ¶ 7; *see Aceto*, 2020 WL 619925, at *19 (awarding $3,000,000 each to plaintiffs with minor physical and psychological injuries); *Akins*, 332 F. Supp. 3d at 41 (awarding $2,500,000 to victims who sustained cuts from flying glass and psychological injury).

Accordingly, servicemember plaintiffs Jason Breeze, Bradley Donaghue, James Porter, Dale Robinson, Patrick Stark, James Mings, Amy Rancier, and Morgan Spruill are entitled to awards of $7,000,000 each; Kenneth Giddens and Lakisha Robertson are entitled to awards of $6,000,000 each; and Travis Leeper is entitled to an award of $3,500,000.

### 3. *Solatium*

"Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *see also Fraenkel*, 892 F.3d at 357. Damages recoverable on the family members' claims of IIED thus will be discussed as claims for solatium.

The remaining thirty-six family member plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of servicemember victims. *See* SAC ¶ 152; Pls.' Mem. at 81-85. "[S]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society." *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)). The D.C. Circuit has explained that solatium "began as a remedy for the loss of a spouse or a parent. It has since expanded to include the loss of a child[,] . . . [a]nd in some circumstances, it can include the loss of a sibling." *K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988, 991-992 (D.C. Cir. 2025) (quoting *Fraenkel,* 892 F.3d at 356 (quoting *Flatow*, 999 F. Supp. at 29)). Two factors are considered in calculating solatium: "The first is the injury to the feelings of a family member caused by the circumstances of the decedent's death," and "[t]he second is the loss of the decedent's comfort and society." *Id*. (internal quotations and citations omitted). "Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356-57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

The *Heiser I* framework for solatium damages has been a generally used guide in this Court, *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)), for purposes of consistency, though this framework is not at all mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in

the amounts that *Heiser* found commonly granted.").  Indeed, "different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damages awards." *Fraenkel*, 892 F.3d at 362 (quoting *Fraenkel v. Islamic Republic of Iran*, 258 F. Supp. 3d 77, 82 (D.D.C. 2017)).  "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011).

Blunt application of the *Heiser* framework can fail "to assess each plaintiff's injuries individually." *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065 (JDB), 2022 WL 2817730, at *43 (D.D.C. July 19, 2022).  Ensuring that "individuals with similar injuries receive similar awards," *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) (quoting *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 48 (D.D.C. 2012)), requires adjustments so that awards reflect differences in the degree of injury.  For example, servicemembers directly injured in terrorist attacks should receive substantially more than their own spouses, who suffer none of the physical injuries and whose emotional injuries—while undoubtedly may be severe—are generally less acute.  *See Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014); *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 15-16 (D.D.C. 2012).  Even outside of a single family unit, family members of surviving servicemembers should generally not receive more than other servicemember victims injured in the same attack. To the extent deviations from the *Heiser* framework are needed to accomplish commonsense proportionality between awards, such deviations promote courts' "primary consideration" of overall consistency and common sense.  *Moradi*, 77 F. Supp. 3d at 70.

The damages awards for plaintiff-spouses are addressed first, followed by parents and children, and then siblings.

### a. Spouses

Three of the remaining family member plaintiffs were spouses of servicemember plaintiffs at the time of the bombing: Curtis Robertson, Sr., Rhonda Spruill, and Maria Hale.  Each spouse has described fear for his or her spouse's physical well-being in the immediate aftermath of the bombing, as well as the toll that the impacts of the bombing have taken in the years since.  *See* C. Robertson Sr. Decl. ¶¶ 7, 9, 11, 13-14 (describing his "complete and utter terror" after learning about the bombing and the lasting emotional and mental impacts on him and his wife); R. Spruill Decl. ¶¶ 6-8, 12-14, 17 (describing being in a "haze" upon learning about the bombing, experiencing the ongoing effects of her husband's PTSD, and the ways in which the experience has changed them); Hale Decl. ¶¶ 6, 9 (describing the "anxiety-filled days" waiting for news of her husband's condition and the toll the impacts have taken emotionally in the years since).

Although the *Heiser* framework would award a baseline of $4,000,000 to each of these spouses, deviations are appropriate to make their awards proportional to the injuries and associated awards of their spouses.  Each spouse will receive half the award that their servicemember spouse received, which also ensures that no plaintiff-spouse receives a larger award than that of a physically and mentally injured servicemember plaintiff in this case, the lowest of which is Travis Leeper's award of $3,500,000.  Accordingly, Curtis Robertson, Sr. and Maria Hale will each receive an award of $3,000,000, and Rhonda Spruill will receive an award of $3,500,000.

### b. Parents

Eight of the family member plaintiffs will receive awards as parents of servicemembers who were injured at the Khobar Towers attack: Judith Kazmar, John Kazmar, Albert Mings, Rosie Caffey, Manuel Caffey, Jane Strader, James Weimer, and Bonita Weimer.  These parents have attested to their panic upon learning about the attack and in the days and years following as they struggled with increased anxiety over their children's safety and witnessing their children deal

with the psychological after-effects of the attack.[13]  These harms are consistent with those suffered by many parents of victims of terrorism.  *See Valencia*, 774 F. Supp. 2d at 16.

The parents of the injured and surviving servicemembers are each entitled to a baseline award of $2,500,000.  *See Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service members).  Here, Albert Mings, Rosie Caffey, Manuel Caffey, Jane Strader, James Weimer, and Bonita Weimer will receive an award of $2,500,000 each.

Two plaintiffs—Judith and John Kazmar—will receive awards of $1,875,000 each.  This downward departure is consistent with the $3,500,000 pain and suffering awards received by Travis Leeper, their servicemember child.  *See also, e.g.*, *Aceto*, 2020 WL 619925, at *22 (awarding this amount to parents whose servicemember children received a $3,000,000 award).

### c.  Children

Seven of the family member plaintiffs are children of servicemembers injured in the Khobar Towers bombing: Courtney Johnson, Curtis Robertson II, Kyle Bump, Angelique Mercier, Trisha Weber, Emily Edman, and Robert Edman.  These plaintiffs describe confusion or fear in the immediate aftermath of the bombing, *see* Co. Johnson Decl. ¶¶ 5-6; Mercier Decl. ¶ 6; Weber Decl. ¶ 7; E. Edman Decl. ¶ 6; R. Edman Decl. ¶ 6, and describe difficulties in their relationships with their servicemember parents that they attribute at least in part to the impacts of the bombing, *see* Co. Johnson Decl. ¶ 7; C. Robertson II Decl. ¶ 6; Bump Decl. ¶¶ 6, 8; Mercier Decl. ¶¶ 7-8; Weber Decl. ¶¶ 8-10, 12; E. Edman Decl. ¶¶ 7-8; R. Edman ¶ 6.  Although both Curtis Robertson II and Kyle Bump were too young at the time of the bombing to remember the events firsthand, *see* C. Robertson II Decl. ¶ 5 (attesting that he was two years old); Bump Decl. ¶ 6 (noting that he was "only a year" old at the time), this lack of awareness does not lessen the distress they

---

[13]     Ju. Kazmar Decl. ¶¶ 5-6; Jo. Kazmar Decl. ¶¶ 8-9; R. Caffey Decl. ¶¶ 7-8, 10, 13-14; M. Caffey Decl. ¶¶ 11, 14, 16-17; Strader Decl. ¶¶ 6-7, 9; J. Weimer Decl. ¶¶ 6-8; B. Weimer Decl. ¶¶ 6-8; 1st A. Mings Decl. ¶¶ 6, 9.

experienced from growing up with a parent suffering from psychological symptoms from the attack, *see* C. Robertson II Decl. ¶ 6 (describing these impacts); Bump Decl. ¶¶ 6, 8 (same); *see also, e.g.*, *Schooley*, 2019 WL 2717888, at \*78 (holding the same); *Aceto*, 2020 WL 619925, at \*22 (same).

"Children of a surviving victim receive $1.5 million on average" under the *Heiser* framework. *Spencer*, 71 F. Supp. 3d at 28. Courtney Johnson, Curtis Robertson II, Angelique Mercier, Robert Edman, Emily Edman, and Trisha Weber will each receive an award of $1,500,000, since each of their servicemember parents were awarded at least $5,000,000, meaning that no downward departure for proportionality is required.

Kyle Bump will receive an award of $750,000. This downward departure is consistent with the $3,000,000 pain and suffering award received by his servicemember parent (Shannon K. Bump) in *Schooley*. 2019 WL 2717888, at \*75.

### d. Siblings

Finally, eighteen of the family member plaintiffs are siblings or half-siblings of servicemember plaintiffs: Denise Rodriguez, David Giddens, Timothy Giddens, Tonya Caffey, Kareem Brown, Roger Dabriel, Cassandra Johnson, Latoya Sapp, Eunice Holman, Jeffrey Jiron, Christopher Burnham, Sandra Madden, Alexandria Capaccio, Vincent Capaccio, Anthony Coleman, Jason Coleman, Phillip Coleman, Jr., and Temeke Coleman. Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[14] These harms are consistent with those suffered by many siblings of victims of terrorism. *See Akins*, 332 F. Supp. 3d at 45. Within the *Heiser* framework, these

---

[14]     *See* Rodriguez Decl. ¶¶ 7-10; D. Giddens Decl. ¶¶ 7, 10; T. Giddens Decl. ¶¶ 6-8, 12-13; T. Caffey Decl. ¶¶ 9, 12-13; Brown Decl. ¶¶ 6-7, 9-10; Dabriel Decl. ¶¶ 6, 8-9; Ca. Johnson Decl. ¶¶ 5, 7, 9; Sapp Decl. ¶¶ 6, 8, 10; Holman Decl. ¶¶ 8-12; Jiron Decl. ¶¶ 6, 9-10, 13, 15; Burnham Decl. ¶¶ 6-7; Madden Decl. ¶¶ 6-7; A. Capaccio Decl. ¶¶ 6-7; V. Capaccio Decl. ¶¶ 6-12; A. Coleman Decl. ¶¶ 6-9; J. Coleman Decl. ¶¶ 7-9, 11; P. Coleman Decl. ¶¶ 6-8, 10; T. Coleman Decl. ¶¶ 7-8.

siblings of injured servicemembers are each entitled to an award of $1,250,000. *See id.* at 45 (awarding a baseline amount of $1,250,000 to siblings of injured service members).

### 4. *Punitive Damages*

In addition to compensatory damages, plaintiffs seek punitive damages under 28 U.S.C. § 1605A(c). *See* SAC ¶¶ 154-155 (Count V); Pls.' Mem. at 85-86. The Supreme Court has laid out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of reprehensibility of the defendants' misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Weighing this precedent, *Christie* awarded "[p]unitive damages equal to compensatory damages" in light of the "identified flaws in the [other] methods" for determining punitive damages. 2020 WL 3606273, at *27. Specifically, *Christie* determined that this method avoided the pitfalls of "a singular focus on deterrence," "elevat[ing] superficial similarities over meaningful ones," and "skim[ming] over analysis of the plaintiffs' precise harms," and does not "yield an excessive award." *Id.* at *28. Awarding punitive damages equal to compensatory damages, *Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial compensatory awards," *id.*, "'the compensatory damages for the injury suffered' . . . [were] 'based on a component which' would be 'duplicated in the punitive award,'" *id.* (quoting *State Farm*, 538 U.S. at 426), and "[a]dding hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by Iran] . . . [was] not likely to have a meaningful deterrent effect," *id.* at *29.

Given that *Christie* reached this conclusion based on the same event at issue in the present case, and that plaintiffs urge the Court to adopt this calculation, Pls.' Mem. at 86-87, the *Christie*

punitive damages approach, which has likewise been applied in other cases in this Court, *see, e.g.*, *Blank*, 2021 WL 3021450, at *13; *Ackley*, 2022 WL 3354720, at *60; *Gration*, 2023 WL 5221955, at *36; *Thole*, 2024 WL 2208208, at *17; *Est. of Johnson*, 2024 WL 3225954, at *16, will also be applied here.  Accordingly, a punitive damages award equal to the compensatory damages awarded in this case is most appropriate.  Plaintiffs are therefore entitled to a total punitive damages award of $132,000,000, to be apportioned among plaintiffs according to their compensatory damages.

### E.    Post-Judgment Interest

Finally, plaintiffs seek the award of post-judgment interest.  SAC at 42; *see also* Pls.' Mem. at 87.[15]  Post-judgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013); *Schooley*, 2019 WL 2717888, at *79.  Under federal law, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and "[s]uch interest shall be calculated from the date of the entry of judgment."  28 U.S.C. § 1961(a).  When post-judgment interest is sought, application of Section 1961(a) is mandatory, not discretionary.  *See, e.g.*, *Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 165; *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 78 (D.D.C. 2021).  Plaintiffs will therefore be awarded post-judgment interest at the statutory rate set out in 28 U.S.C. § 1961.

---

[15]    In the Second Amended Complaint, plaintiffs also sought prejudgment interest, *see* SAC at 42, but are silent on this demand in their Motion for Default Judgment, *see generally* Pls.' Mot.; *id.* at 87 (requesting post-judgment interest without mention of prejudgment interest).  In any event, insofar as plaintiffs do seek prejudgment interest, such request is denied because "nonpecuniary damages for pain and suffering and solatium 'do not typically require prejudgment interest because they are designed to be fully compensatory.'"  *Baker v. Islamic Republic of Iran*, No. 22-cv-2765 (BAH), 2025 WL 2480075 (D.D.C. Aug. 28, 2025) (quoting *Thuneibat*, 167 F. Supp. 3d at 54).

**IV.    CONCLUSION**

Plaintiffs' motion for default judgment is denied with respect to plaintiffs Dilcia H. Fernandez and the estate of Deborah Mings, and granted with respect to the remaining forty-seven plaintiffs.  Iran is liable for the pain and suffering inflicted on the eleven servicemember plaintiffs and for the emotional distress inflicted on the remaining thirty-six family member plaintiffs.

Monetary damages are awarded to plaintiffs in the following amounts, with post-judgment interest at the rate set out in 28 U.S.C. § 1961:

- Servicemember plaintiffs Jason Breezee, Bradley Donaghue, James Porter, Dale Robinson, Patrick Stark, James Mings, Amy Rancier, and Morgan Spruill are each awarded $7,000,000 in pain and suffering damages and $7,000,000 in punitive damages, totaling $14,000,000 each;

- Servicemember plaintiffs Kenneth Giddens and Lakisha Robertson are each awarded $6,000,000 in pain and suffering damages and $6,000,000 in punitive damages, totaling $12,000,000 each;

- Servicemember plaintiff Travis Leeper is awarded $3,500,000 in pain and suffering damages and $3,500,000 in punitive damages, totaling $7,000,000;

- Plaintiff-spouses Curtis Robertson, Sr. and Maria Hale are each awarded $3,000,000 in solatium damages and $3,000,000 in punitive damages, totaling $6,000,000 each;

- Plaintiff-spouse Rhonda Spruill is awarded $3,500,000 in solatium damages and $3,500,000 in punitive damages, totaling $7,000,000;

- Plaintiff-parents Albert Mings, Rosie Caffey, Manuel Caffey, Jane Strader, James Weimer, and Bonita Weimer are each awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages, totaling $5,000,000 each;

- Plaintiff-parents Judith Kazmar and John Kazmar are each awarded $1,875,000 in solatium damages and $1,875,000 in punitive damages, totaling $3,750,000 each;

- Plaintiff-children Courtney Johnson, Curtis Robertson II, Angelique Mercier, Trisha Weber, Emily Edman, and Robert Edman are each awarded $1,500,000 in solatium damages and $1,500,000 in punitive damages, totaling $3,000,000 each;

- Plaintiff-child Kyle Bump is awarded $750,000 in solatium damages and $750,000 in punitive damages, totaling $1,500,000;

- Plaintiff-siblings and half-siblings Denise Rodriguez, David Giddens, Timothy Giddens, Tonya Caffey, Kareem Brown, Roger Dabriel, Cassandra Johnson, Latoya Sapp, Eunice Holman, Jeffrey Jiron, Christopher Burnham, Sandra Madden, Alexandria Capaccio, Vincent Capaccio, Anthony Coleman, Jason Coleman, Phillip Coleman, Jr., and Temeke Coleman are each awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages, totaling $2,500,000 each.

Thus, the total compensatory damages award is $132,000,000 and the total punitive damages award is $132,000,000, for a total damages award against Iran of $264,000,000.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  September 24, 2025

_____
**BERYL A. HOWELL**
United States District Judge

68